**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| BRIAN DAVIS, derivatively on behalf of BROOKDALE SENIOR LIVING INC., | |
| Plaintiff, | Case No. _____ |
| vs. | |
| LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, and LEE S. WIELANSKY, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| BROOKDALE SENIOR LIVING INC., | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Brian Davis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Brookdale Senior Living Inc. ("Brookdale" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Lucinda M. Baier ("Baier"), T. Andrew Smith ("Smith"), Steven E. Swain ("Swain"), Marcus E. Bromley ("Bromley"), Frank M. Bumstead ("Bumstead"), Jackie M. Clegg ("Clegg"), Daniel A. Decker ("Decker"), Rita Johnson-Mills ("Johnson-Mills"), Jeffrey R. Leeds ("Leeds"), Mark J. Parrell

– 1 –

("Parrell"), William G. Petty, Jr. ("Petty"), Guy P. Sansone ("Sansone"), James R. Seward ("Seward"), Denise W. Warren ("Warren"), and Lee S. Wielansky ("Wielansky") (collectively, the "Individual Defendants," and together with Brookdale the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Brookdale, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Brookdale, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Brookdale's directors and officer from August 10, 2016 through April 29, 2020, both dates inclusive (the "Relevant Period").

2.      Brookdale, founded in 2005, is the largest operator of senior living communities in the United States based on total capacity, with 743 communities in 45 states and the ability to

- 2 -

serve approximately 65,000 residents as of February 1, 2020. The Company owns, leases, and manages independent living, assisted living, memory care, and continuing care retirement communities while offering a range of home health, hospice, and outpatient therapy services.

3.     Brookdale residents have been subject to an initial evaluation which determines the level of care each resident needed and, in turn, how much the Company charges each resident for its services under the Company's standard, uniform Residency Agreements (the "Residency Agreements"). To be sure, the more care a resident requires, the more expensive Brookdale's monthly fee has been, the increase in costs purportedly resulting from increased staffing needs.

4.     At the outset of Brookdale's formation, the Company took on an aggressive growth strategy through a series of acquisitions which have been fueled by massive financing. The Company's significant debt and lease obligations have required the Company to set and meet certain financial performance thresholds for Brookdale and each of its individual facilities throughout the United States. Moreover, those obligations are subject to cross-default and cross-collateralization provisions, which means that a default by Brookdale related to one facility could have a significant effect on a sizeable portion of the Company's community portfolio.

5.     As a result of the pressure for each Brookdale facility to satisfy those financial performance targets and avoid default under its extensive debt and lease obligations, the Company operates as a single entity, closely monitors and asserts tight-knit control over each aspect of the operations of every Brookdale managed facility in the United States. The Company almost exclusively operates out of its headquarters based in Brentwood, Tennessee.

6.     Among other ways, the Company utilized a computer software program, which Brookdale developed in-house, called the Service Alignment Software (the "Service Alignment

- 3 -

Software") to determine and regulate the Company's daily staffing needs at its facilities—Brookdale's largest line-item expense.

7.     To function, the Service Alignment Software required that individuals enter certain data such as task counts, task times, logic algorithms, and source code. To guarantee strict compliance with Company policies, particularly on facility staffing needs, the Individual Defendants ensured that facility-level employees did not have access to the Service Alignment Software and could not otherwise adjust staffing at Brookdale facilities.

8.     Throughout the Relevant Period the Individual Defendants caused the Company to: (i) intentionally underestimate the data inputs that were entered into the Service Alignment Software in a concerted effort to meet certain financial performance targets; (ii) as a result, systematically and purposefully set daily staffing numbers and hours at Brookdale facilities greatly beneath the staffing levels necessary to meet resident needs and the demand for care in Brookdale facilities, in accordance with their Personal Service Assessment (defined below); (iii) fail to permit the facility-level employees to adjust data inputs to the Service Alignment Software or facility staffing levels based upon known facility staffing needs; (iv) as a result of the foregoing, fail to provide prompt care and services to residents that had been paid for; (v) as a result of the foregoing, breach Brookdale's standard form Residency Agreements; (vi) as a result of the foregoing, violate state adult care home rules and regulations (collectively, the "Misconduct").

9.     In breach of their fiduciary duties, the Individual Defendants permitted the Misconduct, engaged and caused the Company to engage in the Misconduct, and failed to maintain adequate controls.

- 4 -

10.     Nonetheless, throughout the Relevant Period, several of the Company's annual and quarterly financial reports filed with the SEC on Form 10-Ks and 10-Qs failed to disclose the Misconduct and therefore contained serious errors that rendered them unreliable. Nevertheless, the Company's SEC filings issued throughout the Relevant Period maintained, *inter alia*, that Brookdale maintained adequate control over its financial reporting.

11.     On May 3, 2019, the Bright Action (defined below), was filed against Brookdale, captioned *Bright, et al. v. Brookdale Senior Living, Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn. 2019) seeking, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations. On April 24, 2020, the Gunza Action (defined below) was filed against Brookdale, captioned *Gunza, et al. v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn. 2020) seeking substantially similar relief as sought in the Bright Action.[1]

12.     On April 30, 2020, *Nashville Business Journal* published an article (the "April 2020 Article") which reported on the Gunza Action filed against the Company alleging that the Company had used computer software to "underestimate" staffing needs at each of its facilities to intentionally "chronically" understaff its facilities in North Carolina to satisfy financial performance targets and mislead Brookdale residents and their families by failing to provide "basic care" and "daily living services" that were paid for. The April 2020 Article further revealed that the Company's officers "routinely" scolded executive directors in emails related to staffing budgets. Finally, the April 2020 Article revealed that the Company had established lucrative incentive programs that were connected to satisfying or surpassing the Company's

---

[1] On June 23, 2020, the court granted a joint motion to consolidate the Bright Action with the Gunza Action. This consolidated action is referred to herein as the Consumer Class Action (defined below).

financial performance targets to induce employees to keep staffing expenses within budget regardless of need.

13. On this news, the Company's share price closed on May 1, 2020 at $3.12 per share, a $0.56 drop, or approximately 15.22%, from its closing price of $3.68 per share on April 29, 2020.

14. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Misconduct; (2) the Company's commercial success was maintained by, among other things, the Misconduct; (3) the Misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

15. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

16. During the Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

- 6 -

17.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Nearly 10.1 million shares of the Company's common stock were repurchased between September 2016 and March 2020 for nearly $72.5 million. As the Company stock was actually only worth $3.12 per share, the low price it reached during trading on May 1, 2020, the Company overpaid nearly $41.1 million in total.

18.     As a result of the Individual Defendants' misconduct, which has subjected Brookdale, to being named as a defendant in the federal consumer class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Consumer Class Action") and to being named, along with the Company's Chief Executive Officer ("CEO"), its former CEO, its Chief Financial Officer ("CFO"), as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and former CEO's liability in the Securities Class Action, their being beholden to each other,

their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Brookdale's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Tennessee or who has minimum contacts with

- 8 -

this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

25.     Venue is proper in this District because Brookdale and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

<strong>PARTIES</strong>

**Plaintiff**

26.     Plaintiff is a current shareholder of Brookdale common stock. Plaintiff purchased Brookdale common stock during the beginning of the Relevant Period. Plaintiff is a citizen of Florida.

**Nominal Defendant Brookdale**

27.     Nominal Defendant Brookdale is a Delaware corporation with its principal executive offices at 111 Westwood Place, Suite 400, Brentwood, TN 37027. Brookdale stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BKD."

**Defendant Baier**

28.     Defendant Baier has served as Brookdale's President and CEO and as a Company director since February 2018. Previously, Defendant Baier served as Brookdale's CFO from December 2015 until February 2018. According to the Company's Schedule 14A filed with the SEC on May 18, 2020 (the "2020 Proxy Statement"), on May 11, 2020, Defendant Baier beneficially owned 252,154 shares of the Company's common stock which represented less than

1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Baier owned over $743,854 worth of Brookdale stock as of that date.

29. For the fiscal year ended December 31, 2019, Defendant Baier received $6,350,901 in compensation from the Company. This included $910,000 in salary, $4,773,420 in stock awards, $657,295 in non-equity incentive plan compensation, and $10,186 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Baier received $4,674,255 in compensation from the Company. This included $782,248 in salary, $50,000 in bonus, $3,551,872 in stock awards, $281,023 in non-equity incentive plan compensation, and $9,112 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Baier received $2,407,188 in compensation from the Company. This included $550,000 in salary, $1,500,013 in stock awards, $196,150 in non-equity incentive plan compensation, and $161,025 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Baier received $2,492,367 in compensation from the Company. This included $552,115 in salary, $1,500,005 in stock awards, $222,750 in non-equity incentive plan compensation, and $217,497 in all other compensation.

30. The Company's 2020 Proxy Statement stated the following about Defendant Baier:

> Ms. Baier has served as Brookdale's President and Chief Executive Officer and as a member of the Board since February 2018, after having served as Brookdale's Chief Financial Officer since December 2015. Ms. Baier joined Brookdale from Navigant Consulting, Inc., a specialized global expert services firm, where she served as Executive Vice President and Chief Financial Officer since 2013. In addition, Ms. Baier has had multi-billion dollar operations responsibility, been the chief executive officer for a publicly-traded retailer, and served as an executive officer of a Fortune 30 company. Ms. Baier currently serves as a member of the

- 10 -

Board of Directors of the National Investment Center for the Seniors Housing & Care Industry (NIC), the Board of the Nashville Health Care Council where she chairs its finance and investment committee, and the New York Stock Exchange Board Advisory Council. Ms. Baier is a Certified Public Accountant and a graduate of Illinois State University, with B.S. and M.S. degrees in Accounting.

**Ms. Baier's continued leadership as the Company's President and Chief Executive Officer after demonstrating her abilities as a change-oriented executive as our Chief Financial Officer and in multiple leadership roles at other companies led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

31.     Upon information and belief, Defendant Baier is a citizen of Tennessee.

**Defendant Smith**

32.     Defendant Smith served as the Company's CEO from February 2013, as President from March 2016, and as a Company director from June 2014 until he resigned from all of his positions with the Company on February 28, 2018. Previously, he had served as Executive Vice President, General Counsel, and Secretary from October 2006 until February 2013.

33.     For the fiscal year ended December 31, 2018, Defendant Smith received $2,709,314 in compensation from the Company. This included $157,115 in salary and $2,552,199 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Smith received $1,315,829 in compensation from the Company. This included $950,000 in salary, $356,709 in non-equity incentive plan compensation, and $9,120 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Smith received $6,608,594 in compensation from the Company. This included $953,654 in salary, $5,225,007 in stock awards, $418,594 in non-equity incentive plan compensation, and $11,339 in all other compensation.

- 11 -

34. The Company's Schedule 14A filed with the SEC on August 14, 2017 (the "2017 Proxy Statement") stated the following about stated the following about Defendant Smith:

> **T. Andrew Smith** has over 25 years of experience in seniors housing, mergers and acquisitions, real estate and capital markets transactions, corporate finance and healthcare. Mr. Smith has served as our Chief Executive Officer since February 2013, as our President since March 2016, and as a member of the Board since June 2014. From October 2006 to February 2013, Mr. Smith served as our Executive Vice President, General Counsel and Secretary. In addition to his role in managing our legal affairs, Mr. Smith was responsible for the management and oversight of our corporate development functions (including acquisitions and expansion and development activity); corporate finance (including capital structure, debt and lease transactions and lender/lessor relations); strategic planning; and risk management. Prior to joining Brookdale, Mr. Smith served as a member of Bass, Berry & Sims PLC's corporate and securities group and as chair of the firm's healthcare group. During his tenure at Bass, Berry & Sims (1985 to 2006), Mr. Smith represented American Retirement Corporation as outside General Counsel. He currently serves as a member of the board of directors of the Nashville Health Care Council, Argentum and the National Investment Center for the Seniors Housing & Care Industry (NIC) and as a member of the executive board of the American Seniors Housing Association (ASHA). Mr. Smith's knowledge of the senior housing industry and his experience as our President and Chief Executive Officer, and previously as our Executive Vice President, General Counsel and Secretary, led to the conclusion that he should serve as a member of the Board.

35. Upon information and belief, Defendant Smith is a citizen of Tennessee.

**Defendant Swain**

36. Defendant Swain has served as the Company's CFO since September 2018. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Swain beneficially owned 22,659 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Defendant Swain owned over $66,844 worth of Brookdale stock as of that date.

- 12 -

37. For the fiscal year ended December 31, 2019, Defendant Swain received $2,117,449 in compensation from the Company. This included $515,000 in salary, $1,306,414 in stock awards, $275,545 in non-equity incentive plan compensation, and $20,490 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Swain received $1,272,135 in compensation from the Company. This included $161,538 in salary, $100,000 in bonus, $802,324 in stock awards, $46,038 in non-equity incentive plan compensation, and $162,235 in all other compensation.

38. The Company's 2020 Proxy Statement stated the following about Defendant Swain:

> **Steven E. Swain** joined Brookdale as Executive Vice President and Chief Financial Officer in September 2018. Prior to joining Brookdale, Mr. Swain served as Senior Vice President and Chief Financial Officer of DISH Network Corporation from October 2014 to August 2018, after having served as its Senior Vice President of Programming from April 2014 to October 2014, and as its Vice President of Corporate Financial Planning and Analysis since joining the company in 2011. Prior to DISH Network, Mr. Swain spent more than 15 years working in the telecommunications sector, most recently at CenturyLink, Inc. and Qwest Communications International, Inc. (acquired by CenturyLink), where he served in multiple leadership roles in finance, including corporate financial planning and analysis, treasury, and investor relations, as well as in network engineering. Mr. Swain earned his B.S. degree in Chemical Engineering from the University of Wisconsin–Madison and his M.B.A. degree from the University of Chicago Booth School of Business.

39. Upon information and belief, Defendant Swain is a citizen of Colorado.

**Defendant Bromley**

40. Defendant Bromley has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Bromley beneficially owned 75,171 shares of the Company's common stock which represented less than 1% of the

- 13 -

Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Bromley owned over $221,754 worth of Brookdale stock as of that date.

41.     For the fiscal year ended December 31, 2019, Defendant Bromley received $256,995 in compensation from the Company. This included $157,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Bromley received $230,831 in compensation from the Company. This included $187,000 in fees earned and cash paid and $43,831 in stock awards. For the fiscal year ended December 31, 2017, Defendant Bromley received $203,472 in compensation from the Company.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Bromley:

> Mr. Bromley brings more than 35 years of real estate industry leadership experience. He served as Chairman of the Board and Chief Executive Officer of Gables Residential Trust from 1993 until 2000, and then as a member of its Board until the company was acquired in 2005. Prior to joining Gables Residential Trust, Mr. Bromley was a division partner for the Southeast operation of Trammell Crow Residential Company. Mr. Bromley has served as a member of the Board of Cole Credit Property Trust V, Inc., a non-listed real estate investment trust, since March 2015 and served as its Non-Executive Chairman from June 2015 to August 2018. Mr. Bromley also currently serves as a member of the advisory board of Nancy Creek Capital Management, LLC, a private mezzanine debt and equity investment firm, and Sealy Industrial Partners, a private partnership specializing in the acquisition and operation of various industrial real estate properties. Mr. Bromley holds a B.S. in Economics from Washington & Lee University and an M.B.A. from the University of North Carolina.
>
> **Mr. Bromley's significant executive, leadership, and advisory experience in the real estate industry led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

43.     Upon information and belief, Defendant Bromley is a citizen of Georgia.

- 14 -

**Defendant Bumstead**

44.     Defendant Bumstead has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Bumstead beneficially owned 300,224 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Defendant Bumstead owned over $885,660 worth of Brookdale stock as of that date.

45.     For the fiscal year ended December 31, 2019, Defendant Bumstead received $289,995 in compensation from the Company. This included $190,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Bumstead received $315,994 in compensation from the Company. This included $216,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Bumstead received $379,992 in compensation from the Company. This included $280,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Bumstead received $320,995 in compensation from the Company. This included $221,000 in fees earned and cash paid and $99,995 in stock awards.

46.     The Company's 2020 Proxy Statement stated the following about Defendant Bumstead:

> Mr. Bumstead has over 40 years' experience in the field of business and investment management and financial and investment advisory services, including representing buyers and sellers in a number of merger and acquisition transactions. Mr. Bumstead is a principal shareholder of Flood, Bumstead,

- 15 -

McCready & McCarthy, Inc., a business management firm that represents artists, songwriters and producers in the music industry as well as athletes and other high net worth clients, and has been with the firm since 1989. From 1993 to December 1998, Mr. Bumstead served as the Chairman and Chief Executive Officer of FBMS Financial, Inc., a registered investment advisor. He served in 2015 as Chairman of the Board of Directors of the Country Music Association and is also Vice Chairman of the Board of Directors and Chairman of the Finance and Investment Committee of the Memorial Foundation, Inc., a charitable foundation. In addition, he previously served as a member of the Board of Advisors of United Supermarkets of Texas, LLC and was Chairman of its Finance and Audit Committee. Mr. Bumstead received a B.B.A. degree from Southern Methodist University and a Masters of Business Management from Vanderbilt University's Owen School of Management.

**Mr. Bumstead's experience in business management and as a director of several public companies, along with his knowledge of the senior housing industry (through his prior service as a director of ARC), led to the conclusion that he should serve as a member of the Board.**

47.     Upon information and belief, Defendant Bumstead is a citizen of Tennessee.

**<u>Defendant Clegg</u>**

48.     Defendant Clegg served as a Company director from November 2005 until October 29, 2019. She also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and as a member of the Audit Committee.

49.     For the fiscal year ended December 31, 2019, Defendant Clegg received $349,047 in compensation from the Company. This included $249,052 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Clegg received $322,994 in compensation from the Company. This included $223,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Clegg received $390,992 in compensation from the Company. This included $291,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended

- 16 -

December 31, 2016, Defendant Clegg received $339,995 in compensation from the Company. This included $240,000 in fees earned and cash paid and $99,995 in stock awards.

50. The Company's amended annual report filed on a form 10-K/A with the SEC on April 29, 2019 (the "2018 10-K/A") stated the following about Defendant Clegg:

> Ms. Clegg brings extensive transactional and financial experience, along with expertise in corporate governance and public policy, through her work as a strategic consultant, in government service and as a director of a number of public companies. She founded the strategic consulting firm Clegg International Consultants, LLC, and has served as its Managing Partner since 2001. Prior to that, Ms. Clegg was nominated by the President of the United States and confirmed by the U.S. Senate to serve as the Vice Chair of the Board of Directors and First Vice President of the Export-Import Bank of the United States, the official export credit institution of the United States of America, and then served as Chief Operating Officer. In her role with the Export-Import Bank, Ms. Clegg had direct supervisory responsibilities for the financial operations of the Export-Import Bank and was responsible for financing more than $50 billion in U.S. exports and a portfolio of $65 billion, budgeting decisions for the Export-Import Bank's operational and program budgets and opening Export-Import Bank programs in several countries. Ms. Clegg also served as chair of the Loan and Audit Committees of the Board of Directors and as chair of the Budget Task Force and the Technology and Pricing Committees of the Export-Import Bank. Prior to her Export-Import Bank service, Ms. Clegg worked in the U.S. Senate, focusing on international finance and monetary policy, national security and foreign affairs. Ms. Clegg also draws on her significant experience in service on the boards of directors of public companies and private organizations. She currently serves on the Board of Directors and chairs the Audit Committee of the Public Welfare Foundation. She has previously served as a director of CME Group Inc. (the parent company of the Chicago Mercantile Exchange), the Chicago Board of Trade, Cardiome Pharma Corp., Javelin Pharmaceuticals, Inc., IPC Holdings, Ltd. and Blockbuster, Inc. She previously chaired the Nominating and Corporate Governance Committees of Blockbuster, Inc., IPC Holdings, Ltd. and Cardiome Pharma Corp. and the Audit Committees of the IPC Holdings, Ltd., Chicago Board of Trade, Cardiome Pharma Corp. and Javelin Pharmaceuticals, Inc. She has also chaired and served on numerous special committees overseeing mergers, acquisitions, and financing transactions and has helped companies through the IPO process. Based on her current and former positions and directorships, Ms. Clegg has gained significant financial, corporate governance, public policy, infrastructure, operating and real estate experience.

- 17 -

**Ms. Clegg's extensive transactional and financial experience, as well as her experience in the public sector and as a director of numerous public companies (including her service as chairman of the foregoing standing and special committees) led to the conclusion that she should serve as a member of the Board.**

51.    Upon information and belief, Defendant Clegg is a citizen of Washington, D.C.

**Defendant Decker**

52.    Defendant Decker served as Executive Chairman of the Board from November 1, 2016 until he resigned effective March 1, 2018. Previously, he served as Non-Executive Chairman of the Board from October 2015 until October 31, 2016. He also served as a member of the Investment Committee.

53.    For the fiscal year ended December 31, 2018, Defendant Decker received $221,656 in compensation from the Company. This included $138,077 in fees earned and cash paid, $80,047 in stock awards, and $3,532 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Decker received $705,966 in compensation from the Company. This included $687,500 in fees earned and cash paid and $18,466 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Decker received $1,082,164 in compensation from the Company. This included $479,167 in fees earned and cash paid, $591,313 in stock awards, and $11,685 in all other compensation.

54.    The Company's 2017 Proxy Statement stated the following about Defendant Decker:

> **Daniel A. Decker** has been investing in the senior living industry for more than 25 years. He joined the Board in October 2015 as Non-Executive Chairman of the Board, and was appointed as Executive Chairman of the Board effective November 1, 2016. Mr. Decker is the President and owner of CoastWood Senior Housing Partners, LLC, an investment firm specializing in seniors housing and related services, which he founded in 2006. In January 2013, CoastWood joined

- 18 -

with KKR and Beecken Petty O'Keefe & Company to acquire the operations of Sunrise Senior Living, one of the leading operators of assisted living properties in the United States. The group sold its interest in Sunrise in 2014. Prior to forming CoastWood, Mr. Decker was a partner from 1990 to 2006 at The Hampstead Group, LLC, a private equity firm with a focus on real estate related, operating intensive businesses such as lodging and seniors housing. Mr. Decker was an attorney at the law firm of Decker, Hardt, Kopf, Harr, Munsch & Dinan (now known as Munsch Hardt Kopf & Harr, P.C.) from 1985 to 1990, which he co-founded in 1985, and was an attorney at Winstead PC from 1980 to 1985. Mr. Decker served on the Boards of Directors of Sentio Healthcare Properties, Inc. (a public, non-listed REIT) from March 2013 until September 2015, during which time he served as a member of the Investment Committee, and Health Care REIT, Inc. from October 2011 until August 2012, during which time he served as a member of the Audit, Investment, Nominating/Corporate Governance and Planning Committees. Mr. Decker also has served on the boards of directors of several other public companies, including Omega Healthcare Investors, Inc. (where he served as Executive Chairman and then as Chairman of the Board), Bristol Hotel Company, Wyndham Hotel Company and the Forum Group. Mr. Decker earned his Bachelor of Science in Business Administration degree in economics from the University of Missouri-Columbia, and his J.D. from the University of Missouri-Kansas City. Mr. Decker's significant experience in the senior living and real estate industries, as well as his extensive strategic, investment and transactional experience, led to the conclusion that he should serve as a member of the Board.

55.     Upon information and belief, Defendant Decker is a citizen of California.

**Defendant Johnson-Mills**

56.     Defendant Johnson-Mills has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Johnson-Mills beneficially owned 41,907 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Defendant Johnson-Mills owned over $123,625 worth of Brookdale stock as of that date.

- 19 -

57.     For the fiscal year ended December 31, 2019, Defendant Johnson-Mills received $211,976 in compensation from the Company. This included $170,609 in fees earned and cash paid and $41,367 in stock awards. For the fiscal year ended December 31, 2018, Defendant Johnson-Mills received $155,024 in compensation from the Company. This included $55,033 in fees earned and cash paid and $99,991 in stock awards.

58.     The Company's 2020 Proxy Statement stated the following about Defendant Johnson-Mills:

> Ms. Johnson-Mills is an experienced healthcare executive, with more than 20 years of experience in the broader healthcare industry, including experience in the public sector. She is founder and CEO of RJM Enterprises. Ms. Johnson-Mills served from August 2014 to December 2017 as President and Chief Executive Officer of UnitedHealthcare Community Plan of Tennessee, a health plan serving more than 500,000 government sponsored healthcare consumers with over $2.5 billion of annual revenue, after having previously served as Senior Vice President, Performance Excellence and Accountability for UnitedHealthcare Community & State since 2006. Ms. Johnson-Mills also previously served as the Director of Medicaid Managed Care for the Centers for Medicare and Medicaid Services and as Chief Executive Officer of Managed Health Services Indiana and Buckeye Health Plan, wholly owned subsidiaries of Centene Corporation. Ms. Johnson-Mills earned a B.S. degree from Lincoln University and an M.A. degree in Labor and Human Resource Management and M.P.A. degree in Public Policy and Management from The Ohio State University.
>
> **Ms. Johnson-Mills' experience as an executive in the healthcare space, including her expertise in healthcare operations and strategy, led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

59.     Upon information and belief, Defendant Johnson-Mills is a citizen of Tennessee.

**Defendant Leeds**

60.     Defendant Leeds served as a Company director from November 2005 until his resignation effective October 4, 2018. He also served as Non-Executive Chairman of the Board from June 2012 until September 2015. Defendant Leeds also served as a member of the

- 20 -

Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee.

61. For the fiscal year ended December 31, 2018, Defendant Leeds received $273,081 in compensation from the Company. This included $173,087 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Leeds received $373,992 in compensation from the Company. This included $274,000 in fees earned and cash paid and $99,992 in stock awards.

62. The Company's 2017 Proxy Statement stated the following about Defendant Leeds:

**Jeffrey R. Leeds** is a financial services industry veteran with extensive experience in mergers, acquisitions and dispositions, capital markets and public company management. Mr. Leeds retired as Executive Vice President and Chief Financial Officer of GreenPoint Financial Corporation and GreenPoint Bank in October 2004, having served since January 1999. Prior to that, he was Executive Vice President, Finance and Senior Vice President and Treasurer of GreenPoint. Prior to GreenPoint, Mr. Leeds was with Chemical Bank for 14 years, having held positions as Head of Asset and Liability Management, Proprietary Trading and Chief Money Market Economist. Mr. Leeds has been an independent member of the Board since November 2005 and served as Non-Executive Chairman of the Board from June 2012 through September 2015. He previously served as a director and chair of the Audit Committee of Och-Ziff Capital Management Group LLC and as a director and Audit Committee member of United Western Bancorp. Mr. Leeds received a B.A. in economics from the University of Michigan and an MBA and M.Ph. from Columbia University. Mr. Leeds' experience as an executive and principal financial officer, along with his extensive financial industry and transactional expertise, led to the conclusion that he should serve as a member of the Board.

63. Upon information and belief, Defendant Leeds is a citizen of New York.

**Defendant Parrell**

- 21 -

64.     Defendant Parrell served as a Company director from April 2015 until his resignation effective July 24, 2017 at the Company's annual meeting. He also served as a member of the Audit Committee and Investment Committee.

65.     For the fiscal year ended December 31, 2017, Defendant Parrell received $213,514 in compensation from the Company. This included $113,522 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Parrell received $259,306 in compensation from the Company. This included $190,000 in fees earned and cash paid and $69,306 in stock awards.

66.     The Company's 2017 Proxy Statement stated the following about Defendant Parrell:

> **Mark J. Parrell** brings to Brookdale over 20 years of real estate, capital markets, mergers and acquisitions and investment experience. He has served as the Executive Vice President and Chief Financial Officer of Equity Residential, the largest United States apartment real estate investment trust, since October 2007. Mr. Parrell was Senior Vice President and Treasurer of Equity Residential from August 2005 to October 2007, and served in various roles in the company's finance group since September 1999. He currently serves as the Chair of the Finance Committee of the National Multifamily Housing Council and is a member of the Urban Land Institute. Mr. Parrell joined our Board of Directors in April 2015 and is an independent director. He served as a director of Aviv REIT, Inc. from March 2013 until it was acquired on April 1, 2015. Mr. Parrell holds a B.B.A. from the University of Michigan and a J.D. from the Georgetown University Law Center. Mr. Parrell's extensive real estate, capital markets, mergers and acquisitions and investment experience, including his experience as the principal financial officer of an S&P 500 REIT, led to the conclusion that he should serve as a member of the Board of Directors.

67.     Upon information and belief, Defendant Parrell is a citizen of Illinois.

**Defendant Petty**

- 22 -

68.     Defendant Petty served as a Company director from December 2014 until his resignation effective February 21, 2018. He also served as the Chair of the Investment Committee and as a member of the Nominating and Corporate Governance Committee.

69.     For the fiscal year ended December 31, 2018, Defendant Petty received $115,883 in compensation from the Company. This included $15,889 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Petty received $214,992 in compensation from the Company. This included $115,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Petty received $308,995 in compensation from the Company. This included $209,000 in fees earned and cash paid and $99,995 in stock awards.

70.     The Company's 2017 Proxy Statement stated the following about Defendant Petty:

> **William G. Petty, Jr.** brings to Brookdale nearly 30 years of experience in the healthcare services industry, as well as extensive operational, investment and transactional experience in the senior living industry, and a robust background in finance. He joined the Board in December 2014 and is an independent director. Mr. Petty is a partner of Beecken Petty O'Keefe & Company, a private equity management firm he co-founded in 1996, which currently has approximately $1.3 billion under management. Mr. Petty's prior leadership experience includes service as Chairman of the Board of Directors of Sunrise Senior Living, Inc. from January 2013 to April 2014; as Chief Executive Officer of Alternative Living Services, Inc./Alterra Healthcare Corporation from 1993 to 1996 and as its Chairman from 1993 to 2000; as Chairman, President and Chief Executive Officer of Evergreen Healthcare, Inc. and as a director of that company's publicly-traded successors (GranCare, Inc. and Mariner Health Care Inc.); and as a director and member of the executive committee of Forum Group, Inc. In 1985, he co-founded Omega Capital Ltd., a private investment fund focused on the healthcare industry, which formed Omega Healthcare Investors, Inc., a healthcare REIT, during his tenure as managing director. In addition, he has served on the boards of directors of several Beecken Petty portfolio companies. Mr. Petty received a B.S. in Business Administration from the University of Illinois. Mr. Petty's significant executive experience in the senior living and healthcare services industries, as

- 23 -

well as his extensive operational, investment and transactional experience, led to the conclusion that he should serve as a member of the Board.

71. Upon information and belief, Defendant Petty is a citizen of Illinois.

**Defendant Sansone**

72. Defendant Sansone has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Sansone beneficially owned 2,491 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Sansone owned over $7,348 worth of Brookdale stock as of that date.

73. For the fiscal year ended December 31, 2019, Defendant Sansone received $120,387 in compensation from the Company. This included $20,391 in fees earned and cash paid and $99,996 in stock awards.

74. The Company's 2020 Proxy Statement stated the following about Defendant Sansone:

> Mr. Sansone joined Brookdale's Board in October 2019 and became Non-Executive Chairman of the Board in January 2020. For more than 25 years, he has led efforts to optimize the performance of healthcare and senior housing companies. Mr. Sansone has served as Chairman and CEO of H2 Health, a leading regional provider of physical rehabilitation services and clinician staffing solutions, since February 2020. Prior to that, he served as a Managing Director of Alvarez & Marsal, a global professional services firm specializing in performance improvement for large, high profile businesses, where he served as Chairman of the firm's Healthcare Industry Group, which he founded in 2004. Mr. Sansone also served as interim Chief Executive Officer of the Visiting Nurse Service of New York, the largest non-profit home and community-based health care organization in the United States, from November 2014 to December 2016 and, prior to that, served in various executive roles at numerous healthcare companies. His prior experience in the senior housing industry includes having served as

- 24 -

Chief Restructuring Officer and a member of the Board of Erickson Retirement Communities and as a senior consultant to Sunrise Senior Living. He also serves and has served on the Boards of Directors of numerous investor-owned and not-for-profit companies, primarily in the healthcare industry. Mr. Sansone earned a B.S. in Economics from the State University of New York at Albany.

**Mr. Sansone's executive, senior advisory, and board leadership of public and private organizations, including his extensive service to companies in the healthcare, and senior housing industries, led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

75.     Upon information and belief, Defendant Sansone is a citizen of South Carolina.

**Defendant Seward**

76.     Defendant Seward served as a Company director from November 2008 until his resignation effective October 29, 2019. He also served as a member of the Audit Committee.

77.     For the fiscal year ended December 31, 2019, Defendant Seward received $327,403 in compensation from the Company. This included $227,408 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Seward received $326,161 in compensation from the Company. This included $226,167 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Seward received $367,159 in compensation from the Company. This included $267,167 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Seward received $309,995 in compensation from the Company. This included $210,000 in fees earned and cash paid and $99,995 in stock awards.

78.     The Company's 2018 10-K/A stated the following about Defendant Seward:

James R. Seward has extensive experience in senior management and oversight in the investment sector, including significant experience in mergers and acquisitions and capital markets transactions. Mr. Seward is a Chartered Financial Analyst and, since 2000, has been a private investor. Previously, Mr. Seward was

- 25 -

Executive Vice President, Chief Financial Officer, and director of Seafield Capital Corporation, a publicly-traded investment holding company. In that capacity, Mr. Seward also served as a director and as a member of the executive committee and as Audit Committee Chairman of LabOne, a provider of health screening and risk assessment services to life insurance companies and clinical diagnostic testing services to healthcare providers, until LabOne was sold to Quest Diagnostics in 2005. Mr. Seward also previously served as Chief Executive Officer and President of SLH Corporation, a spin-off of Seafield Capital Corporation. He also currently serves as Chairman of the Board of Trustees and as a member of the Audit Committee and Valuation, Portfolio and Performance Committee of RBC Funds, a registered investment company. He previously served as a director of ARC and has also served as a member of the Board of Directors and Audit Committee of Syntroleum Corporation. Mr. Seward received a Bachelor of Arts degree from Baker University, a Masters in Public Administration, City Management from the University of Kansas and a Masters in Business Administration, Finance from the University of Kansas.

**Mr. Seward's experience and credentials in investing and finance, along with his knowledge of both the senior housing industry (through his prior service as a director of ARC) and the health care industry (through his prior service as a director of LabOne), led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

79.     Upon information and belief, Defendant Seward is a citizen of Kansas.

**Defendant Warren**

80.     Defendant Warren has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Warren beneficially owned 48,606 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Warren owned over $143,387 worth of Brookdale stock as of that date.

- 26 -

81. For the fiscal year ended December 31, 2019, Defendant Warren received $196,882 in compensation from the Company. This included $172,500 in fees earned and cash paid and $24,382 in stock awards. For the fiscal year ended December 31, 2018, Defendant Warren received $132,181 in compensation from the Company. This included $32,185 in fees earned and cash paid and $99,996 in stock awards.

82. The Company's 2020 Proxy Statement stated the following about Defendant Warren:

> Ms. Warren brings more than 30 years of operational, financial, and healthcare experience. Since October 2015, she has served as Executive Vice President and Chief Operating Officer of WakeMed Health & Hospitals, where she is responsible for the strategic, financial, and operational performance of the organization's network of facilities in the North Carolina Research Triangle area. Prior to that, from 2005 to September 2015, Ms. Warren served as Chief Financial Officer of Capella Healthcare, Inc., an owner and operator of general acute-care hospitals, as well as its Executive Vice President since January 2014, and as its Senior Vice President prior to that. Before joining Capella, she served as Senior Vice President and Chief Financial Officer of Gaylord Entertainment Company from 2000 to 2001, as Senior Equity Analyst and Research Director for Avondale Partners LLC, and as Senior Equity Analyst for Merrill Lynch & Co. Ms. Warren earned a B.S. degree in Economics from Southern Methodist University and an M.B.A. from Harvard University.
>
> **Ms. Warren's extensive executive, financial, and operational experience in the healthcare and other industries led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

83. Upon information and belief, Defendant Warren is a citizen of North Carolina.

### Defendant Wielansky

84. Defendant Wielansky has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until

- 27 -

December 31, 2019. He also served as a member of the Compensation Committee. According to the 2020 Proxy Statement, on May 11, 2020, Defendant Wielansky beneficially owned 101,338 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Wielansky owned over $298,947 worth of Brookdale stock as of that date.

85.     For the fiscal year ended December 31, 2019, Defendant Wielansky received $506,604 in compensation from the Company. This included $406,609 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Wielansky received $553,577 in compensation from the Company. This included $453,583 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Wielansky received $361,992 in compensation from the Company. This included $262,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Wielansky received $274,306 in compensation from the Company. This included $205,000 in fees earned and cash paid and $69,306 in stock awards.

86.     The Company's 2020 Proxy Statement stated the following about Defendant Wielansky:

> Mr. Wielansky has more than 40 years of commercial real estate investment, management, and development experience. He currently serves as Chairman and CEO of Opportunistic Equities, which specializes in low income housing. He has also served as Chairman and CEO of Midland Development Group, Inc., which he re-started in 2003 and focused on the development of retail properties in the midwest and southeast. Prior to Midland, he served as President and CEO of JDN Development Company, Inc. and as a director of JDN Realty Corporation. Before joining JDN, he served as Managing Director–Investments of Regency Centers Corporation, which in 1998 acquired Midland Development Group, a retail properties development company co-founded by Mr. Wielansky in 1983.

- 28 -

Mr. Wielansky served as Brookdale's Non-Executive Chairman of the Board from February 2018 through December 2019. He received a bachelor's degree in Business Administration, with a major in Real Estate and Finance, from the University of Missouri—Columbia, where he is currently a member of the Strategic Development Board of the College of Business. He also serves on the Board of Directors of The Foundation for Barnes-Jewish Hospital.

**Mr. Wielansky's real estate investment, management, and development experience, as well as his service as a director of several public companies, led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

87.     Upon information and belief, Defendant Wielansky is a citizen of Missouri.

**Non-Party Freed**

88.     Non-Party Victoria L. Freed ("Freed") has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, on May 11, 2020, Freed beneficially owned 2,491 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $2.95, Freed owned over $7,348 worth of Brookdale stock as of that date.

89.     For the fiscal year ended December 31, 2019, Freed received $124,387 in compensation from the Company. This included $24,391 in fees earned and cash paid and $99,996 in stock awards.

90.     The Company's 2020 Proxy Statement stated the following about Freed:

Ms. Freed brings more than 25 years of executive leadership in the areas of sales, customer service, and marketing, and has earned numerous awards for outstanding achievement in sales and marketing during her career. Ms. Freed is Senior Vice President of Sales, Trade Support and Service for Royal Caribbean International, having served in that role since 2008, where she oversees the largest sales team in the cruise line industry and also manages the company's consumer

- 29 -

outreach, reservations, group sales, and customer service functions. Prior to her service with Royal Caribbean, Ms. Freed worked for 29 years with Carnival Cruise Lines, where she served as Senior Vice President of Sales and Marketing during the last 15 years of her tenure. She is a trustee of the United Way of Miami-Dade County and serves as a member of the board of Jewish Adoption and Foster Care Options (JAFCO). Ms. Freed earned a bachelor's degree in business with an emphasis in marketing from the University of Colorado.

**Ms. Freed's decades of executive leadership in sales, customer service, and marketing in the hospitality industry led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

91.     By reason of their positions as officers, directors and/or fiduciaries of Brookdale and because of their ability to control the business and corporate affairs of Brookdale, the Individual Defendants owed Brookdale and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Brookdale in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Brookdale and its shareholders so as to benefit all shareholders equally.

92.     Each director and officer of the Company owes to Brookdale and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

93.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Brookdale, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

- 30 -

94. To discharge their duties, the officers and directors of Brookdale were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

95. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Brookdale, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Brookdale's Board at all relevant times.

96. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

- 31 -

97.     To discharge their duties, the officers and directors of Brookdale were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Brookdale were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, the United States, and pursuant to Brookdale's own internal guidelines, including its Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Brookdale conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Brookdale and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Brookdale's operations would comply with

all laws and Brookdale's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

98.    Each of the Individual Defendants further owed to Brookdale and the shareholders the duty of loyalty requiring that each favor Brookdale's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

99.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Brookdale and were at all times acting within the course and scope of such agency.

- 33 -

100.    Because of their advisory, executive, managerial, and directorial positions with Brookdale, each of the Individual Defendants had access to adverse, non-public information about the Company.

101.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Brookdale.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

102.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

103.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

104.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate

- 34 -

applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Brookdale was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

105. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

106. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brookdale, and was at all times acting within the course and scope of such agency.

## BROOKDALE'S CODE OF CONDUCT

107. Pursuant to the 2020 Proxy Statement, the Code of Conduct "applies to all employees, directors, and officers[.]"

108. The Code of Conduct provides that its purpose is to "serve as a guide in doing [our] jobs the way they should be done - according to the highest ethical and professional standards and in accordance with applicable laws and regulations."

109. The Code of Conduct provides, in the section titled "Associates, Conflicts of Interest, Corporate Opportunities and Gifts" that:

> Brookdale associates, officers and directors are expected to dedicate their best
> efforts to advancing Brookdale's interests and to make decisions that affect

- 35 -

Brookdale based on the Company's best interests, independent of outside influences. Except as provided in Article Eight of the Company's Amended and Restated Certificate of Incorporation, every associate, officer and director must avoid any situation that conflicts or appears to conflict with the interests of Brookdale. A conflict of interest can arise when an associate or a related party can personally benefit or profit from a transaction involving Brookdale and the associate or related party, or where an associate's personal interests influence or appear to influence his or her ability to make objective decisions in the course of performing his or her job duties.

* * *

Special rules apply to executive officers and directors who engage in conduct that creates an actual, apparent or potential conflict of interest. Before engaging in any such conduct, executive officers and directors must make full disclosure of all facts and circumstances to the General Counsel, who shall inform and seek the prior approval of the Audit Committee of the Board of Directors.

110.    The Code of Conduct provides, in the section titled "Health Care," in relevant part, that:

Brookdale intends to comply with state and federal laws relating to health care providers and to ensure that associates and agents of Brookdale comply with these laws. Brookdale endeavors to follow the highest standards of ethics, honesty and integrity in conducting transactions and relationships with physicians, insurers, clients, state and federal government agencies and any other health care related entities. Associates whose responsibilities include providing resident care should receive annual training regarding these health care standards.

111.    The Code of Conduct provides, in the section titled "Finance and Business Matters," in relevant part, that:

In compliance with the Sarbanes-Oxley Act of 2002 and related Securities and Exchange Commission ("SEC") regulations, the Company has established a written Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"). Amendments to or implicit or explicit waivers of the Code of Ethics will be disclosed as required by SEC rules. The Code of Ethics has been designed to deter wrongdoing and to promote honest and ethical conduct, including the ethical handling of any actual or apparent conflicts of interest; full, fair, accurate, timely and understandable disclosure in Brookdale's SEC filings and submissions, as well as other public communications by the Company; compliance with applicable laws, rules and regulations; and prompt reporting of

- 36 -

any violations or suspected violations of the Code of Ethics or applicable law. To the extent of any inconsistency between the terms of this Code and the Code of Ethics, the requirements of the Sarbanes-Oxley Act shall control.

\* \* \*

**Marketing and Advertising**
Advertising and marketing materials need to conform to state and federal laws and
regulations regarding these activities. Brookdale advertising should be truthful and not misleading. Specific claims about the quality of Brookdale's services should be supportable. Price advertising should accurately reflect the true charge for services provided to residents.

Brookdale will not use advertisements or marketing programs that might cause confusion between Brookdale's services and those of our competitors. Brookdale will not disparage the service or business of a competitor through the use of false or misleading representations.

\* \* \*

**Fair Dealing**
Brookdale depends on its reputation for quality, service and integrity. The way we deal with our residents, competitors and suppliers molds our reputation, builds long-term trust and ultimately determines our success. Associates, officers and directors should endeavor to deal fairly with Brookdale's residents, competitors, suppliers and associates. We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

112.    The Code of Conduct provides, in the section titled "Information, Records and

Company Assets," in relevant part, that:

**Complaints and Concerns Regarding Accounting Matters**
Brookdale is committed to compliance with applicable securities and other laws, rules and regulations, accounting standards and internal accounting controls. It is the responsibility of every Brookdale associate to promptly report complaints or concerns regarding accounting, internal accounting controls and auditing matters. Associates may report suspected misconduct, including such concerns or complaints, on a confidential or anonymous basis by the calling the Brookdale Integrity Line. No one will be subject to retaliation because of a good faith report of suspected misconduct. Please see the Brookdale Integrity Line section of this Code for more details on reporting suspected misconduct.

- 37 -

* * *

**Integrity of Records, Statements and Reports, and Compliance with Accounting Procedures**

Each associate should do his or her part to ensure that Brookdale's books of account and financial records meet applicable standards of accuracy and completeness. If an associate has reason to believe that any of Brookdale's books and records are not being maintained in an accurate or complete manner, the associate is expected to report this immediately to the head of Brookdale's Internal Audit Department.

* * *

**Protection and Proper Use of Company Assets**

Associates, officers and directors have a duty to protect Brookdale's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on Brookdale's profitability. We should take measures to prevent damage to and theft or misuse of Brookdale property. When you leave the Company, all Brookdale property must be returned to the Company. Except as specifically authorized, all Brookdale assets, including Company time, funds, equipment, materials, resources and proprietary information, must be used for legitimate business purposes only.

**<u>Brookdale's Code of Ethics for Chief Executive and Senior Financial Officers</u>**

113.    The Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"), which is referenced in the Code of Conduct, provides, that the Company is "committed to conducting [its] business in accordance with applicable laws, rules and regulations and the highest standards of business ethics, and to full and accurate financial disclosure in compliance with applicable law."

114.    The Code of Ethics states, in relevant part, the following:

As a Senior Officer, you must not only comply with applicable law. You also must engage in and promote honest and ethical conduct and abide by the Code of Business Conduct and Ethics and other Corporation policies and procedures that govern the conduct of our business. Your leadership responsibilities include creating a culture of high ethical standards and commitment to compliance, maintaining a work environment that encourages employees to raise concerns, and

- 38 -

promptly addressing employee compliance concerns.

115. The Code of Ethics provides, in the section titled "Compliance With Laws, Rules And Regulations," in relevant part, that, "[y]ou are required to comply with the laws, rules and regulations that govern the conduct of our business[.]"

116. The Code of Ethics provides, in the section titled "Conflicts of Interest," in relevant part, that:

> A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of the Corporation. Your obligation to conduct the Corporation's business in an honest and ethical manner includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

117. The Code of Ethics provides, in the section titled "Disclosures," in relevant part, that:

> It is Corporation policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Corporation. As a Senior Officer, you are required to promote compliance with this policy by all employees and to abide by Corporation standards, policies and procedures designed to promote compliance with this policy.

118. The Individual Defendants violated the Code of Conduct and Code of Ethics by engaging in or permitting the Misconduct and the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same, and for contribution under Sections 10(b) and 21D of the Exchange Act.

- 39 -

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

119.     Based in Brentwood, Tennessee, Brookdale touts itself as the largest operator of senior living communities in the United States based on total capacity, with 743 communities in 45 states and the ability to serve approximately 65,000 residents as of February 1, 2020. Specifically, as of that date, the Company owned 356 communities, leased 307 communities, managed 77 communities on behalf of third parties, and managed three communities for which Brookdale has an equity interest. The Company operates and manages independent living, assisted living, memory care, and continuing care retirement communities while offering a range of home health, hospice, and outpatient therapy services to more than 20,000 patients, as of February 1, 2020. For fiscal year 2019, the Company reported nearly $4.06 billion in revenue.

120.     The Company was incorporated in Delaware in June 2005 and was the result of a series of mergers to combine Brookdale Living Communities, Inc., which had been operating independently since 1986, and Alterra Healthcare Corporation, which had been operating independently since 1981. Shortly thereafter, on November 22, 2005, the Company went public and the following year, on July 25, 2006, Brookdale initiated a series of acquisitions that would lead to its rise as the nation's largest operator of senior living communities including its acquisition of American Retirement Corporation, Horizon Bay on September 1, 2011, and Emeritus Corporation on July 31, 2014 for $2.8 billion. Consequently, the Company bound itself to massive debt and lease obligations that financed Brookdale's steadfast growth strategy.

121.     However, as provided in the Company's annual reports filed with the SEC, to secure such considerable financing and lease agreements, the Company agreed to delineate profit

- 40 -

and financial performance thresholds for Brookdale's facilities both separately and on a collective basis. Thus, pursuant to the Company's debt and lease obligations, the Company was required to, among other things, "maintain or satisfy specified financial ratios and coverage tests, including prescribed net worth levels" and "maintain lease coverage ratios on a lease portfolio basis" and "maintain stockholders' equity or tangible net worth amounts." Further, regarding communities in which Brookdale manages, the Company could be terminated if it did "not satisfy certain designated performance thresholds." Moreover, the Company's mortgages and leases contained "cross-default and cross-collateralization" provisions, so that a default by Brookdale related to one community could affect a significant number of the Company's communities and their corresponding financing agreements and leases. Also, certain debt obligations were secured by both "a mortgage on a community" and a "guaranty by [Brookdale][.]"[2]

122.    For that reason, to ensure that Brookdale would satisfy, among other things, the Company's financial performance thresholds and its other contractual obligations, and, in turn, to reduce the risk of defaulting on agreements concerning substantial segments of its community-portfolio, the Company closely supervised, carefully oversaw, diligently monitored, tightly controlled, and thoroughly scrutinized all facets of the Company's operations and management of its facilities and communities throughout the nation, including, and particularly, daily staffing—the Company's principal expenditure.

### *The Individual Defendants Regulate Daily Staffing Needs*

---

[2] The Company's guarantees, which guaranteed the full and prompt performance of its contractual obligations including on-demand remuneration of fees, costs, and charges of enforcement of Brookdale's management agreements, were material and necessary inducements for the execution of credit agreements, lending agreements, and management agreements with many lessors.

- 41 -

123. The Individual Defendants oversee, manage, analyze, and, ultimately, dictate the Company's day-to-day staffing needs at each one of Brookdale facilities around the country based upon the Service Alignment Software—a staffing algorithm produced by computer software that Brookdale designed, developed, and controls. In fact, only certain of the Company's high-level officers had access to or were able to alter the Service Alignment Software or its data inputs, as described below.

124. The Company used the Service Alignment Software to regulate, ration, and dictate the total amount of time for the care its staff could provide to the residents of Brookdale's communities. The Service Alignment Software accounts for two core types of information: (1) the amount of time necessary to accomplish certain day-to-day services, which were supposedly informed by internal studies; and (2) systems and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to determine the amount of staffing hours the Company needed on an everyday basis. Thus, through the Service Alignment Software, the Individual Defendants determined the amount of staffing hours Brookdale needed in each of its facilities by accounting for the total assessed care that needed to be provided by Brookdale staff to the Company's residents and also the respective average time necessary for care to be provided, which the Company purportedly determined through time studies that it had conducted.

125. The Individual Defendants kept the details of its method confidential and would not even provide its own facility level employees, including executive directors at each facility, with the information (as described below) used to determine staffing needs. To that end, facility level employees were unable to adjust the daily staffing need which were determined by

- 42 -

corporate management without explicit and written consent from upper level corporate management.

### The Individual Defendants Regulate Brookdale's Budget

126. The Individual Defendants oversee, manage, analyze, and, ultimately, dictate the Company's operating budgets at each one of Brookdale's facilities around the country, including expense limits dedicated to staffing.[3]

127. Initially, the Company's financial planning and analysis team circulates a draft budget with approximate final estimates for each Brookdale facility in the nation. Then, certain facility-level employees at each facility, whom have "read access" to the document, have one week to review their draft budget and respond to the Company's Regional Vice President, Regional Director of Operations and the Company's financial planning and analysis team with comments and modification requests. Upon final approval of the annual budget, the Individual Defendants caused the Company to strictly enforce those budgets, including maximum daily staffing expenses, without alteration by way of emails, telephone calls, conference calls, and meetings. The Individual Defendants regularly directed that facility-level employees: (1) strictly adhere to staffing budgets; (2) reduce staffing to eliminate budget variances; (3) adhere to savings commitments related to staffing; (4) "do a better job managing [the Company's] labor, as [staffing] is by far [Brookdale's] largest expense;" (5) implement changes to cause staffing to remain under budget or were pressured to make cuts. Moreover, the Individual Defendants

---

[3] According to the Company's annual report filed with the SEC on February 22, 2018 for the quarter and year ended December 31, 2017 on a Form 10-K "[w]e have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections. Our operating procedures include … implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures." The Company's annual reports filed with the SEC for the quarter and year ended December 31, 2014, December 31, 2015, and December 31, 2016 contained substantively the same statements.

- 43 -

caused the Company to admonish facility-level employees by: (1) stating that everyone would be held accountable for labor control; (2) stating that the Company had a zero-tolerance policy related to staffing expenses coming in over budget; (3) emphatically accentuating the significance of controlling labor and eliminating overtime; (4) stating that the Company had a zero-tolerance policy for "dropping the ball" on labor controls.[4]

128.    Moreover, the Individual Defendants caused the Company to create and implement lucrative bonus and incentive packages attached to achieving or surpassing certain financial performance targets to induce employees to keep staffing expenses low.

### The Individual Defendants Regulate Brookdale's Staffing Guidelines at All Facilities

129.    The Individual Defendants caused the Company to establish, employ, and impose far-reaching, "company-wide" and "standardized" policies and operations procedures related to, among other things, management, accounting, finance, marketing, risk management, employee training, marketing, hiring of personnel, compliance with laws, employee behavior, resident behavior, resident assessment and resident care at its facilities.[5] The Company's facility-level employees lack the authorization to amend the Company's comprehensive, company-wide policies.

130.    The Company's documents, forms, data, and software related to, among other things, staffing is virtually identical in all of Brookdale' facilities throughout the country.

### Brookdale Operates as a Centralized and Single Enterprise

131.    The Company's corporate officers based out of Brookdale's headquarters in Brentwood, Tennessee, direct, control, and coordinate the Company's services and overall

---

[4] According to documents produced by the Company in other litigation.
[5] Discussed in the Company's annual and quarterly reports as detailed herein.

business operations for its locations throughout the United States. Moreover, a majority of Brookdale's executive and administrative functions are located in Tennessee, the CEO and Chief Operating Officer, the Company's Secretary maintain their principal offices in Tennessee, all of Brookdale's Executive Vice Presidents are also located in Tennessee, final decisions regarding the company-wide issues relating to the operations of Brookdale facilities throughout the nation were made by corporate executives at the Company's headquarters in Tennessee.[6]

132. The Company's centralized operation as a single enterprise is further evidenced by Brookdale's annual and quarterly reports that the Induvial Defendants caused the Company to file with the SEC, as referenced in detail below. For example, the Company's annual report for the periods ended December 31, 2014, December 31, 2015, December 31, 2016, December 31, 2017, and December 31, 2018 state that "we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing."

**The Misconduct**

133. During the Relevant Period, the Individual Defendants engaged in and/or permitted the Misconduct. The Individual Defendants allowed multiple violations of Brookdale's corporate governance policies to occur that injured the company. These violations included, but were not limited to, engaging in or allowing the Misconduct and engaging in or allowing

---

[6] *See Edwards v. Emeritus Corp.*, Case No. 2:16-CV-08191-BRO-JPR (C.D. Cal. 2016); Notice of Removal of Action to Federal Court, ECF #1 ⬜11; *Briones v. Brookdale Senior Living, Inc.*, Case No. 2:16-CV-08789-FMO-SK (C.D. Cal. 2016); Notice of Removal of Action to Federal Court, ECF #1 ⬜21, Declaration of Liberty Stansbury, SVP Human Resources for Brookdale, ⬜3-8; *Therrien v. Brookdale Senior Living, Inc.*, Case No. 2:13-CV-00933-GAF-DTB (C.D. Cal. 2013); Notice of Removal of Action to Federal Court, ECF #1 ⬜14, and Declaration of Chad White ⬜⬜2-4; *Rejuso v. Brookdale Senior Living, Inc.*, Case No. 2:17-CV-04647-DSF-KS (C.D. Cal. 2017); ECF #1, Declaration of Liberty Stansbury ⬜⬜5-9; *Schrenk v. Brookdale Senior Living, Inc.*, Case No. 5:18-CV-01270-SVW-SP (C.D. Cal. 2018); ECF #1, Declaration of Liberty Stansbury ⬜⬜5-7; *See Llamas v. Brookdale Senior Living, Inc.*, Case No. 8:14-CV-00223-JLS-AN (C.D. Cal. 2014); ECF #1, Declaration of Jack Leebron ⬜⬜4-10.

widespread violations of the Company's Code of Conduct and, as a result, caused the Company to engage in the Misconduct by failing and allowing the Company to fail to take meaningful action in response to complaints from Brookdale's residents, families of residents, and even Brookdale's own staff regarding the aforementioned violations and to take wrongful action in response. The Misconduct resulted in a decline in the value of the Company.

### Brookdale's Standard Form Contracts Misrepresent the Services Provided

134. The Company's standard and uniform form Residency Agreements advertise Brookdale's commitment to personalized care. To that end, Brookdale mandates that each of its facilities conduct what Brookdale refers to as a "Personal Service Assessment" (the "Personal Service Assessment") upon each resident, which assesses a resident's needs. Afterwards, according to the level of care required, residents are assigned to one of two "Care Groups": (1) Choice Personal Services—care includes services related to, among other things, medication, nutrition, dressing and grooming, showering, or bathing, bathroom assistance, escort and mobility and service coordination; or (2) Comprehensive Care Options—care includes services related to, among other things, chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand upright, bathroom assistance needs for residents who are catheterized, incontinent or cannot stand upright, two person or mechanical lifts, cognitive and psychological needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance, and pet care. In its form contract, Brookdale pledges to regularly re-assess residents' the level of care needed to meet their needs.

- 46 -

135.    Each service need is broken down by particular and granular needs and ascribed a cost. The Company charges its residents a monthly "Personal Service Rate" in exchange for meeting the evaluated level of care and specific needs documented in the Personal Service Plan, which includes the "Basic Service Rate" and together with the lesser of: (1) the total cost for meeting each assessed need with each category; or (2) a "Predictable Maximum Total" the Company assigns to each Care Group. Personal Service Rates are amended from time to time depending on re-evaluations of residents' needs and updates to their Personal Service Plans. According to the standardized letters the Company sends to Brookdale residents who are subject to rate increases, the Company attributes the increased rate, in large part, to the increased staffing costs to "take care of your senior living needs."

### *Brookdale's Sales & Marketing Materials Misrepresent the Services Provided*

136.    In addition to the misrepresentations regarding the staffing and services provided to its residents that are contained in the Company's standard and uniform form Residency Agreements, Brookdale's sales and marketing materials, including the Company's website, brochures, and presentations, which induced residents to enter into those Residency Agreements emphasize those same or substantially similar misrepresentations. For instance, the Company's website[7] stated:

a.      [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, ***offering individually tailored personal care options to perfectly suit their needs.***

b.      Your health is our top priority, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A ***personalized service assessment and plan*** where we evaluate ***your individual needs and then create a custom care plan tailored to you.***

---

[7] https://www.brookdale.com/en.html.

c.     Brookdale will *assess your needs* and help you chose the **services you need**.

d.     Our **trained caregivers provide attention and assistance** with medication support, bathing, dressing, cooking and other tasks **throughout the day**. Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. **So your loved one gets the care they need** while enjoying the quality of life they've earned.

e.     **Trained caregivers provide assisted living care by providing assistance** with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers.

f.     At an assisted living community, *caring staff members* **are available to help them accomplish these tasks**, making life a lot easier than if they were living alone. This service provides *peace of mind* for them, as well as you. There's no need to take a chance on their health and safety, because *our team of medical professionals can lend the right level of support that they need throughout the day*.

g.     The Brookdale approach provides *services that are tailored to each individual's unique needs*, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, by *offering the desired service and care as their needs and preferences dictate*. By *customizing personal care offerings for the individual*, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go.

h.     At Brookdale, we are **committed to listening to your needs**, understanding the life you want for yourself or your loved one, and *then partnering with you to customize a solution* for all the places you still want your life to go.

i.     The first step towards determining the right senior living option is *to understand you and your family's needs*.

j.     [W]e believe in delivering senior care that's *tailored to you* and your loved one *based on those unique needs* and desires. That's why we provide a variety of options. *This personalized approach ensures that you* and your family *get exactly what you need....*

k.     [We] cannot provide *exceptional care and service* until we find out exactly what it is that your *loved one needs.*

l.     *We start with a detailed assessment,* listing the specifics of your loved one's level of care.

- 48 -

(Emphasis added.)

137.    Further, Brookdale's website advertised that the Company would "[r]ecognize and [i]ntegrate" the results of each resident's Personal Service Assessment by ensuring that Brookdale's "professional staff is trained to recognize the specific needs … of each individual" and that a "continuous assessment process" "ensures" the Company would be able to satisfy its residents' care needs.

138.    Similarly, certain of the Company's marketing materials advertised that at Brookdale facilities:

> ***Carefully selected and trained associates do more than assist with activities of daily living*** such as dressing, bathing and dispensing of medications; ***they implement custom care plans designed to meet the individual needs of each resident*** … It all begins with a Personal Service Assessment. We take the time to listen to our residents so that ***we understand how to establish clinical, dining and program support that works for them in a meaningful way***. We recognize their individual needs and preferences and respond to them accordingly.

(Emphasis added.)

139.    The Company's marketing materials also highlighted that Brookdale:

> Provide[s] customized care solutions to meet residents' unique needs and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, we strive to offer personalized care and exceptional service at competitive and affordable rates. ***Fees for care and services are based on each resident's needs*** and preferences, as determined by the Living Accommodation selected ***and their Personal Service Plan.***
>
> * * *
>
> This provides customer value because ***our residents only pay for what they need and want.***

(Emphasis added.)

- 49 -

140. Likewise, certain of the Company's presentations available on Brookdale's social media platforms, such as a video presentation uploaded to YouTube on December 1, 2017, have emphasized the advantages Brookdale's staffing provided:

> We know it's hard to talk about the next chapter, so we make every effort to make it easy for you. We start by asking, what does compassion, excellence, respect and integrity mean to you? Well, it means everything to us here at Brookdale and we listen. Listening helps us answer any question or concerns you may have about senior living. Together, we team up and plan the best way for you to enjoy life. This trusted relationship is maintained in over 1000 communities nationwide so you can live just about anywhere you want and have **80,000 passionate associates ready to work for you**. They've made Brookdale the industry leader in dedicated senior care. Every day they'll connect with you in a personal way and make sure that you're engaged and included. I want you to know that Brookdale is more than a progressive community, we're a community with a vision. A vision that is continually improving senior care at all levels for you. I know that senior care decisions can be difficult which is why we're dedicated to making it easy for you....

***The Individual Defendants Systematically Failed to Adequately Staff Brookdale's Facilities and Failed to Disclose and Actively Concealed Same***

141. Throughout the Relevant Period, the Individual Defendants caused the Company to systematically fail to provide adequate staffing for Brookdale's facilities. As a result, contrary to the representations described above, the Individual Defendants caused the Company to fail to meet the collective needs as determined by the Personal Service Assessment and violate the Company's obligations under the Residency Agreements and also state adult care home rules and regulations.

142. Specifically, to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed above, the Individual Defendants caused the Company to set staffing figures, including the amount of time estimated to fulfill certain tasks and levels of care, greatly beneath the actual required duration. As a result, the collective amount of labor time required to

- 50 -

deliver the daily services for Brookdale's resident population exceeded the daily amount of staff time the Company allotted to its facilities. Moreover, to ensure staffing costs would not rise, the Individual Defendants caused the Company to assert tight-knit control over the facility staffing and adopt a policy that precluded local facility-level employees from adjusting staffing, or critical factors and data that was entered into the Company's Service Alignment Software (such as, task counts, task times, logic algorithms, and source code), based upon known staffing demands to meet the daily care needs of Brookdale's residents. Furthermore, the Company itself failed to appropriately adjust staffing despite the fact that the Individual Defendants knew Brookdale's staffing figures were inadequate to meet residents' assessed care needs, Brookdale's contractual obligations, and to comply with adult care home laws, rules, and regulations.

143. The Misconduct resulted in extreme wait times for service care needs that were paid for and even subjected dependent, disabled, and/or vulnerable residents to the risk of actual service deprivations. As a result, the Misconduct violated state laws and regulations and exposed the Company to a substantially increased risk of litigation.

144. Despite receiving a wave of complaints arising out of the Misconduct from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, the Individual Defendants intentionally and knowingly refused to address the well-founded complaints, continued to engage in or permit the Misconduct, failed to disclose the Misconduct, and actively concealed the Misconduct, so that it would not default on its massive debt and lease obligations. Moreover, numerous reports generated by the Company's own facilities, corporate audits of each facilities' performance, and internal emails and communications demonstrate the Individual Defendants engaged in or permitted the Misconduct.

- 51 -

145. Throughout the Relevant Period, Brookdale did not maintain control over its financial statements and operational statements. This caused the Company's financial reports throughout the Relevant Period to be materially false and misleading.

**Related Litigation**

***Bright Action***

146. On May 3, 2019, Meghan Bright, as curator of the estate of Leonard Foote and Jean Howard, by and through her son Gary Weir, as power of attorney, filed a complaint, on behalf of a class of residents in the Company's communities located in Florida a class of residents in the Company's communities located in North Carolina, against Brookdale, captioned *Bright, et. al. v. Brookdale Senior Living, Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn. 2019) (the "Bright Action") seeking, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations. Bright Action, ECF No. 1, ☐☐ 11. On June 23, 2020, the court granted a joint motion to consolidate the Bright Action with the Gunza Action (defined below).

***Gunza Action***

147. On April 24, 2020, George Gunza, by and through his sister Peggy Fisher, as power of attorney, filed a complaint, on behalf of a class of residents in the Company's communities located in North Carolina, against Brookdale, captioned Gunza*, et. al. v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn. 2020) (the "Gunza Action") seeking substantially similar relief as sought in the Bright Action, including, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities

- 52 -

that "routinely" failed to sufficiently service the needs of its resident populations. Gunza, ECF No. 1, ⬜⬜ 12. On June 23, 2020, the court granted a joint motion to consolidate the Gunza Action with the Bright Action.

**False and Misleading Statements**

*August 9, 2016 Form 10-Q*

148.    On August 9, 2016, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2016 on Form 10-Q (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

149.    For the quarter, Brookdale reported net loss of $35.45 million attributable to Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion, compared to a net loss of approximately $84.8 million attributable to Company stockholders, or $0.46 per diluted share, on total revenue of approximately $1.24 billion for the same quarter in the prior year.

150.    Regarding "Resident Fees" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Resident fee revenue increased $10.6 million, or 1.0%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 1.6% at the 933 communities we owned or leased during both full periods with a 3.0% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue).

- 53 -

151.     Regarding "Facility Operating Expense" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Facility operating expense decreased over the prior year period primarily due to the impact of disposition and lease termination activity since the beginning of the prior year period and a $13.7 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The decrease was partially offset by increases in salaries and wages due to wage rate increases.

152.     Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> General and administrative expense increased $1.2 million, or 1.3%, over the prior year period primarily as a result of an increase in salaries and wages due to wage rate and bonus accrual increases and an increase in non-cash stock-based compensation expense. The increase was partially offset by a decrease in integration, transaction, transaction-related and strategic project costs.

153.     Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q16 10-Q also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $6.7 million, or 3.7%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.
.

154.     The 2Q16 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2016, the Company had "the ability to serve approximately 107,000 residents." Further, the 2Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the

- 54 -

senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)." Moreover, the 2Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

155.    The 2Q16 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

156.    The 2Q16 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 3, 2016 Form 10-Q***

157.    On November 3, 2016, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2016 on Form 10-Q (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

- 55 -

158.    For the quarter, Brookdale reported net loss of $51.69 million attributable to Company stockholders, or $0.28 per diluted share, on total revenue of approximately $1.25 billion, compared to a net loss of approximately $68.22 million attributable to Company stockholders, or $0.37 per diluted share, on total revenue of approximately $1.24 billion for the same quarter in the prior year.

159.    Regarding "Resident Fees" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

> Resident fee revenue increased $2.7 million, or 0.3%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 2.0% at the 896 communities we owned or leased during both full periods with a 3.2% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue). The increase was partially offset by the impact of disposition activity since the beginning of the prior year period and a 110 basis point decrease in weighted average occupancy in the 896 communities we owned or leased during both full periods. The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, generated $15.1 million of revenue during the current year period compared to $31.5 million of revenue in the prior year period.

160.    Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

> Facility operating expense increased $4.5 million, or 0.6%, over the prior year period primarily due to the impact of increases in salaries and wages due to wage rate increases. This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year period and a $13.9 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, incurred $13.0 million of facility operating expenses during the current year period compared to $26.8 million of facility operating expenses in the prior year period.

- 56 -

161.    Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

> General and administrative expense decreased $36.1 million, or 36.3%, over the prior year period primarily due to a $29.4 million decrease in integration, transaction, transaction-related and strategic project costs, a decrease in bonus expense and a decrease in stock-based compensation expense.

162.    Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q16 10-Q also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $3.7 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

163.    The 3Q16 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 105,000 residents." Further, the 3Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 3Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

164.    The 3Q16 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

- 57 -

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

165.    The 3Q16 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *February 15, 2017 Form 10-K*

166.    On February 15, 2017, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2016 on a Form 10-K (the "2016 10-K"). The 2016 10-K was signed by Defendants Baier, Smith, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

167.    For the 2016 fiscal year, the Company reported a net loss of $404.4 million attributable to Company stockholders, or $2.18 per diluted share, on total revenue of $4.98

- 58 -

billion, compared to a net loss of $457.5 million attributable to Company stockholders, or $2.48 per diluted share, on total revenue of $4.96 billion for the prior year.

168.     Regarding "Resident Fees" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $8.5 million, or (0.2)%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year and a 130 basis point decrease in occupancy at the 876 communities we owned or leased during both full periods. The decrease in resident fees was partially offset by a 3.1% increase in RevPOR[8] at these communities compared to the prior year. Total RevPAR for the consolidated portfolio also increased by 3.0% compared to the prior year. The 81 communities disposed of subsequent to the beginning of the prior year generated $126.2 million of revenue during 2016 compared to $202.0 million of revenue in the prior year.

169.     Regarding "Facility Operating Expense" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

> Facility operating expense increased $10.5 million, or 0.4%, over the prior year primarily due to a $46.5 million increase in salaries and wages due to wage rate increases at the 876 communities we owned or leased during both full periods and $18.4 million of expense increases for our ancillary services in connection with higher home health and hospice average daily census. This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year and a $35.4 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The 81 communities disposed of subsequent to the beginning of the prior year, either through sales or lease terminations, incurred $99.6 million of facility operating expenses during 2016 compared to $164.5 million of facility operating expenses in the prior year.

170.     Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

> General and administrative expense decreased $57.2 million, or 15.4%, over the prior year primarily due to a $61.5 million decrease in integration, transaction-related and strategic project costs.

---

[8] RevPAR means "average monthly senior housing resident fee revenues per available unit[.]"

- 59 -

* * *

This decrease was partially offset by an increase in salaries and wages due to wage rate increases.

171.    Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2016, the 2016 10-K also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $14.3 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full years.

172.    Like the 2Q16 10-Q, the 2016 10-K also flaunted the Company's purportedly first-rate services and facilities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of December 31, 2016, the Company had "the ability to serve approximately 103,000 residents." Further, the 2Q16 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)." Moreover, the 2Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

173.    Regarding the Company's "Operations," the 2016 10-K stated:

> **We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. We have centralized accounting, finance and other operating functions in our support centers so that, consistent**

- 60 -

*with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations.* Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, energy and insurance, *implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations;* billing and collections; accounts payable; finance and accounting; *risk management; development of employee training materials and programs; marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements*[.]

(Emphasis added.)

174. Regarding "Community Staffing and Training" the 2016 10-K stated, in relevant part, the following:

> Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.
>
> * * *
>
> Depending upon the size of the community, each Executive Director is supported by a community staff member who is directly responsible for day-to-day care of the residents and either community staff or regional support to oversee the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, therapy services, activities, housekeeping, and engineering.
>
> We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

175. Regarding "Quality Assurance" the 2016 10-K stated, in relevant part, the following:

> *We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among*

- 61 -

*other things, community inspections conducted by corporate staff on a regular basis. These inspections cover* the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities*; *and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.*

(Emphasis added.)

176.    In the "Risk Factors," section the 2016 10-K contained nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, [which] would have an adverse effect on [the Company's] business, results of operations and cash flow." The risk warnings contained in the 2016 10-K were broad catch-all clauses that were not designed to disclose the Company's known risks regarding the Misconduct. Specifically, the 2016 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company]

- 62 -

charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

177. The 2016 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

178. The 2016 10-K, stated in relevant part, about the Company's internal control over financial reporting:

- 63 -

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\* \* \*

**Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016. Management reviewed the results of their assessment with our Audit Committee.**

\* \* \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

179.     The 2016 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2016 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

**May 10, 2016 Form 10-Q**

180.     On May 10, 2016, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to

- 64 -

the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

181. For the quarter, Brookdale reported net loss of $126.3 million attributable to Company stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion, compared to a net loss of approximately $48.78 million attributable to Company stockholders, or $0.26 per diluted share, on total revenue of approximately $1.26 billion for the same quarter in the prior year.

182. Regarding "Resident Fees" for the third fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $44.2 million, or 4.2%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 816 communities we owned or leased during both full periods. Additionally, Brookdale Ancillary Services segment revenue decreased $10.2 million, or 8.4%, primarily due to a decrease in outpatient therapy service volume. The 59 communities disposed of subsequent to the beginning of the prior year period (excluding the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $0.7 million of revenue during the current year period compared to $43.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 2.0% increase in RevPOR at the 816 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period. Resident fee revenue for the three months ended March 31, 2017 includes $64.0 million of revenue for the 62 communities acquired by the Blackstone Venture.

183. Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $41.4 million, or 5.8%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 59 communities since the beginning of the prior year period, which incurred

- 65 -

$1.3 million of facility operating expenses during the three months ended March 31, 2017 compared to $33.8 million of facility operating expenses in the three months ended March 31, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $11.3 million, or 10.5%, primarily due to a decrease in outpatient therapy services volume.

184.     Regarding "General and Administrative Expense" for the first fiscal quarter, the

1Q17 10-Q also reported, in relevant part, that:

> General and administrative expense decreased $27.1 million, or 29.2%, over the prior year period primarily due to a $19.0 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.2 million during the current period compared to $19.1 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended March 31, 2017.

185.     Regarding "Costs Incurred on Behalf of Managed Communities" for the first

fiscal quarter, the 1Q17 10-Q also reported, in relevant part, that:

> Costs incurred on behalf of managed communities decreased $1.3 million, or 0.7%, primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

186.     The 1Q17 10-Q also advertised the Company's supposedly excellent senior living

communities and the services they could provide to customers, stating, "[t]he Company is

- 66 -

committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 105,000 residents." Further, the 1Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 1Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

187. The "Risk Factors" section of the 1Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

188. The 1Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

189. The 1Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act)

- 67 -

during the fiscal quarter ended September 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***August 8, 2017 Form 10-Q***

190.   On August 8, 2017, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2017 on Form 10-Q (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

191.   For the quarter, Brookdale reported net loss of $46.29 million attributable to Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion, compared to a net loss of approximately $35.45 million attributable to Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion for the same quarter in the prior year.

192.   Regarding "Resident Fees" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $120.5 million, or 11.4%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 150 basis points at the 818 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $13.1 million, or 10.7%, primarily due to decreases in volume for outpatient therapy services and home health services. The 130 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $6.3 million of revenue during the current year period

- 68 -

compared to $116.2 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.8% increase in RevPOR at the 818 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period.

193.    Regarding "Facility Operating Expense" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

Facility operating expense decreased $50.7 million, or 7.3%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 130 communities since the beginning of the prior year period, which incurred $7.5 million of facility operating expenses during the three months ended June 30, 2017 compared to $88.5 million of facility operating expenses in the three months ended June 30, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $7.2 million, or 6.9%, primarily due to decreases in volume for outpatient therapy services and home health services. These decreases were partially offset by an $11.3 million increase in insurance expense related to positive changes in the three months ended June 30, 2016 to estimates in general liability and professional liability and workers compensation expenses and an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods.

194.    Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

General and administrative expense decreased $23.6 million, or 26.0%, over the prior year period primarily due to a $16.1 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.6 million during the current period compared to $16.7 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic

- 69 -

projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended June 30, 2017.

195. Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q17 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $43.9 million, or 23.6%, primarily due to our entry into management agreements with the Blackstone Venture.

196. The 2Q17 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2017, the Company had "the ability to serve approximately 102,000 residents." Further, the 2Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 2Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

197. The "Risk Factors" section of the 2Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

- 70 -

198. The 2Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2017, our disclosure controls and procedures were effective***.

(Emphasis added.)

199. The 2Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *November 7, 2017 Form 10-Q*

200. On November 7, 2017, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2017 on Form 10-Q (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

201. For the quarter, Brookdale reported net loss of $413.89 million attributable to Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion, compared to a net loss of approximately $51.69 million attributable to Company

stockholders, or $0.28 per diluted share, on total revenue of approximately $1.25 billion for the same quarter in the prior year.

202. Regarding "Resident Fees" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $119.9 million, or 11.5%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 160 basis points at the 809 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $6.7 million, or 5.7%, primarily due to a decrease in volume for outpatient therapy services and a decrease in reimbursement rates for home health services. The 136 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $4.0 million of revenue during the current year period compared to $115.1 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.4% increase in RevPOR at the 809 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 1.1% compared to the prior year period.

203. Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $53.6 million, or 7.6%, over the prior year period. For the three months ended September 30, 2017, facility operating expense includes $5.3 million of costs related to our response to Hurricanes Harvey and Irma. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 136 communities since the beginning of the prior year period, which incurred $3.3 million of facility operating expenses during the current year period compared to $87.4 million of facility operating expenses in the prior year period. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $1.9 million, or 1.8%, primarily due to a decrease in volume for outpatient therapy services. These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods and an $8.1 million increase in insurance expense related to

- 72 -

positive changes in the three months ended September 30, 2016 to estimates in general liability and professional liability and workers compensation expenses.

204.    Regarding "General and Administrative Expense" for the third fiscal quarter, the

3Q17 10-Q also reported, in relevant part, that:

General and administrative expense increased $0.4 million, or 0.6%, over the prior year period primarily due to increased legal fees. This increase was partially offset by a $5.6 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.8 million during the current period compared to $6.4 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale.

205.    Regarding "Costs Incurred on Behalf of Managed Communities" for the third

fiscal quarter, the 3Q17 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $49.2 million, or 26.2%, primarily due to our entry into management agreements with the Blackstone Venture.

206.    The 3Q17 10-Q also advertised the Company's supposedly excellent senior living

communities and the services they could provide to customers, stating, "[t]he Company is

committed to providing senior living solutions primarily within properties that are designed,

purpose-built and operated to provide the highest quality service, care and living

- 73 -

accommodations for residents" and that as of September 30, 2017, the Company had "the ability to serve approximately 101,000 residents." Further, the 3Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" Moreover, the 3Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

207.    The "Risk Factors" section of the 3Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

208.    The 3Q17 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2017, our disclosure controls and procedures were effective.***

(Emphasis added.)

209.    The 3Q17 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

*February 22, 2018 Form 10-K*

210.    On February 22, 2018, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2017 on a Form 10-K (the "2017 10-K"). The 2017 10-K was signed by Defendants Baier, Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Seward, and Wielansky, and contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

211.    For the 2017 fiscal year, the Company reported a net loss of $571.4 million attributable to Company stockholders, or $3.07 per diluted share, on total revenue of $4.75 billion, compared to a net loss of $404.4 million attributable to Company stockholders, or $2.18 per diluted share, on total revenue of $4.98 billion for the prior year.

212.    Regarding "Resident Fees" for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $388.5 million, or 9.3%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year. Weighted average occupancy decreased 130 basis points at the 766 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets.
>
> * * *
>
> The 165 communities disposed of subsequent to the beginning of the prior year (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $172.6 million of revenue during the current year period compared to $543.3 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 2.5% increase in RevPOR. Total RevPAR for the consolidated portfolio also increased by 1.6% compared to the prior year.

- 75 -

213.    Regarding "Facility Operating Expense" for the full fiscal year ended December

31, 2017, the 2017 10-K also reported, in relevant part, that:

Facility operating expense decreased $197.2 million, or 7.0%, over the prior year.

* * *

The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 165 communities since the beginning of the prior year period, which incurred $135.0 million of facility operating expenses during the current year compared to $413.1 million of facility operating expenses in the prior year.

* * *

These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full years and a $23.3 million increase in insurance expense related to positive changes in the prior year to estimates in general liability and professional liability and workers compensation expenses.

214.    Regarding the Company's "General and Administrative Expense" for the full

fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part, that:

General and administrative expense decreased $58.0 million, or 18.5%, over the prior year primarily due to a $47.4 million decrease in integration, transaction-related and strategic project costs.

* * *

Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out projects) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expenses in the current year.

215.    Regarding the Company's "Costs Incurred on Behalf of Managed Communities"

for the full fiscal year ended December 31, 2017, the 2017 10-K also reported, in relevant part,

that:

- 76 -

Costs incurred on behalf of managed communities increased $153.5 million, or 20.8%, primarily due to our entry into management agreements with the Blackstone Venture.

216.    Like the 2Q16 10-Q and the 2016 10-K, the 2017 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of December 31, 2017, the Company had "the ability to serve approximately 101,000 residents." Further, the 2Q17 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 2Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

217.    Regarding the Company's "Operations," the 2017 10-K stated:

*We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service*. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections*. Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, supplies and insurance, *implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures*. *We have also established company-wide policies and procedures relating to, among other things: resident care*; *community design and community operations*; billing and collections; accounts payable; finance and accounting; *risk management; development of employee training materials and programs*; marketing activities; *the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements*[.]

- 77 -

(Emphasis added.)

218.    Regarding "Community Staffing and Training" the 2017 10-K stated, in relevant

part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

* * *

Depending upon the size of the community, each Executive Director is supported by a community staff member (health and wellness director or nursing director) who is directly responsible for day-to-day care of residents and community marketing and sales staff with regional support to oversee the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

219.    Regarding "Quality Assurance" the 2017 10-K stated, in relevant part, the

following:

*We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections* cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff*; quality of resident care* (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.*

(Emphasis added.)

220.    In the "Risk Factors," section the 2017 10-K contained nonspecific, boilerplate language regarding risks related to [i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, would have an adverse effect on our business, results of operations and cash flow."

The risk warnings contained in the 2017 10-K were generic catch-all clauses that were not tailored to reveal the known risks related to the Misconduct. Specifically, the 2017 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash

- 79 -

flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

221.    The 2017 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

222.    The 2017 10-K, stated in relevant part, about the Company's internal control over financial reporting:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\* \* \*

- 80 -

*Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016. Management reviewed the results of their assessment with our Audit Committee.*

\* \* \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

223.   The 2017 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2017 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

### May 8, 2018 Form 10-Q

224.   On May 8, 2018, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2018 on Form 10-Q (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendant Baier and non-party, and Interim CFO, Teresa F. Sparks ("Sparks") attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

225.   For the quarter, Brookdale reported net loss of $457.19 million attributable to Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion, compared to a net loss of approximately $126.30 million attributable to Company

- 81 -

stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion for the same quarter in the prior year.

226.    Regarding "Resident Fees" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $110.7 million, or 10.9%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 130 basis points at the 769 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $1.5 million, or 1.3%, primarily due to a decline in volume for home health visits. The 111 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $2.2 million of revenue during the current year period compared to $107.6 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.0% increase in RevPOR at the 769 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.8% compared to the prior year period.

227.    Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $42.2 million, or 6.3%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 111 communities since the beginning of the prior year period, which incurred $2.1 million of facility operating expenses during the current year period compared to $81.0 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in employee compensation costs at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. Additionally, insurance expense increased related to positive changes in the prior year period to estimates in general liability and professional liability and workers compensation expenses. Additionally, Brookdale Ancillary Services segment facility operating expenses increased $5.9 million, or 6.1%, primarily due to an increase in salaries and wages for the expansion of our hospice services.

- 82 -

228.     Regarding "General and Administrative Expense" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> General and administrative expense increased $11.2 million, or 17.0%, over the prior year period primarily due to increased costs associated with organizational restructuring, including severance and retention costs related to our efforts to reduce general and administrative expense and senior leadership changes. During the current year period, general and administrative expense included severance costs and retention costs of $10.7 million and $1.7 million, respectively.

229.     Regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q18 10-Q also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $78.3 million, or 42.6%, primarily due to our entry into management agreements with the Blackstone Venture.

230.     The 1Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of March 31, 2018, the Company had "the ability to serve approximately 99,000 residents." Further, the 1Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 1Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

- 83 -

231. The "Risk Factors" section of the 1Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

232. The 1Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

233. The 1Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***August 7, 2018 Form 10-Q***

234. On August 7, 2018, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2018 on Form 10-Q (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Baier, and contained SOX certifications signed by Defendant Baier and non-party, Sparks attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

- 84 -

235. For the quarter, Brookdale reported net loss of $165.49 million attributable to Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion, compared to a net loss of approximately $46.29 million attributable to Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion for the same quarter in the prior year.

236. Regarding "Resident Fees" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $38.1 million, or 4.1%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 94 communities, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 758 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. The communities disposed of subsequent to the beginning of the prior year period generated $50.0 million of revenue during the current year period compared to $94.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 0.9% increase in RevPOR at the 758 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.5% compared to the prior year period.

237. Regarding "Facility Operating Expense" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

> Facility operating expense decreased $15.3 million, or 2.4%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 94 communities since the beginning of the prior year period, which incurred $31.8 million of facility operating expenses during the current year period compared to $68.7 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period.

238. Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

- 85 -

General and administrative expense decreased $6.8 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year.

239. Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q18 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $12.2 million, or 5.3%, primarily due primarily due to the impact of the adoption of ASU 2014-09, *Revenue from Contracts with Customers* on January 1, 2018 under the modified retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.3 million for the three months ended June 30, 2018, respectively.

240. The 2Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of June 30, 2018, the Company had "the ability to serve approximately 95,000 residents." Further, the 2Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 2Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

241. The "Risk Factors" section of the 2Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

- 86 -

242.    The 2Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

243.    The 2Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***2018 Proxy Statement***

244.    On August 21, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky solicited the 2018 Proxy Statement which contained material misstatements and omissions.[9]

245.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, including our principal."

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

246. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendant's failures to report violations of the Code of Conduct.

247. The 2018 Proxy Statement also called for shareholder approval of, among other things: (1) the election of three directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to declassify the Board (the "First 2018 Proposal"); and (3) the approval of an amendment to the Company's Certificate of Incorporation to eliminate a supermajority voting for director removal (the "Second 2018 Proposal" and, together with the First 2018 Proposal, the "2018 Proposals").

248. The 2018 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Misconduct; (2) the Company's commercial success was maintained by, among other things, the Misconduct; (3) the Misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

- 88 -

249. The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2018 Proposals who would not have approved the 2018 Proposals had they been informed about the Misconduct.

### *November 6, 2018 Form 10-Q*

250. On November 6, 2018, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2018 on Form 10-Q (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Swain, and contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

251. For the quarter, Brookdale reported net loss of $37.12 million attributable to Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion, compared to a net loss of approximately $413.89 million attributable to Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion for the same quarter in the prior year.

252. Regarding "Resident Fees" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

> Resident fee revenue decreased $82.7 million, or 9.0%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 104 communities, since the beginning of the prior year period, which generated $15.0 million of revenue during the current year period compared to $106.9 million of revenue in the prior year period. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. Weighted average occupancy decreased 90 basis points at the 714 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. RevPAR and RevPOR at the 714 communities we

- 89 -

owned or leased during both full periods increased by 0.2% and 1.3%, respectively. Total RevPAR for the consolidated portfolio also increased by 4.0% compared to the prior year period primarily due to fewer weighted average units.

253. Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

Facility operating expense decreased $43.6 million, or 6.7%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 104 communities since the beginning of the prior year period, which incurred $11.2 million of facility operating expense during the current year period compared to $75.6 million of facility operating expense in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. We expect that our labor investments will continue into 2019. Facility operating expense included costs related to our responses to hurricanes of $1.5 million in the current year period and $5.4 million in the prior year period.

254. Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

General and administrative expense decreased $6.5 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year. During the current year period, general and administrative expense included retention costs of $1.6 million.

255. Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q18 10-Q also reported, in relevant part, that:

Costs incurred on behalf of managed communities increased $24.4 million, or 10.3%, primarily due to our entry into interim management agreements with HCP and Welltower for communities for which our leases were terminated subsequent to the prior year period. Additionally, costs incurred on behalf of managed communities increased due to the impact of the adoption of ASU 2014-09, *Revenue from Contracts with Customers* on January 1, 2018 under the modified retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on

- 90 -

behalf of managed communities as a result of applying ASC 606 was an increase of $11.2 million for the three months ended September 30, 2018.

256. The 3Q18 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of September 30, 2018, the Company had "the ability to serve approximately 93,000 residents." Further, the 3Q18 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 3Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

257. The "Risk Factors" section of the 3Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

258. The 3Q18 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

- 91 -

259. The 3Q18 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### February 14, 2019 Form 10-K

260. On February 14, 2019, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2018 on a Form 10-K (the "2018 10-K"). The 2018 10-K was signed by Defendants Baier, Swain, Bromley, Bumstead, Clegg, Johnson-Mills, Seward, Warren, and Wielansky, and contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

261. For the 2017 fiscal year, the Company reported a net loss of $528.3 million attributable to Company stockholders, or $2.82 per diluted share, on total revenue of $4.53 billion, compared to a net loss of $571.4 million attributable to Company stockholders, or $3.07 per diluted share, on total revenue of $4.75 billion for the prior year.

262. Regarding "Resident Fees" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

> Resident fee revenue decreased $330.9 million, or 8.8%, compared to the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year.

\* \* \*

- 92 -

The decrease was partially offset by $32.3 million of revenue for four communities acquired during 2018. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. RevPOR at the 664 communities we owned or leased during both full years increased by 1.2%. Weighted average occupancy decreased 90 basis points at the 664 communities we owned or leased during both full years, which reflects the impact of new competition in our markets. RevPOR increased at communities that we owned or leased during both full years primarily as a result of in-place rent increases and lower discounting.

263. Regarding "Facility Operating Expense" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

Facility operating expense decreased $148.8 million, or 5.7%, over the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year, which incurred $207.8 million of facility operating expense during 2018 compared to $453.4 million of facility operating expense in the prior year. The decrease was partially offset by an increase in labor expense at the communities we operated during both full years and by $17.9 million of facility operating expense for four communities acquired during 2018.

* * *

Facility operating expense at the 664 communities we operated during both full years increased 4.6%, over the prior year, reflecting the impact of our investment in salaries and benefits and a tight labor market during 2018. We expect that our labor investments will continue into 2019. Additionally, costs for information technology systems and insurance expenses increased at the communities we operated during both full years.

264. Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

General and administrative expense decreased $5.0 million, or 1.9%, over the prior year primarily due to a decrease in salaries and wages expense as a result of a reduction in our corporate associate headcount pursuant to the initiative to scale our general and administrative costs in connection with our portfolio optimization strategy. General and administrative expense included severance costs and retention costs of $12.3 million and $6.5 million, respectively, in 2018.

- 93 -

265.    Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2018, the 2018 10-K also reported, in relevant part, that:

> Costs incurred on behalf of managed communities increased $119.1 million, or 13.4%, primarily due to our entry into management agreements with the Blackstone Venture and the transition of communities previously leased from HCP and Welltower into the management services segment on an interim basis. Additionally, costs incurred on behalf of managed communities increased as a result of increases in salaries and wages and other facility operating expense at the communities managed in both full years and due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to each of revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $46.1 million for 2018.

266.    Like the Company's previous quarterly and annual reports referenced above, the 2018 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide quality service, care and living accommodations for residents" and that as of December 31, 2018, the Company had "the ability to serve approximately 84,000 residents." Further, the 2017 10-K stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" Moreover, the 2018 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

- 94 -

267. Regarding the Company's "Operations," the 2018 10-K stated:

**We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service.** Further, we believe our centralized support infrastructure allows our community-based leaders and personnel **to focus on resident care and family connections.**

We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement. **We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations**; billing and collections; accounts payable; finance and accounting; risk management; **development of employee training materials and programs**; marketing activities; **the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements**[.]

(Emphasis added.)

268. Regarding "Community Staffing and Training" the 2018 10-K stated, in relevant

part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

* * *

Depending upon the size of the community, each Executive Director is supported by key leaders, a Health and Wellness Director (or nursing director) and/or a Sales Director. The Health and Wellness Director or nursing director is directly responsible for day-to-day care of residents. The Sales Director oversees the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

- 95 -

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

269. Regarding "Quality Assurance" the 2018 10-K stated, in relevant part, the following:

> *We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections* cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.*

(Emphasis added.)

270. In the "Risk Factors," section the 2018 10-K contained generic, hypothetical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, and wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2018 10-K were generic catch-all clauses that were not crafted to divulge the Company's known risks related to the Misconduct. Specifically, the 2018 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists or other

- 96 -

personnel, low levels of unemployment, or general inflationary pressures may have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the proposed increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

271. The 2018 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as

- 97 -

amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

272.    The 2018 10-K, stated in relevant part, about the Company's internal control over

financial reporting:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\* \* \*

***Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2018. Management reviewed the results of their assessment with our Audit Committee***.

\* \* \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

273.    The 2018 10-K also contained general statements about the risk of errors in the

Company's financial reporting. To this point, the 2018 10-K stated, "[b]ecause of its inherent

limitations, internal control over financial reporting may not prevent or detect misstatements.

- 98 -

Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

### May 7, 2019 Form 10-Q

274.    On May 7, 2019, Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2019 on Form 10-Q (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Swain, and contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

275.    For the quarter, Brookdale reported net loss of $42.60 million attributable to Company stockholders, or $0.23 per diluted share, on total revenue of approximately $1.04 billion, compared to a net loss of approximately $457.19 million attributable to Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion for the same quarter in the prior year.

276.    Regarding "Resident Fees" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 118 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which had $119.9 million less in resident fees during the three months ended March 31, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.6% increase in same community RevPAR at the 658 communities we owned or leased during both full periods, comprised of a 3.1% increase in same community RevPOR and a 120 basis point decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $48.4 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

- 99 -

277.     Regarding "Facility Operating Expense" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

> The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which had $80.7 million less in facility operating expense during the three months ended March 31, 2019 compared to the prior year period. The decrease was partially offset by a 4.4% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from wage rate increases.

278.     Regarding "General and Administrative Expense" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

> The decrease in general and administrative expense was primarily attributable to a decrease in organizational restructuring costs and salaries and wages expense as a result of a reduction in our corporate associate headcount since the beginning of the prior year period as we scaled our general and administrative costs in connection with community dispositions. Transaction and organizational restructuring costs decreased $16.7 million compared to the prior period, to $0.5 million for the three months ended March 31, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs.

279.     Regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter, the 1Q19 10-Q also reported, in relevant part, that:

> The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

280.     The 1Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, " [t]he Company is

- 100 -

committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of March 31, 2019, the Company had "the ability to serve approximately 80,000 residents." Further, the 1Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]" Moreover, the 1Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

281.    The "Risk Factors" section of the 1Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

282.    The 1Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2019, our disclosure controls and procedures were effective***.

(Emphasis added.)

283.    The 1Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> During the quarter ended March 31, 2019, the Company adopted the new lease standard (ASC 842). The Company updated its lease policies and implemented

- 101 -

new processes, which changed the Company's internal controls over financial reporting for leases and related disclosures for our current period reporting. There were no other changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *August 6, 2019 Form 10-Q*

284.    On August 6, 2019, Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2019 on Form 10-Q (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Swain, and contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

285.    For the quarter, Brookdale reported net loss of $55.47 million attributable to Company stockholders, or $0.30 per diluted share, on total revenue of approximately $1.02 billion, compared to a net loss of approximately $165.49 million attributable to Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion for the same quarter in the prior year.

286.    Regarding "Resident Fees" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 124 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $117.4 million less in resident fees during the three months ended June 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.9% increase in same community RevPAR at the 650 communities we owned or leased during both full periods, comprised of a 3.3% increase in same community RevPOR and a 110 basis points decrease in same community weighted average occupancy. Additionally, management services revenue,

- 102 -

including management fees and reimbursed costs incurred on behalf of managed communities, decreased $41.6 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

287. Regarding "Facility Operating Expense" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which resulted in $80.2 million less in facility operating expense during the three months ended June 30, 2019 compared to the prior year period. The decrease was partially offset by a 5.5% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases and increased use of overtime.

288. Regarding "General and Administrative Expense" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs. Transaction and organizational restructuring costs decreased $4.4 million compared to the prior period, to $0.6 million for the three months ended June 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the remainder of 2019 we expect to incur additional transaction costs related to stockholder relations advisory matters.

289. Regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter, the 2Q19 10-Q also reported, in relevant part, that:

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

290. The 2Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is

- 103 -

committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of June 30, 2019, the Company had "the ability to serve approximately 77,000 residents." Further, the 2Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]" Moreover, the 2Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

291. The "Risk Factors" section of the 2Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

292. The 2Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2019, our disclosure controls and procedures were effective***.

(Emphasis added.)

293. The 2Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act)

- 104 -

during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *2019 Proxy Statement*

294.     On September 18, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky solicited the 2019 Proxy Statement which contained material misstatements and omissions.[10]

295.     With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he Board also has adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, as well as a Code of Ethics for Chief Executive and Senior Financial Officers, which applies to our President and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Treasurer and Controller."

296.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendant's failures to report violations of the Code of Conduct or Code of Ethics.

297.     The 2019 Proxy Statement also called for shareholder approval of, among other things: (1) the election of two directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to facilitate implementation of a majority voting standard for uncontested elections of directors (the "2019 First Amendment Proposal"); and (3) the approval

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

- 105 -

of the Amended and Restated 2014 Omnibus Inventive Plan (the "Plan") which, among other things, would: (i) replenish the number of shares of common stock available to be granted under the plan by 5,400,000, or 2.9% of the Company's outstanding shares of Brookdale common stock as of September 9, 2019; (ii) amend the term of the existing plan from June 5, 2024 to the tenth anniversary of the Annual Meeting; (iii) increase the share limitation on awards granted during any fiscal year from 700,000 to 800,000 for restricted shares, restricted stock units, unrestricted shares, performance awards or other stock-based awards; (iv) subject dividends or dividend equivalents credited with respect to any award granted under the Plan to the same restrictions, conditions and risks of forfeiture as the underlying awards; and (v) subject all equity-based awards granted under the Plan, other than awards representing a maximum of 5% of the shares reserved for issuance under the plan, to a minimum vesting period of at least 12 months following the grant date (the "Incentive Proposal" and, together with the 2019 First Amendment Proposal, the "2019 Proposals" and, together with the 2018 Proposals, the "Proposals").

298. The 2019 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Misconduct; (2) the Company's commercial success was maintained by, among other things, the Misconduct; (3) the Misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a

result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

299. The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2019 Proposals who would not have approved the 2019 Proposals had they been informed about the Misconduct.

### *November 5, 2019 Form 10-Q and Earnings Call*

300. On November 5, 2019, Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2019 on Form 10-Q (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Swain, and contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

301. For the quarter, Brookdale reported net loss of $78.46 million attributable to Company stockholders, or $0.42 per diluted share, on total revenue of approximately $1.01 billion, compared to a net loss of approximately $37.12 million attributable to Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion for the same quarter in the prior year.

302. Regarding "Resident Fees" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 77 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $63.9 million less in resident fees during the three months ended September 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.8% increase in same community RevPAR, comprised of a 2.8% increase in

- 107 -

same community RevPOR and an 80 basis points decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $72.2 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

303. Regarding "Facility Operating Expense" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

> The increase in facility operating expense was primarily attributable to a 7.0% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases, an increase in employee benefit expense, and an increase in advertising, property remediation, and insurance costs during the period. The increase was partially offset by the disposition of communities since the beginning of the prior year period, which resulted in $47.5 million less in facility operating expense during the three months ended September 30, 2019 compared to the prior year period.

304. Regarding "General and Administrative Expense" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

> The decrease in general and administrative expense was primarily attributable to a reduction in our corporate headcount, as we scaled our general and administrative costs in connection with community dispositions. The decrease was partially offset by a $0.7 million increase in transactional and organizational restructuring costs compared to the prior period, to $3.9 million for the three months ended September 30, 2019. The increase was due to $3.4 of transaction costs related to stockholder relations advisory matters incurred during the three months ended September 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the full year 2019, we expect transaction costs related to stockholder relations advisory matters to be approximately $5.5 million, of which $3.4 million was incurred for the three months ended September 30, 2019.

305. Regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter, the 3Q19 10-Q also reported, in relevant part, that:

- 108 -

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

306.    The 3Q19 10-Q also advertised the Company's supposedly excellent senior living communities and the services they could provide to customers, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of September 30, 2019, the Company had "the ability to serve approximately 75,000 residents." Further, the 3Q19 10-Q stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living such as eating, bathing, dressing, toileting, and transferring/walking[.]" Moreover, the 3Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

307.    The "Risk Factors" section of the 3Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

308.    The 3Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2019, our disclosure controls and procedures were effective***.

- 109 -

(Emphasis added.)

309.   The 3Q19 10-Q, stated in relevant part, about the Company's internal control over financial reporting:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended September 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

310.   Also on November 5, 2019, the Company held an earnings call in connection to Brookdale's financial and operating results for the fiscal quarter ended September 30, 2019. During the call, in reply to a question from an analyst related to "wage pressures," Defendant Baier responded, in pertinent part:

> Now turning your first question of what do we -- what are we doing to deal with the wage pressures. However, the first and most important thing is a true focus on controlling overtime and contract labor. Now we have to get to the root cause of what drove this up and in 2019, and in Q3 in particular. One of the things that we've seen is it's the tightest labor market in the last 50 years. ***And so making sure that we've got a propriate staff in our communities is the most important thing that we can do.***

(Emphasis added.)

***February 19, 2020 Form 10-K***

311.   On February 19, 2020, the Company filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2019 on a Form 10-K (the "2019 10-K"). The 2019 10-K was signed by Defendants Baier, Swain, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky, and non-party Freed, and contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the

- 110 -

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

312.    For the 2018 fiscal year, the Company reported a net loss of $268.5 million attributable to Company stockholders, or $1.44 per diluted share, on total revenue of $4.06 billion, compared to a net loss of $528.3 million attributable to Company stockholders, or $2.82 per diluted share, on total revenue of $4.53 billion for the prior year.

313.    Regarding "resident fees" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

> The decrease in total revenue was primarily attributable to the disposition of 135 communities through sales of owned communities and lease terminations since the beginning of the prior year, which resulted in $336.5 million less in resident fees during the year ended December 31, 2019 compared to the prior year.

> *  *  *

> The decrease in total revenue was partially offset by a 1.9% increase in same community resident fee revenue and RevPAR, resulting from a 2.9% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy.

314.    Regarding "facility operating expense" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

> The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year, which resulted in $234.2 million less in facility operating expense during the year ended December 31, 2019. The decrease was partially offset by a 5.1% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from planned wage rate increases and an increase in employee benefit expense and increases in insurance and advertising costs compared to the prior year.

- 111 -

315.    Regarding the Company's "General and Administrative Expense" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, in relevant part, that:

> The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs, a reduction in our corporate associate headcount since the beginning of the prior year as we scaled our general and administrative costs in connection with community dispositions, and lower professional fees.

316.    Regarding the Company's "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2019, the 2019 10-K stated, that:

> The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

317.    Like the Company's previous quarterly and annual reports referenced above, the 2019 10-K also touted the Company's allegedly excellent customer service and senior living communities, stating, "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built, and operated to provide quality service, care, and living accommodations for residents" and that as of February 1, 2020, the Company had "the ability to serve approximately 65,000 residents." Further, the 2019 10-K stated that the Company offers its residents "access to a broad continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living ("ADLs") such as eating, bathing, dressing, toileting, transferring/walking[.]" Moreover, the 2019 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

318.    Regarding the Company's "Operations," the 2019 10-K stated:

- 112 -

*We have implemented intensive standards, policies and procedures, and systems, including detailed staff resources and training materials, which we believe have contributed to high levels of customer service.* Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections.*

We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology, and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining, clinical services, sales, customer engagement, marketing, and procurement. *We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations*; billing and collections; accounts payable; finance and accounting; risk management; *development of associate training materials and programs; advertising and marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements*[.]

(Emphasis added.)

319.    Regarding "Community Staffing and Training" the 2019 10-K stated, in relevant

part, the following:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services, and financial performance.

* * *

Depending upon the size and type of the community, each Executive Director is supported by key leaders, a Health and Wellness Director (or nursing director), and/or a Sales Director. The Health and Wellness Director or nursing director is directly responsible for day-to-day care of residents. The Sales Director oversees the community's sales, marketing, and community outreach programs.

- 113 -

Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

320. Regarding "Quality Assurance" the 2019 10-K stated, in relevant part, the following:

> *We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction through the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections* cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; *quality of resident care* (including assisted living services, nursing care, therapy, and home health programs); the quality of activities and the dining program; *observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services we provide to residents*

(Emphasis added.)

321. In the "Risk Factors," section the 2019 10-K contained general, theoretical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2019 10-K were generic catch-all provisions that were not fashioned to make public Brookdale's known risks regarding the Misconduct. Specifically, the 2019 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of

- 114 -

[Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists, or other personnel, low levels of unemployment, or general inflationary pressures have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase in the minimum salary threshold for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists, or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs, and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

322. The 2019 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

- 115 -

The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2019, our disclosure controls and procedures were effective***.

(Emphasis added.)

323. The 2019 10-K, stated in relevant part, about the Company's internal control over financial reporting:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\* \* \*

***Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2019. Management reviewed the results of their assessment with our Audit Committee***.

\* \* \*

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

324. The 2019 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2019 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

325. The statements and omissions referenced in ¶¶ 148–243, 250-293, and 300–324 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Misconduct; (2) the Company's commercial success was maintained by, among other things, the Misconduct; (3) the Misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

326. On April 30, 2020, *Nashville Business Journal* published the April 2020 Article titled "Lawsuit accuses Brentwood health care giant of deception, understaffing" which reported on the Consumer Class Action filed against the Company alleging that the Company had intentionally "chronically" understaffed its facilities in North Carolina "in an effort to meet financial benchmarks" and, as a result, misled residents in North Carolina and their families when Brookdale had "promised basic care and daily living services." Further, the April 2020 Article revealed that the lawsuit claimed that the Company's residents in North Carolina "have not received the care and services they paid for" and seeks, *inter alia*, to enjoin the Company from engaging in "unlawful and fraudulent practices." The April 2020 Article also shed light on

- 117 -

allegations regarding the Company's use of "computer software to 'underestimate' staffing needs at each of its facilities." The April 2020 Article further revealed that the Company's officers "routinely" scolded executive directors in emails related to staffing budgets. Finally, the April 2020 Article exposed that the Company had "created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale's financial performance targets" to entice employees to "stay at or below Brookdale's limits for staffing and expenses."

327. On this news, the Company's share price closed on May 1, 2020 at $3.12 per share, a $0.56 drop, or approximately 15.22%, from its closing price of $3.68 per share on April 29, 2020.

**Repurchases During the Relevant Period**

328. During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company, which overpaid an aggregate amount of nearly $41.1 million for repurchases of its own stock during the Relevant Period.

329. According to the 3Q16 10-Q, within the Relevant Period during the three months ended September 30, 2016, the Individual Defendants caused the Company to repurchase 8,618 shares of its own common stock at an average price per share of approximately $17.36, for a total cost to the Company of approximately $149,608.

330. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $14.24 more than the actual worth of each share within the Relevant Period during the three months ended September 30, 2016. Thus, the total over payment by the

- 118 -

Company for repurchases of its own stock within the Relevant Period during the three months ended September 30, 2016 was approximately $122,720.

331.    According to the 2016 10-K, during the three months ended December 31, 2016, the Individual Defendants caused the Company to repurchase 767,711 shares of its own common stock at an average price per share of approximately $12.83, for a total cost to the Company of approximately $9,849,732.

332.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $9.71 more than the actual worth of each share during the three months ended December 31, 2016. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended December 31, 2016 was approximately $7,454,474.

333.    According to the 1Q17 10-Q, during the three months ended March 31, 2017, the Individual Defendants caused the Company to repurchase 349,420 shares of its own common stock at an average price per share of approximately $14.63, for a total cost to the Company of approximately $5,112,015.

334.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.51 more than the actual worth of each share during the three months ended March 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended March 31, 2017 was approximately $4,021,824.

- 119 -

335.     According to the 2Q17 10-Q, during the three months ended June 30, 2017, the Individual Defendants caused the Company to repurchase 14,833 shares of its own common stock at an average price per share of approximately $14.02, for a total cost to the Company of approximately $207,959.

336.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.90 more than the actual worth of each share during the three months ended June 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended June 30, 2017 was approximately $161,680.

337.     According to the 3Q17 10-Q, during the three months ended September 30, 2017, the Individual Defendants caused the Company to repurchase 29,092 shares of its own common stock at an average price per share of approximately $11.97, for a total cost to the Company of approximately $348,231.

338.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $8.85 more than the actual worth of each share during the three months ended September 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended September 30, 2017 was approximately $257,464.

339.     According to the 2017 10-K, during the three months ended December 31, 2017, the Individual Defendants caused the Company to repurchase 24,238 shares of its own common

- 120 -

stock at an average price per share of approximately $10.44, for a total cost to the Company of approximately $253,045.

340. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.32 more than the actual worth of each share during the three months ended December 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended December 31, 2017 was approximately $177,422.

341. According to the 1Q18 10-Q, during the three months ended March 31, 2018, the Individual Defendants caused the Company to repurchase 384,788 shares of its own common stock at an average price per share of approximately $6.80, for a total cost to the Company of approximately $2,616,558.

342. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.68 more than the actual worth of each share during the three months ended March 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended March 31, 2018 was approximately $1,416,020.

343. According to the 2Q18 10-Q, during the three months ended June 30, 2018, the Individual Defendants caused the Company to repurchase 12,685 shares of its own common stock at an average price per share of approximately $7.64, for a total cost to the Company of approximately $96,913.

344. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the

Company paid on average $4.52 more than the actual worth of each share during the three months ended June 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended June 30, 2018 was approximately $57,336.

345.    According to the 3Q18 10-Q, during the three months ended September 30, 2018, the Individual Defendants caused the Company to repurchase 15,777 shares of its own common stock at an average price per share of approximately $8.20, for a total cost to the Company of approximately $129,371.

346.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.08 more than the actual worth of each share during the three months ended September 30, 2018. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended September 30, 2018 was approximately $80,147.

347.    According to the 2018 10-K, during the three months ended December 31, 2018, the Individual Defendants caused the Company to repurchase 1,310,052 shares of its own common stock at an average price per share of approximately $6.65, for a total cost to the Company of approximately $8,711,846.

348.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.53 more than the actual worth of each share during the three months ended December 31, 2018. Thus, the total over payment by the Company for repurchases

- 122 -

of its own stock during the three months ended December 31, 2018 was approximately $4,624,484.

349.    According to the 1Q19 10-Q, during the three months ended March 31, 2019, the Individual Defendants caused the Company to repurchase 1,366,397 shares of its own common stock at an average price per share of approximately $6.58, for a total cost to the Company of approximately $8,990,892.

350.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.46 more than the actual worth of each share during the three months ended March 31, 2019. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended March 31, 2019 was approximately $4,727,734.

351.    According to the 2Q19 10-Q, during the three months ended June 30, 2019, the Individual Defendants caused the Company to repurchase 1,294,115 shares of its own common stock at an average price per share of approximately $6.39, for a total cost to the Company of approximately $8,269,395.

352.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.27 more than the actual worth of each share during the three months ended June 30, 2019. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended June 30, 2019 was approximately $4,231,756.

353.    According to the 3Q19 10-Q, during the three months ended September 30, 2019, the Individual Defendants caused the Company to repurchase 16,631 shares of its own common

- 123 -

stock at an average price per share of approximately $8.23, for a total cost to the Company of approximately $136,873.

354. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.11 more than the actual worth of each share during the three months ended September 30, 2019. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended September 30, 2019 was approximately $84,984.

355. According to the 2019 10-K, during the three months ended December 31, 2019, the Individual Defendants caused the Company to repurchase 804,356 shares of its own common stock at an average price per share of approximately $6.99, for a total cost to the Company of approximately $5,622,448.

356. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.87 more than the actual worth of each share during the three months ended December 31, 2019. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended December 31, 2019 was approximately $3,112,858.

357. According to the Company's quarterly report for the fiscal quarter ended March 31, 2020 on Form 10-Q, during the three months ended March 31, 2020, the Individual Defendants caused the Company to repurchase 3,673,314 shares of its own common stock at an

average price per share of approximately $5.99, for a total cost to the Company of approximately $22,003,151.

358.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $2.87 more than the actual worth of each share during the three months ended March 31, 2020. Thus, the total over payment by the Company for repurchases of its own stock during the three months ended March 31, 2020 was approximately $10,542,411.

## DAMAGES TO BROOKDALE

359.    As a direct and proximate result of the Individual Defendants' conduct, Brookdale will lose and expend many millions of dollars.

360.    Such losses include the Company's overpayment by nearly $41.1 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

361.    Such expenditures include, but are not limited to costs associated with the costs of legal fees associated with the Consumer Class Action filed against the Company and the Securities Class Action and other lawsuits filed against the Company, its CEO, former CEO, and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

362.    Such expenditures include, but are not limited to costs associated with the costs of defending investigations of the Misconduct and for fines paid in connection thereto.

363.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

- 125 -

364. As a direct and proximate result of the Individual Defendants' conduct, Brookdale has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

365. Plaintiff brings this action derivatively and for the benefit of Brookdale to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Brookdale, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

366. Brookdale is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

367. Plaintiff is, and has been at all relevant times, a Brookdale shareholder. Plaintiff will adequately and fairly represent the interests of Brookdale in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

368. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

369. A pre-suit demand on the Board of Brookdale is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants

Baier, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky (the "Director-Defendants"); and non-parties Freed and Jordan R. Asher (the "Non-Parties" and, together the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who were on the Board at the time this action was commenced.

370.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

371.   Demand is also excused as to all of the Director-Defendants because the Misconduct was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

372.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

373.   Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by

causing the Company to pay Defendants Baier, Smith, and Swain their annual bonus and/or stock awards each year that they violated the Company's policies. Indeed, the Misconduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

374. Moreover, Defendants Baier, Bromley, Bumstead, Johnson-Mills, Warren, and Wielansky caused the 2019 Proxy Statement to call for a shareholder vote to approve the Incentive Proposal, which provided for the grant of stock and cash-based performance awards for officers and directors, including Defendants Baier and Swain. The misrepresentations and omissions set forth herein were material to shareholders in voting on the Incentive Proposal who would not have approved the Incentive Proposal, had they been informed about the Misconduct. As a result of shareholder approval of the Inventive Proposal, Defendants Baier and Swain undeservedly received approximately $4,773,420 and $1,306,414, respectively, in performance-based stock awards during the fiscal year ended December 31, 2019; and Defendants Bromley, Bumstead, Sansone, Wielansky, Clegg, and Seward, and non-party Freed undeservedly received approximately $99,995 each in stock awards during the fiscal year ended December 31, 2019; and Defendants Johnson-Mills and Warren undeservedly received approximately $41,367 and $24,382, respectively in stock awards during the fiscal year ended December 31, 2019. For this reason too, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

375. Demand is also excused as to the Director-Defendants because they were fully aware of the Misconduct during the Relevant Period, as evidenced by the fact that Brookdale's residents, families of residents, and even Brookdale's own staff inundated the Company with

- 128 -

complaints of the chronic understaffing of Brookdale's facilities and, as a result of the Misconduct, the Company's failure to provide proper and promised care to the Company's residents. Nonetheless, the Director-Defendants caused the Company to disseminate the false and misleading statements described herein, and, among other Individual Defendants, Defendants Bromley, Bumstead, and Wielansky caused Defendant Baier to be promoted to CEO in February 2018. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

376. Additional reasons that demand on Defendant Baier is futile follow. Defendant Baier has served as the Company's President and CEO and as a Company director since February 2018. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Baier with her principal occupation, and she receives handsome compensation, including $6,350,901 during the fiscal year ended December 31, 2019, $4,674,255 during the fiscal year ended December 31, 2018, $2,407,188 during the fiscal year ended December 31, 2017, and $2,492,367 during the fiscal year ended December 31, 2016. As the Company provides Defendant Baier with her primary occupation and means of livelihood, it is unlikely she would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining her compensation and evaluating her continued employment with Brookdale. Defendant Baier was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing quarterly reports described herein filed on Form 10-Qs with the SEC as well as the 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K, which she signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, she conducted little, if any,

oversight of the Misconduct (which Defendant Baier engaged in and permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Baier is a defendant in the Securities Class Action. For these reasons, too, Defendant Baier breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

377. Additional reasons that demand on Defendant Bromley is futile follow. Defendant Bromley has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. Defendant Bromley has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Bromley permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bromley signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Bromley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

378. Additional reasons that demand on Defendant Bumstead is futile follow. Defendant Bumstead has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate

Governance Committee. Defendant Bumstead has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Bumstead permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bumstead signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Bumstead breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

379. Additional reasons that demand on Defendant Johnson-Mills is futile follow. Defendant Johnson-Mills has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee. Defendant Johnson-Mills has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Misconduct (which Defendant Johnson-Mills permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Johnson-Mills signed, and thus personally made the false and misleading statements in the 2018 10-K and 2019 10-K. For these reasons, too, Defendant

Johnson-Mills breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

380. Additional reasons that demand on Defendant Sansone is futile follow. Defendant Sansone has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. Defendant Sansone has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Sansone permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sansone signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Sansone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

381. Additional reasons that demand on Defendant Warren is futile follow. Defendant Warren has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Warren has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Misconduct (which Defendant Warren permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect

- 132 -

corporate assets. Defendant Warren breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

382.    Additional reasons that demand on Defendant Wielansky is futile follow. Defendant Wielansky has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. Defendant Wielansky has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Wielansky permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Wielansky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

383.    Additional reasons that demand on non-party Freed is futile follow. Non-party Freed has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Freed has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Misconduct (which Freed permitted despite being aware of it) the Company's engagement in the

- 133 -

scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Freed signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, non-party Freed breached her fiduciary duties, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

384.    Additional reasons that demand on the Board is futile follow.

385.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, six of the eight Director-Defendants have served on the Board for at least two years or more. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

386.    In violation of the Audit Committee Charter, Defendants Bromley, Warren, and Wielansky failed to ensure that Brookdale's public disclosures were full and accurate and that the Company complied with all relevant laws and regulations. Thus, as members of the Audit Committee, they face a substantial likelihood of liability and demand is futile as to them.

- 134 -

387.     Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by nearly $41.1 million for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

388.     Brookdale has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Brookdale any part of the damages Brookdale suffered and will continue to suffer thereby. Thus, any demand on the Director-Defendants would be futile.

389.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

- 135 -

390. The acts complained of herein constitute violations of fiduciary duties owed by Brookdale's officers and directors, and these acts are incapable of ratification.

391. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Brookdale. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Brookdale, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

392. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Brookdale to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

393. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

- 136 -

# FIRST CLAIM

## Against the Individual Defendants for Violations of
## Section 14(a) of the Securities Exchange Act of 1934

394.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

395.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

396.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

397.    Under the direction and watch of the Directors, the 2018 Proxy Statement and 2019 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that:  (1) the Misconduct; (2) the Company's commercial success was maintained by, among other things, the Misconduct; (3) the Misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's

- 137 -

financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

398.     The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ performance based compensation elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on the Misconduct and misrepresented as a result of false and misleading statements, causing the Company's share price and financial performance to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

399.     Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or tolerance of the Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

400.     The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Misconduct.

401.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

- 138 -

determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval the Proposals.

402. The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2019 Proposals who would not have approved, among other things, Defendants Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky incentive award plan, had they been informed about the Misconduct. As a result of shareholder approval of the Inventive Proposal, Defendants Baier and Swain undeservedly received approximately $4,773,420 and $1,306,414, respectively, in performance-based stock awards during the fiscal year ended December 31, 2019; and Defendants Bromley, Bumstead, Sansone, Wielansky, Clegg, and Seward, and non-party Freed undeservedly received approximately $99,995 each in stock awards during the fiscal year ended December 31, 2019; and Defendants Johnson-Mills and Warren undeservedly received approximately $41,367 and $24,382, respectively in stock awards during the fiscal year ended December 31, 2019.

403. The false and misleading elements of the 2018 Proxy Statement led to, among other things, the approval of the 2018 Proposals and the election or re-election of Defendants Bromley, Johnson-Mills, and Warren, which allowed them to breach or continue breaching their fiduciary duties to Brookdale.

404. The false and misleading elements of the 2019 Proxy Statement led to, among other things, the approval of the 2019 Proposals and the election of Defendant Sansone and non-party Freed which allowed them to breach their fiduciary duties to Brookdale.

405. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

- 139 -

406.     Plaintiff, on behalf of Brookdale, has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

407.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

408.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Brookdale. Not only is Brookdale now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Brookdale by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase nearly 10.1 million of its own shares on the open market at artificially inflated prices, damaging Brookdale by nearly $41.1 million.

409.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

410.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

- 140 -

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Brookdale not misleading.

411.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Brookdale. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

412.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director and/or officer would have signed the Company's false and misleading Form 10-K's filed with the SEC during the Relevant Period, including Defendants Baier, Smith, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky who signed the 2016 10-K, Defendants Baier, Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Seward, and Wielansky who signed the 2017 10-K, Defendants Baier, Swain, Bromley, Bumstead, Clegg, Johnson-Mills,

- 141 -

Seward, Warren, and Wielansky who signed the 2018 10-K, Defendants Baier, Swain, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky, and non-party Freed who signed the 2019 10-K.

413. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

414. Plaintiff on behalf of Brookdale has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

415. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

416. The Individual Defendants, by virtue of their positions with Brookdale and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Brookdale and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Brookdale to engage in the illegal conduct and practices complained of herein.

417. Plaintiff, on behalf of Brookdale, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

418. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

- 142 -

419. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Brookdale's business and affairs.

420. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

421. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Brookdale.

422. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

423. In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Misconduct.

424. Also in breach of their fiduciary duties owed to Brookdale, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Misconduct; (2) the Company's commercial success was maintained by, among other things, the Misconduct; (3) the Misconduct exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Misconduct would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to

- 143 -

maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

425. In further breach of their fiduciary duties owed to Brookdale, the Individual Defendants willfully or recklessly caused the Company to repurchase nearly $72.5 million worth of Company stock at artificially inflated prices.

426. The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay the Individual Defendants their annual bonuses and/or stock awards each year that they violated the Company's policies.

427. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Brookdale's securities.

428. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Brookdale's securities. The Individual Defendants, in good faith, should have taken

- 144 -

appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

429.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

430.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Brookdale has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

431.    Plaintiff on behalf of Brookdale has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

432.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

433.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Brookdale.

434.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Brookdale that was tied to the performance or artificially inflated valuation of Brookdale, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

435.    Plaintiff, as a shareholder and a representative of Brookdale, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based

- 145 -

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

436.     Plaintiff on behalf of Brookdale has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

437.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

438.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Brookdale, for which they are legally responsible.

439.     As a direct and proximate result of the Individual Defendants' abuse of control, Brookdale has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Brookdale has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

440.     Plaintiff on behalf of Brookdale has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

441.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

442.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

- 146 -

with regard to prudently managing the assets and business of Brookdale in a manner consistent with the operations of a publicly-held corporation.

443. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Brookdale has sustained and will continue to sustain significant damages.

444. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

445. Plaintiff, on behalf of Brookdale, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

446. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

447. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Brookdale to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

448. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

449. Plaintiff, on behalf of Brookdale, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Baier, Smith, and Swain for Contribution

- 147 -

**Under Sections 10(b) and 21D of the Exchange Act**

450. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

451. Brookdale, along with Defendants Baier, Smith, and Swain are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Baier, Smith, and Swain's willful and/or reckless violations of their obligations as officers and/or directors of Brookdale.

452. Defendants Baier, Smith, and Swain, because of their positions of control and authority as officers and/or directors of Brookdale, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Brookdale, including the wrongful acts complained of herein and in the Securities Class Action.

453. Accordingly, Defendants Baier, Smith, and Swain are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

454. As such, Brookdale is entitled to receive all appropriate contribution or indemnification from Defendants Baier, Smith, and Swain.

## <u>PRAYER FOR RELIEF</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

- 148 -

(a)    Declaring that Plaintiff may maintain this action on behalf of Brookdale, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Brookdale;

(c)    Determining and awarding to Brookdale the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Brookdale and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Brookdale and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.    a provision to permit the shareholders of Brookdale to nominate at least five candidates for election to the board; and

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Brookdale restitution from Individual Defendants, and each of them;

- 149 -

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 29, 2020                    Respectfully submitted,

<u>**s/Paul Kent Bramlett**</u>
PAUL KENT BRAMLETT
TN #7387/MS#4291
ROBERT PRESTON BRAMLETT
TN #25985
Bramlett Law Offices
P. O. Box 150734
Nashville, TN 37215-0734
Telephone: 615.248.2828
Facsimile: 866.816.4116
E-mails: PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**                    *Attorneys for Plaintiff*
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

- 150 -