**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| BRIAN DAVIS, derivatively on behalf of BROOKDALE SENIOR LIVING INC., | Lead Case No. 3:20-cv-00929 |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, and LEE S. WIELANSKY, | |
| Defendants, | |
| and | |
| BROOKDALE SENIOR LIVING INC., | |
| Nominal Defendant. | |

## VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Brian Davis ("Davis"), Brian Bickett ("Bickett"), and Robert Bazinet ("Bazinet," and collectively, "Plaintiffs"), by and through their undersigned attorneys, derivatively and on behalf of Nominal Defendant Brookdale Senior Living Inc. ("Brookdale" or the "Company"), files this Verified Consolidated Amended Shareholder Derivative Complaint

– 1 –

against Individual Defendants Lucinda M. Baier ("Baier"), T. Andrew Smith ("Smith"), Steven E. Swain ("Swain"), Marcus E. Bromley ("Bromley"), Frank M. Bumstead ("Bumstead"), Jackie M. Clegg ("Clegg"), Daniel A. Decker ("Decker"), Rita Johnson-Mills ("Johnson-Mills"), Jeffrey R. Leeds ("Leeds"), Mark J. Parrell ("Parrell"), William G. Petty, Jr. ("Petty"), Guy P. Sansone ("Sansone"), James R. Seward ("Seward"), Denise W. Warren ("Warren"), and Lee S. Wielansky ("Wielansky") (collectively, the "Individual Defendants," and together with Brookdale the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Brookdale, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs' allegations are based upon their personal knowledge as to them and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Brookdale, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Brookdale's directors and officers between August 2016 and March 2021, at least, both dates inclusive (the "Relevant Period").

2.      Brookdale, founded in 2005, is the largest operator of senior living communities in the United States based on total capacity, with 679 communities in 41 states and the ability to serve more than 60,000 residents as of December 31, 2021. The Company owns, leases, and manages independent living, assisted living, memory care, and continuing care retirement communities while offering a range of home health, hospice, and outpatient therapy services.

3.      During the Relevant Period, Brookdale residents were subjected to an initial evaluation to determine the level of care each resident needed and, in turn, how much the Company would charge each resident for its services under the Company's standard, uniform Residency Agreements (the "Residency Agreements"). To be sure, the more care a resident requires, the more expensive Brookdale's monthly fees are. This increase in costs purportedly results from increased staffing needs.

4.      At the outset of Brookdale's formation, the Company took on an aggressive growth strategy through a series of acquisitions, fueled by massive financing. The Company's significant debt and lease obligations require the Company to set and meet certain financial performance thresholds, and each of its individual facilities throughout the United States. Moreover, those obligations are subject to cross-default and cross-collateralization provisions, which means that a default by Brookdale related to one facility could have a significant effect on a sizeable portion of the Company's community portfolio.

- 3 -

5.     As a result of the pressure for each Brookdale facility to satisfy those financial performance targets and avoid default under its extensive debt and lease obligations, the Company operates as a single entity by closely monitoring and asserting tight-knit control over each aspect of the operations of every Brookdale-managed facility in the United States. The Company almost exclusively operates out of its headquarters in Brentwood, Tennessee.

6.     The Company utilized a computer software program, which Brookdale developed in-house, called the Service Alignment Software (the "Service Alignment Software") to determine and regulate the Company's daily staffing needs at its facilities—Brookdale's largest line-item expense.

7.     To function, the Service Alignment Software required individuals to enter certain data such as task counts, task times, logic algorithms, and source code. To guarantee strict compliance with Company policies, particularly on facility staffing needs, the Individual Defendants ensured that facility-level employees did not have access to the Service Alignment Software and could not otherwise adjust staffing at Brookdale facilities.

8.     Throughout the Relevant Period the Individual Defendants caused the Company to: (i) intentionally underestimate the data inputs that were entered into the Service Alignment Software in a concerted effort to meet certain financial performance targets; (ii) as a result, systematically and purposefully set daily staffing numbers and hours at Brookdale facilities greatly beneath the staffing levels necessary to meet resident needs and the demand for care in Brookdale facilities, in accordance with their Personal Service Assessment (defined below); (iii) fail to permit the facility-level employees to adjust data inputs to the Service Alignment Software or facility staffing levels based upon known facility staffing needs and; (iv) as a result of the

- 4 -

foregoing, fail to provide prompt care and services to residents that had been paid for, breach Brookdale's standard form Residency Agreements, and violate multiple state adult care home rules and regulations, including from falsely advertising its services, improperly obtaining better ratings by submitting false data about its staffing to the government, and, at times, improperly discharging residents (collectively, the "Misconduct").

9. In breach of their fiduciary duties, the Individual Defendants enabled and/or permitted the Misconduct, engaged in and/or caused the Company to engage in the Misconduct, and failed to maintain adequate controls.

10. The Misconduct was no secret internally. Rather, it was part of a long-standing and widespread business practice implemented by the Individual Defendants to achieve actual or perceived profitability at the Company, which benefited the Individual Defendants through lucrative compensation programs. The Misconduct ultimately subjected the Company to millions of dollars in damages, at least. Nonetheless, during the Relevant Period, certain of the Individual Defendants solicited and caused the Company to file materially false and misleading Schedule 14A proxy statements with the SEC that, *inter alia*, failed to disclose the Misconduct.

11. In 2017, Company residents began initiating class actions against Brookdale, seeking relief for the Misconduct. On April 4, 2017, Gloria Runton, a former Brookdale resident, filed the "Runton Action" (defined below) against Brookdale, captioned *Runton v. Brookdale Senior Living, Inc.*, No. 17-60664 (S.D. Fl. 2017) seeking, *inter alia*, to recover damages from Brookdale's failure to adequately staff its facilities and instead staffing its facilities based upon corporate decisions to maximize profits, while concealing how the Company made facility staffing decisions from residents, family members of residents, and the general public.

- 5 -

12.     A couple years later, on May 3, 2019, Meghan Bright, as curator of the estate of Leonard Foote and Jean Howard, by and through her son Gary Weir, as power of attorney, filed the Bright Action (defined below) against Brookdale, captioned *Bright, et al. v. Brookdale Senior Living, Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn. 2019) (the "Bright Action") alleging, among other things, violation of the North Carolina Unfair and Deceptive Trade Practices Act and seeking, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations.

13.     On April 24, 2020, the Gunza Action (defined below) was filed against Brookdale, captioned *Gunza, et al. v. Brookdale Senior Living, Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn. 2020) (the "Gunza Action") seeking substantially similar relief as sought in the Bright Action.[1]

14.     On April 30, 2020, *Nashville Business Journal* published an article (the "April 2020 Article") which reported on the Gunza Action filed against the Company alleging that the Company used computer software to "underestimate" staffing needs at each of its facilities to intentionally "chronically" understaff its facilities in North Carolina to satisfy financial performance targets and mislead Brookdale residents and their families by failing to provide "basic care" and "daily living services" that were paid for. The April 2020 Article further revealed that the Company's officers "routinely" scolded executive directors in emails related to staffing budgets. Finally, the April 2020 Article revealed that the Company established lucrative incentive programs that were connected to satisfying or surpassing the Company's financial

---

[1] On June 23, 2020, the court granted a joint motion to consolidate the Bright Action with the Gunza Action. This consolidated action is referred to herein as the "Consumer Class Action."

- 6 -

performance targets to induce employees to keep staffing expenses within budget regardless of need.

15.     On March 12, 2021, defendant's motion to dismiss the Consumer Class Action was denied in part. The court held that the "central allegations are more than vague statements of corporate optimism," and that the allegations that the Company "engaged in a deliberate scheme to target elderly, disabled, and dependent individuals to contract for residence in its facilities based on the false promise of delivering services tailored to meet their care needs" are sufficient to bring a viable claim under the North Carolina Unfair and Deceptive Trade Practices Act. The court also upheld claims in the Gunza Action for breach of contract, tortious interference, and unjust enrichment and refused to determine that class certification was not appropriate.

16.     On March 15, 2021, the California Attorney General Xavier Becerra filed an action against Brookdale, captioned *The People of the State of California v. Brookdale Senior Living, Inc.*, No. BCV-21-100539 (Cal. Super. Ct.) (the "California Action") charging Brookdale with, *inter alia*, "systematically" violating multiple statutes shielding senior Californians, including but not limited to: increasing the Company's profits to the detriment of residents' care and rights as a nursing home resident, suddenly discharging residents without adequate notice, submitting false data about its staffing to the federal government in order to achieve higher ratings and falsely advertising its quality of care on a false business model.

17.     On March 11, 2022, the California Action reached a settlement with Brookdale for $3.25 million, $2.4 million of which consists of civil penalties against the Company for misrepresenting the quality of care provided to Brookdale residents and reporting false information to the Centers for Medicare & Medicaid Services ("CMS").

- 7 -

18.     As a result of the Individual Defendants' misconduct, which subjected Brookdale, to being named as a defendant in the federal Consumer Class Action pending in the United States District Court for the Middle District of Tennessee the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Brookdale's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

21.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

- 8 -

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Tennessee or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

25.    Venue is proper in this District because Brookdale and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

<u>**PARTIES**</u>

<u>**Plaintiffs**</u>

26.    Plaintiff Davis is a current shareholder of Brookdale common stock. Davis purchased Brookdale common stock during the beginning of the Relevant Period. Plaintiff is a citizen of Florida.

27.    Plaintiff Bickett is a current shareholder of Brookdale common stock and has held Brookdale common stock since 2005. Bickett is a citizen of Florida.

- 9 -

28.     Plaintiff Bazinet is a current shareholder of Brookdale common stock and has held Brookdale common stock since 2015. Bazinet is a citizen of Minnesota.

**Nominal Defendant Brookdale**

29.     Nominal Defendant Brookdale is a Delaware corporation with its principal executive offices at 111 Westwood Place, Suite 400, Brentwood, TN 37027. Brookdale stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BKD."

**Defendant Baier**

30.     Defendant Baier has served as Brookdale's President and Chief Executive Officer ("CEO") and as a Company director since February 2018. Previously, Defendant Baier served as Brookdale's Chief Financial Officer ("CFO") from December 2015 until February 2018. According to the Company's Schedule 14A filed with the SEC on April 29, 2021, (the "2021 Proxy Statement"), on April 23, 2021, Defendant Baier beneficially owned 444,597 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Baier owned over $2,880,988 worth of Brookdale stock as of that date.

31.     For the fiscal year ended December 31, 2020, Defendant Baier received $7,087,470 in compensation from the Company. This included $930,000 in salary, $4,939,153 in stock awards, $158,288 in non-equity executive compensation, and $7,331 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Baier received $6,350,901 in compensation from the Company. This included $910,000 in salary, $4,773,420 in stock awards, $657,295 in non-equity incentive plan compensation, and $10,186 in all other

- 10 -

compensation. For the fiscal year ended December 31, 2018, Defendant Baier received $4,674,255 in compensation from the Company. This included $782,248 in salary, $50,000 in bonus, $3,551,872 in stock awards, $281,023 in non-equity incentive plan compensation, and $9,112 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Baier received $2,407,188 in compensation from the Company. This included $550,000 in salary, $1,500,013 in stock awards, $196,150 in non-equity incentive plan compensation, and $161,025 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Baier received $2,492,367 in compensation from the Company. This included $552,115 in salary, $1,500,005 in stock awards, $222,750 in non-equity incentive plan compensation, and $217,497 in all other compensation.

32. The Company's 2021 Proxy Statement stated the following about Defendant Baier:

> Ms. Baier has served as Brookdale's President and Chief Executive Officer and as a member of the Board since February 2018, after having served as Brookdale's Chief Financial Officer since December 2015. Ms. Baier joined Brookdale from Navigant Consulting, Inc., a specialized global expert services firm, where she served as Executive Vice President and Chief Financial Officer since 2013. In addition, Ms. Baier has had multi-billion dollar operations responsibility, been the chief executive officer for a publicly-traded retailer, and served as an executive officer of a Fortune 30 company. She has served for more than a decade as a board member of public and private companies and organizations. She currently serves as a member of the board of directors of the Nashville Health Care Council, where she serves on the Executive Committee, and is a member of the NYSE Board Advisory Council, which identifies and connects diverse board candidates to NYSE-listed companies seeking new directors. Ms. Baier has been recognized by a number of professional organizations, including as recipient of the Corporate Citizenship 2020 Award from the Committee for Economic Development of The Conference Board, being named in WomenInc.'s 2019 Most Influential Corporate Directors list, and for the second consecutive year being named to the Nashville Business Journal's "Most Admired CEO" list. Ms. Baier is a Certified Public Accountant and a graduate of Illinois State University, with B.S. and M.S. degrees in Accounting.

- 11 -

**Ms. Baier's continued leadership and accomplishments in the areas of our people, portfolio, and operations and strong crisis management as the Company's President and Chief Executive Officer, and her prior leadership roles at other companies, led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

33.     Upon information and belief, Defendant Baier is a citizen of Tennessee.

**Defendant Smith**

34.     Defendant Smith served as the Company's CEO from February 2013, as President from March 2016, and as a Company director from June 2014 until he resigned from all his positions with the Company on February 28, 2018. Previously, he had served as Executive Vice President, General Counsel, and Secretary from October 2006 until February 2013.

35.     For the fiscal year ended December 31, 2018, Defendant Smith received $2,709,314 in compensation from the Company. This included $157,115 in salary and $2,552,199 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Smith received $1,315,829 in compensation from the Company. This included $950,000 in salary, $356,709 in non-equity incentive plan compensation, and $9,120 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Smith received $6,608,594 in compensation from the Company. This included $953,654 in salary, $5,225,007 in stock awards, $418,594 in non-equity incentive plan compensation, and $11,339 in all other compensation.

36.     The Company's Schedule 14A filed with the SEC on August 14, 2017 (the "2017 Proxy Statement") stated the following about Defendant Smith:

- 12 -

**T. Andrew Smith** has over 25 years of experience in seniors housing, mergers and acquisitions, real estate and capital markets transactions, corporate finance and healthcare. Mr. Smith has served as our Chief Executive Officer since February 2013, as our President since March 2016, and as a member of the Board since June 2014. From October 2006 to February 2013, Mr. Smith served as our Executive Vice President, General Counsel and Secretary. In addition to his role in managing our legal affairs, Mr. Smith was responsible for the management and oversight of our corporate development functions (including acquisitions and expansion and development activity); corporate finance (including capital structure, debt and lease transactions and lender/lessor relations); strategic planning; and risk management. Prior to joining Brookdale, Mr. Smith served as a member of Bass, Berry & Sims PLC's corporate and securities group and as chair of the firm's healthcare group. During his tenure at Bass, Berry & Sims (1985 to 2006), Mr. Smith represented American Retirement Corporation as outside General Counsel. He currently serves as a member of the board of directors of the Nashville Health Care Council, Argentum and the National Investment Center for the Seniors Housing & Care Industry (NIC) and as a member of the executive board of the American Seniors Housing Association (ASHA). Mr. Smith's knowledge of the senior housing industry and his experience as our President and Chief Executive Officer, and previously as our Executive Vice President, General Counsel and Secretary, led to the conclusion that he should serve as a member of the Board.

37.     Upon information and belief, Defendant Smith is a citizen of Tennessee.

**Defendant Swain**

38.     Defendant Swain has served as the Company's CFO since September 2018. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Swain beneficially owned 67,207 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Defendant Swain owned over $435,501 worth of Brookdale stock as of that date.

39.     For the fiscal year ended December 31, 2020, Defendant Swain received $2,841,756 in compensation from the Company. This included $575,000 in salary, $1,713,588 in stock awards, $71,875 in non-equity incentive plan compensation, and $6,918 in all other

- 13 -

compensation. For the fiscal year ended December 31, 2019, Defendant Swain received $2,117,449 in compensation from the Company. This included $515,000 in salary, $1,306,414 in stock awards, $275,545 in non-equity incentive plan compensation, and $20,490 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Swain received $1,272,135 in compensation from the Company. This included $161,538 in salary, $100,000 in bonus, $802,324 in stock awards, $46,038 in non-equity incentive plan compensation, and $162,235 in all other compensation.

40. The Company's 2021 Proxy Statement stated the following about Defendant Swain:

> **Steven E. Swain** joined Brookdale as Executive Vice President and Chief Financial Officer in September 2018. Prior to joining Brookdale, Mr. Swain served as Senior Vice President and Chief Financial Officer of DISH Network Corporation from October 2014 to August 2018, after having served as its Senior Vice President of Programming from April 2014 to October 2014, and as its Vice President of Corporate Financial Planning and Analysis since joining the company in 2011. Prior to DISH Network, Mr. Swain spent more than 15 years working in the telecommunications sector, most recently at CenturyLink, Inc. and Qwest Communications International, Inc. (acquired by CenturyLink), where he served in multiple leadership roles in finance, including corporate financial planning and analysis, treasury, and investor relations, as well as in network engineering. Mr. Swain earned his B.S. degree in Chemical Engineering from the University of Wisconsin–Madison and his M.B.A. degree from the University of Chicago Booth School of Business.

41. Upon information and belief, Defendant Swain is a citizen of Colorado.

**Defendant Bromley**

42. Defendant Bromley has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Bromley beneficially owned 101,693 shares of the Company's common stock which represented less than 1% of the

- 14 -

Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Bromley owned over $658,970 worth of Brookdale stock as of that date.

43. For the fiscal year ended December 31, 2020, Defendant Bromley received $211,033 in compensation from the Company. This included $111,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Defendant Bromley received $256,995 in compensation from the Company. This included $157,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Bromley received $230,831 in compensation from the Company. This included $187,000 in fees earned and cash paid and $43,831 in stock awards. For the fiscal year ended December 31, 2017, Defendant Bromley received $203,472 in compensation from the Company.

44. The Company's 2021 Proxy Statement stated the following about Defendant Bromley:

> Mr. Bromley brings more than 35 years of real estate industry leadership experience. He served as Chairman of the Board and Chief Executive Officer of Gables Residential Trust from 1993 until 2000, and then as a member of its Board until the company was acquired in 2005. Prior to joining Gables Residential Trust, Mr. Bromley was a division partner for the Southeast operation of Trammell Crow Residential Company. Mr. Bromley has served as a member of the Board of Cole Credit Property Trust V, Inc., a non-listed real estate investment trust, since March 2015 and served as its Non-Executive Chairman from June 2015 to August 2018. Mr. Bromley also currently serves as a member of the advisory board of Nancy Creek Capital Management, LLC, a private mezzanine debt and equity investment firm, and Sealy Industrial Partners, a private partnership specializing in the acquisition and operation of various industrial real estate properties. Mr. Bromley holds a B.S. in Economics from Washington & Lee University and an M.B.A. from the University of North Carolina.
>
> **Mr. Bromley's significant executive, leadership, and advisory experience in the real estate industry led to the conclusion that he should serve as a member of the Board.**

- 15 -

(Emphasis in original.)

45.     Upon information and belief, Defendant Bromley is a citizen of Georgia.

**Defendant Bumstead**

46.     Defendant Bumstead has served as a Company director since August 2006. He also serves as a member of the Compensation Committee, Investment Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Bumstead beneficially owned 326,746 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Defendant Bumstead owned over $2,117,314 worth of Brookdale stock as of that date.

47.     For the fiscal year ended December 31, 2020, Defendant Bumstead received $228,003 in compensation from the Company. This included $128,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Defendant Bumstead received $289,995 in compensation from the Company. This included $190,000 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Bumstead received $315,994 in compensation from the Company. This included $216,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Bumstead received $379,992 in compensation from the Company. This included $280,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Bumstead received $320,995 in

- 16 -

compensation from the Company. This included $221,000 in fees earned and cash paid and $99,995 in stock awards.

48. The Company's 2021 Proxy Statement stated the following about Defendant Bumstead:

> Mr. Bumstead has over 40 years' experience in the field of business and investment management and financial and investment advisory services, including representing buyers and sellers in a number of merger and acquisition transactions. Mr. Bumstead is a principal shareholder of Flood, Bumstead, McCready & McCarthy, Inc., a business management firm that represents artists, songwriters and producers in the music industry as well as athletes and other high net worth clients, and has been with the firm since 1989. From 1993 to December 1998, Mr. Bumstead served as the Chairman and Chief Executive Officer of FBMS Financial, Inc., a registered investment advisor. He served in 2015 as Chairman of the Board of Directors of the Country Music Association and is also Vice Chairman of the Board of Directors and Chairman of the Finance and Investment Committee of the Memorial Foundation, Inc., a charitable foundation. In addition, he previously served as a member of the Board of Advisors of United Supermarkets of Texas, LLC and was Chairman of its Finance and Audit Committee. Mr. Bumstead received a B.B.A. degree from Southern Methodist University and a Masters of Business Management from Vanderbilt University's Owen School of Management.

> **Mr. Bumstead's experience in business management and as a director of several public companies, along with his knowledge of the senior housing industry (through his prior service as a director of ARC), led to the conclusion that he should serve as a member of the Board.**

49. Upon information and belief, Defendant Bumstead is a citizen of Tennessee.

**Defendant Clegg**

50. Defendant Clegg served as a Company director from November 2005 until October 29, 2019. She also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and as a member of the Audit Committee.

- 17 -

51.     For the fiscal year ended December 31, 2019, Defendant Clegg received $349,047 in compensation from the Company. This included $249,052 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Clegg received $322,994 in compensation from the Company. This included $223,000 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Clegg received $390,992 in compensation from the Company. This included $291,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Clegg received $339,995 in compensation from the Company. This included $240,000 in fees earned and cash paid and $99,995 in stock awards.

52.     The Company's amended annual report filed on a form 10-K/A with the SEC on April 29, 2019 (the "2018 10-K/A") stated the following about Defendant Clegg:

> Ms. Clegg brings extensive transactional and financial experience, along with expertise in corporate governance and public policy, through her work as a strategic consultant, in government service and as a director of a number of public companies. She founded the strategic consulting firm Clegg International Consultants, LLC, and has served as its Managing Partner since 2001. Prior to that, Ms. Clegg was nominated by the President of the United States and confirmed by the U.S. Senate to serve as the Vice Chair of the Board of Directors and First Vice President of the Export-Import Bank of the United States, the official export credit institution of the United States of America, and then served as Chief Operating Officer. In her role with the Export-Import Bank, Ms. Clegg had direct supervisory responsibilities for the financial operations of the Export-Import Bank and was responsible for financing more than $50 billion in U.S. exports and a portfolio of $65 billion, budgeting decisions for the Export-Import Bank's operational and program budgets and opening Export-Import Bank programs in several countries. Ms. Clegg also served as chair of the Loan and Audit Committees of the Board of Directors and as chair of the Budget Task Force and the Technology and Pricing Committees of the Export-Import Bank. Prior to her Export-Import Bank service, Ms. Clegg worked in the U.S. Senate, focusing on international finance and monetary policy, national security and foreign affairs. Ms. Clegg also draws on her significant experience in service on the boards of directors of public companies and private organizations. She currently serves on the Board of Directors and chairs the Audit Committee of the

- 18 -

Public Welfare Foundation. She has previously served as a director of CME Group Inc. (the parent company of the Chicago Mercantile Exchange), the Chicago Board of Trade, Cardiome Pharma Corp., Javelin Pharmaceuticals, Inc., IPC Holdings, Ltd. and Blockbuster, Inc. She previously chaired the Nominating and Corporate Governance Committees of Blockbuster, Inc., IPC Holdings, Ltd. and Cardiome Pharma Corp. and the Audit Committees of the IPC Holdings, Ltd., Chicago Board of Trade, Cardiome Pharma Corp. and Javelin Pharmaceuticals, Inc. She has also chaired and served on numerous special committees overseeing mergers, acquisitions, and financing transactions and has helped companies through the IPO process. Based on her current and former positions and directorships, Ms. Clegg has gained significant financial, corporate governance, public policy, infrastructure, operating and real estate experience.

**Ms. Clegg's extensive transactional and financial experience, as well as her experience in the public sector and as a director of numerous public companies (including her service as chairman of the foregoing standing and special committees) led to the conclusion that she should serve as a member of the Board.**

53.     Upon information and belief, Defendant Clegg is a citizen of Washington, D.C.

**Defendant Decker**

54.     Defendant Decker served as Executive Chairman of the Board from November 1, 2016, until he resigned effective March 1, 2018. Previously, he served as Non-Executive Chairman of the Board from October 2015 until October 31, 2016. He also served as a member of the Investment Committee.

55.     For the fiscal year ended December 31, 2018, Defendant Decker received $221,656 in compensation from the Company. This included $138,077 in fees earned and cash paid, $80,047 in stock awards, and $3,532 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Decker received $705,966 in compensation from the Company. This included $687,500 in fees earned and cash paid and $18,466 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Decker received $1,082,164 in

- 19 -

compensation from the Company. This included $479,167 in fees earned and cash paid, $591,313 in stock awards, and $11,685 in all other compensation.

56.    The Company's 2017 Proxy Statement stated the following about Defendant Decker:

> **Daniel A. Decker** has been investing in the senior living industry for more than 25 years. He joined the Board in October 2015 as Non-Executive Chairman of the Board, and was appointed as Executive Chairman of the Board effective November 1, 2016. Mr. Decker is the President and owner of CoastWood Senior Housing Partners, LLC, an investment firm specializing in seniors housing and related services, which he founded in 2006. In January 2013, CoastWood joined with KKR and Beecken Petty O'Keefe & Company to acquire the operations of Sunrise Senior Living, one of the leading operators of assisted living properties in the United States. The group sold its interest in Sunrise in 2014. Prior to forming CoastWood, Mr. Decker was a partner from 1990 to 2006 at The Hampstead Group, LLC, a private equity firm with a focus on real estate related, operating intensive businesses such as lodging and seniors housing. Mr. Decker was an attorney at the law firm of Decker, Hardt, Kopf, Harr, Munsch & Dinan (now known as Munsch Hardt Kopf & Harr, P.C.) from 1985 to 1990, which he co-founded in 1985, and was an attorney at Winstead PC from 1980 to 1985. Mr. Decker served on the Boards of Directors of Sentio Healthcare Properties, Inc. (a public, non-listed REIT) from March 2013 until September 2015, during which time he served as a member of the Investment Committee, and Health Care REIT, Inc. from October 2011 until August 2012, during which time he served as a member of the Audit, Investment, Nominating/Corporate Governance and Planning Committees. Mr. Decker also has served on the boards of directors of several other public companies, including Omega Healthcare Investors, Inc. (where he served as Executive Chairman and then as Chairman of the Board), Bristol Hotel Company, Wyndham Hotel Company and the Forum Group. Mr. Decker earned his Bachelor of Science in Business Administration degree in economics from the University of Missouri-Columbia, and his J.D. from the University of Missouri-Kansas City. Mr. Decker's significant experience in the senior living and real estate industries, as well as his extensive strategic, investment and transactional experience, led to the conclusion that he should serve as a member of the Board.

57.    Upon information and belief, Defendant Decker is a citizen of California.

**Defendant Johnson-Mills**

- 20 -

58.     Defendant Johnson-Mills has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Johnson-Mills beneficially owned 74,591 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Defendant Johnson-Mills owned over $483,349 worth of Brookdale stock as of that date.

59.     For the fiscal year ended December 31, 2020, Defendant Johnson-Mills received $228,003 in compensation from the Company. This included $128,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Defendant Johnson-Mills received $211,976 in compensation from the Company. This included $170,609 in fees earned and cash paid and $41,367 in stock awards. For the fiscal year ended December 31, 2018, Defendant Johnson-Mills received $155,024 in compensation from the Company. This included $55,033 in fees earned and cash paid and $99,991 in stock awards.

60.     The Company's 2021 Proxy Statement stated the following about Defendant Johnson-Mills:

> Ms. Johnson-Mills is a healthcare executive, with more than 25 years of combined federal, state, and private industry experience. She is founder and CEO of RJM Enterprises. Ms. Johnson-Mills served from August 2014 to December 2017 as President and Chief Executive Officer of UnitedHealthcare Community Plan of Tennessee, a health plan serving more than 500,000 government sponsored healthcare consumers with over $2.5 billion of annual revenue, after having previously served as Senior Vice President, Performance Excellence and Accountability for UnitedHealthcare Community & State since 2006, and was a founding member of UnitedHealthGroup's Diversity and Inclusion Council. Ms. Johnson-Mills also previously served as the Director of Medicaid Managed Care

- 21 -

for the Centers for Medicare and Medicaid Services and as Chief Executive Officer of Managed Health Services Indiana and Buckeye Health Plan, wholly owned subsidiaries of Centene Corporation. She currently serves on the Board of Directors of Quest Analytics and is a Governance Fellow with the National Association of Corporate Directors (NACD). Ms. Johnson-Mills earned a B.S. degree from Lincoln University and an M.A. degree in Labor and Human Resource Management and M.P.A. degree in Public Policy and Management from The Ohio State University.

**Ms. Johnson-Mills' experience as an executive in the healthcare space, including her expertise in healthcare operations and strategy, led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

61.     Upon information and belief, Defendant Johnson-Mills is a citizen of Tennessee.

**<u>Defendant Leeds</u>**

62.     Defendant Leeds served as a Company director from November 2005 until his resignation effective October 4, 2018. He also served as Non-Executive Chairman of the Board from June 2012 until September 2015. Defendant Leeds also served as a member of the Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee.

63.     For the fiscal year ended December 31, 2018, Defendant Leeds received $273,081 in compensation from the Company. This included $173,087 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Leeds received $373,992 in compensation from the Company. This included $274,000 in fees earned and cash paid and $99,992 in stock awards.

64.     The Company's 2017 Proxy Statement stated the following about Defendant Leeds:

**Jeffrey R. Leeds** is a financial services industry veteran with extensive experience in mergers, acquisitions and dispositions, capital markets and public

- 22 -

company management. Mr. Leeds retired as Executive Vice President and Chief Financial Officer of GreenPoint Financial Corporation and GreenPoint Bank in October 2004, having served since January 1999. Prior to that, he was Executive Vice President, Finance and Senior Vice President and Treasurer of GreenPoint. Prior to GreenPoint, Mr. Leeds was with Chemical Bank for 14 years, having held positions as Head of Asset and Liability Management, Proprietary Trading and Chief Money Market Economist. Mr. Leeds has been an independent member of the Board since November 2005 and served as Non-Executive Chairman of the Board from June 2012 through September 2015. He previously served as a director and chair of the Audit Committee of Och-Ziff Capital Management Group LLC and as a director and Audit Committee member of United Western Bancorp. Mr. Leeds received a B.A. in economics from the University of Michigan and an MBA and M.Ph. from Columbia University. Mr. Leeds' experience as an executive and principal financial officer, along with his extensive financial industry and transactional expertise, led to the conclusion that he should serve as a member of the Board.

65. Upon information and belief, Defendant Leeds is a citizen of New York.

**Defendant Parrell**

66. Defendant Parrell served as a Company director from April 2015 until his resignation effective July 24, 2017, at the Company's annual meeting. He also served as a member of the Audit Committee and Investment Committee.

67. For the fiscal year ended December 31, 2017, Defendant Parrell received $213,514 in compensation from the Company. This included $113,522 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Parrell received $259,306 in compensation from the Company. This included $190,000 in fees earned and cash paid and $69,306 in stock awards.

68. The Company's 2017 Proxy Statement stated the following about Defendant Parrell:

**Mark J. Parrell** brings to Brookdale over 20 years of real estate, capital markets, mergers and acquisitions and investment experience. He has served as the Executive Vice President and Chief Financial Officer of Equity Residential, the

- 23 -

largest United States apartment real estate investment trust, since October 2007. Mr. Parrell was Senior Vice President and Treasurer of Equity Residential from August 2005 to October 2007, and served in various roles in the company's finance group since September 1999. He currently serves as the Chair of the Finance Committee of the National Multifamily Housing Council and is a member of the Urban Land Institute. Mr. Parrell joined our Board of Directors in April 2015 and is an independent director. He served as a director of Aviv REIT, Inc. from March 2013 until it was acquired on April 1, 2015. Mr. Parrell holds a B.B.A. from the University of Michigan and a J.D. from the Georgetown University Law Center. Mr. Parrell's extensive real estate, capital markets, mergers and acquisitions and investment experience, including his experience as the principal financial officer of an S&P 500 REIT, led to the conclusion that he should serve as a member of the Board of Directors.

69.     Upon information and belief, Defendant Parrell is a citizen of Illinois.

**Defendant Petty**

70.     Defendant Petty served as a Company director from December 2014 until his resignation effective February 21, 2018. He also served as the Chair of the Investment Committee and as a member of the Nominating and Corporate Governance Committee.

71.     For the fiscal year ended December 31, 2018, Defendant Petty received $115,883 in compensation from the Company. This included $15,889 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Petty received $214,992 in compensation from the Company. This included $115,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Petty received $308,995 in compensation from the Company. This included $209,000 in fees earned and cash paid and $99,995 in stock awards.

72.     The Company's 2017 Proxy Statement stated the following about Defendant Petty:

**William G. Petty, Jr.** brings to Brookdale nearly 30 years of experience in the healthcare services industry, as well as extensive operational, investment and

- 24 -

transactional experience in the senior living industry, and a robust background in finance. He joined the Board in December 2014 and is an independent director. Mr. Petty is a partner of Beecken Petty O'Keefe & Company, a private equity management firm he co-founded in 1996, which currently has approximately $1.3 billion under management. Mr. Petty's prior leadership experience includes service as Chairman of the Board of Directors of Sunrise Senior Living, Inc. from January 2013 to April 2014; as Chief Executive Officer of Alternative Living Services, Inc./Alterra Healthcare Corporation from 1993 to 1996 and as its Chairman from 1993 to 2000; as Chairman, President and Chief Executive Officer of Evergreen Healthcare, Inc. and as a director of that company's publicly-traded successors (GranCare, Inc. and Mariner Health Care Inc.); and as a director and member of the executive committee of Forum Group, Inc. In 1985, he co-founded Omega Capital Ltd., a private investment fund focused on the healthcare industry, which formed Omega Healthcare Investors, Inc., a healthcare REIT, during his tenure as managing director. In addition, he has served on the boards of directors of several Beecken Petty portfolio companies. Mr. Petty received a B.S. in Business Administration from the University of Illinois. Mr. Petty's significant executive experience in the senior living and healthcare services industries, as well as his extensive operational, investment and transactional experience, led to the conclusion that he should serve as a member of the Board.

73.     Upon information and belief, Defendant Petty is a citizen of Illinois.

**Defendant Sansone**

74.     Defendant Sansone has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Sansone beneficially owned 43,740 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Sansone owned over $283,435 worth of Brookdale stock as of that date.

75.     For the fiscal year ended December 31, 2020, Defendant Sansone received $226,537 in compensation from the Company. This included $209,000 in fees earned and cash paid and $17,537 in stock awards. For the fiscal year ended December 31, 2019, Defendant

- 25 -

Sansone received $120,387 in compensation from the Company. This included $20,391 in fees earned and cash paid and $99,996 in stock awards.

76. The Company's 2021 Proxy Statement stated the following about Defendant Sansone:

> Mr. Sansone joined Brookdale's Board in October 2019 and became Non-Executive Chairman of the Board in January 2020. For more than 25 years, he has led efforts to optimize the performance of healthcare and senior housing companies. Mr. Sansone has served as Chairman and CEO of H2 Health, a leading regional provider of physical rehabilitation services and clinician staffing solutions, since February 2020. Prior to that, he served as a Managing Director of Alvarez & Marsal, a global professional services firm specializing in performance improvement for large, high profile businesses, where he served as Chairman of the firm's Healthcare Industry Group, which he founded in 2004. Mr. Sansone also served as interim Chief Executive Officer of the Visiting Nurse Service of New York, the largest non-profit home and community-based health care organization in the United States, from November 2014 to December 2016 and, prior to that, served in various executive roles at numerous healthcare companies. His prior experience in the senior housing industry includes having served as Chief Restructuring Officer and a member of the Board of Erickson Retirement Communities and as a senior consultant to Sunrise Senior Living. He also serves and has served on the Boards of Directors of numerous investor-owned and not-for-profit companies, primarily in the healthcare industry. Mr. Sansone earned a B.S. in Economics from the State University of New York at Albany.
>
> **Mr. Sansone's executive, senior advisory, and board leadership of public and private organizations, including his extensive service to companies in the healthcare, and senior housing industries, led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

77. Upon information and belief, Defendant Sansone is a citizen of South Carolina.

**Defendant Seward**

78. Defendant Seward served as a Company director from November 2008 until his resignation effective October 29, 2019. He also served as a member of the Audit Committee.

- 26 -

79.    For the fiscal year ended December 31, 2019, Defendant Seward received $327,403 in compensation from the Company. This included $227,408 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Seward received $326,161 in compensation from the Company. This included $226,167 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Seward received $367,159 in compensation from the Company. This included $267,167 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Seward received $309,995 in compensation from the Company. This included $210,000 in fees earned and cash paid and $99,995 in stock awards.

80.    The Company's 2018 10-K/A stated the following about Defendant Seward:

James R. Seward has extensive experience in senior management and oversight in the investment sector, including significant experience in mergers and acquisitions and capital markets transactions. Mr. Seward is a Chartered Financial Analyst and, since 2000, has been a private investor. Previously, Mr. Seward was Executive Vice President, Chief Financial Officer, and director of Seafield Capital Corporation, a publicly-traded investment holding company. In that capacity, Mr. Seward also served as a director and as a member of the executive committee and as Audit Committee Chairman of LabOne, a provider of health screening and risk assessment services to life insurance companies and clinical diagnostic testing services to healthcare providers, until LabOne was sold to Quest Diagnostics in 2005. Mr. Seward also previously served as Chief Executive Officer and President of SLH Corporation, a spin-off of Seafield Capital Corporation. He also currently serves as Chairman of the Board of Trustees and as a member of the Audit Committee and Valuation, Portfolio and Performance Committee of RBC Funds, a registered investment company. He previously served as a director of ARC and has also served as a member of the Board of Directors and Audit Committee of Syntroleum Corporation. Mr. Seward received a Bachelor of Arts degree from Baker University, a Masters in Public Administration, City Management from the University of Kansas and a Masters in Business Administration, Finance from the University of Kansas.

**Mr. Seward's experience and credentials in investing and finance, along with his knowledge of both the senior housing industry (through his prior service as a director of ARC) and the health care industry (through his prior service**

- 27 -

**as a director of LabOne), led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

81.     Upon information and belief, Defendant Seward is a citizen of Kansas.

**Defendant Warren**

82.     Defendant Warren has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Warren beneficially owned 75,128 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Warren owned over $486,829 worth of Brookdale stock as of that date.

83.     For the fiscal year ended December 31, 2020, Defendant Warren received $231,003 in compensation from the Company. This included $131,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Defendant Warren received $196,882 in compensation from the Company. This included $172,500 in fees earned and cash paid and $24,382 in stock awards. For the fiscal year ended December 31, 2018, Defendant Warren received $132,181 in compensation from the Company. This included $32,185 in fees earned and cash paid and $99,996 in stock awards.

84.     The Company's 2021 Proxy Statement stated the following about Defendant Warren:

> Ms. Warren brings more than 30 years of operational, financial, and healthcare experience. Most recently, she has served as Executive Vice President and Chief Operating Officer of WakeMed Health & Hospitals from October 2015 through December 2020, where she was responsible for the strategic, financial, and

- 28 -

operational performance of the organization's network of facilities in the North Carolina Research Triangle area. Prior to that, from 2005 to September 2015, Ms. Warren served as Chief Financial Officer of Capella Healthcare, Inc., an owner and operator of general acute-care hospitals, as well as its Executive Vice President since January 2014, and as its Senior Vice President prior to that. Before joining Capella, she served as Senior Vice President and Chief Financial Officer of Gaylord Entertainment Company from 2000 to 2001, as Senior Equity Analyst and Research Director for Avondale Partners LLC, and as Senior Equity Analyst for Merrill Lynch & Co. She also currently serves on the Board of Directors of Virtusa, Inc. Ms. Warren is National Association of Corporate Directors (NACD) Directorship Certified and received a Corporate Directors Certificate from Harvard Business School. Ms. Warren earned a B.S. degree in Economics from Southern Methodist University and an M.B.A. from Harvard University.

**Ms. Warren's extensive executive, financial, and operational experience in the healthcare and other industries led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

85. Upon information and belief, Defendant Warren is a citizen of North Carolina.

**Defendant Wielansky**

86. Defendant Wielansky has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. According to the 2021 Proxy Statement, on April 23, 2021, Defendant Wielansky beneficially owned 127,860 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021 was $6.48, Wielansky owned over $828,532 worth of Brookdale stock as of that date.

- 29 -

87. For the fiscal year ended December 31, 2020, Defendant Wielanksy received $226,003 from the Company. This included $126,000 in fees earned and cash paid and $100,003 in stock awards. For the fiscal year ended December 31, 2019, Defendant Wielansky received $506,604 in compensation from the Company. This included $406,609 in fees earned and cash paid and $99,995 in stock awards. For the fiscal year ended December 31, 2018, Defendant Wielansky received $553,577 in compensation from the Company. This included $453,583 in fees earned and cash paid and $99,994 in stock awards. For the fiscal year ended December 31, 2017, Defendant Wielansky received $361,992 in compensation from the Company. This included $262,000 in fees earned and cash paid and $99,992 in stock awards. For the fiscal year ended December 31, 2016, Defendant Wielansky received $274,306 in compensation from the Company. This included $205,000 in fees earned and cash paid and $69,306 in stock awards.

88. The Company's 2021 Proxy Statement stated the following about Defendant Wielansky:

Mr. Wielansky has more than 40 years of commercial real estate investment, management, and development experience. He currently serves as Chairman and CEO of Opportunistic Equities, which specializes in low income housing. He has also served as Chairman and CEO of Midland Development Group, Inc., which he re-started in 2003 and focused on the development of retail properties in the midwest and southeast. Prior to Midland, he served as President and CEO of JDN Development Company, Inc. and as a director of JDN Realty Corporation. Before joining JDN, he served as Managing Director–Investments of Regency Centers Corporation, which in 1998 acquired Midland Development Group, a retail properties development company co-founded by Mr. Wielansky in 1983. Mr. Wielansky joined the Company's Board of Directors in April 2015 and served as Non-Executive Chairman of the Board from February 2018 through December 2019. He also serves as Lead Trustee of Acadia Realty Trust and served as a director of Isle of Capri Casinos, Inc. from 2007 to 2017 and Pulaski Financial Corp. from 2005 to 2016. Mr. Wielanksy received a bachelor's degree in Business Administration, with a major in Real Estate and Finance, from the University of Missouri—Columbia, where he is currently a member of the Strategic Development Board of the College of Business. He also served on the

- 30 -

Board of Directors of The Foundation for Barnes-Jewish Hospital.

**Mr. Wielansky's real estate investment, management, and development experience, as well as his service as a director of several public companies, led to the conclusion that he should serve as a member of the Board.**

(Emphasis in original.)

89.     Upon information and belief, Defendant Wielansky is a citizen of Missouri.

**Non-Party Freed**

90.     Non-Party Victoria L. Freed ("Freed") has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, on April 23, 2021, Freed beneficially owned 43,740 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 23, 2021, was $6.48, Freed owned over $283,435 worth of Brookdale stock as of that date.

91.     For the fiscal year ended December 31, 2020, Freed received $130,537 in compensation from the Company. This included $113,000 in fees earned and cash paid and $17,537 in stock awards. For the fiscal year ended December 31, 2019, Freed received $124,387 in compensation from the Company. This included $24,391 in fees earned and cash paid and $99,996 in stock awards.

92.     The Company's 2021 Proxy Statement stated the following about Freed:

Ms. Freed brings more than 25 years of executive leadership in the areas of sales, customer service, and marketing, and has earned numerous awards for outstanding achievement in sales and marketing during her career. Ms. Freed is Senior Vice President of Sales, Trade Support and Service for Royal Caribbean International, having served in that role since 2008, where she oversees the largest sales team in the cruise line industry and also manages the company's consumer outreach, reservations, group sales, and customer service functions. Prior to her

- 31 -

service with Royal Caribbean, Ms. Freed worked for 29 years with Carnival Cruise Lines, where she served as Senior Vice President of Sales and Marketing during the last 15 years of her tenure. She is a trustee of the United Way of Miami-Dade County and serves as a member of the board of Jewish Adoption and Foster Care Options (JAFCO). Ms. Freed earned a bachelor's degree in business with an emphasis in marketing from the University of Colorado.

**Ms. Freed's decades of executive leadership in sales, customer service, and marketing in the hospitality industry led to the conclusion that she should serve as a member of the Board.**

(Emphasis in original.)

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

93.     By reason of their positions as officers, directors and/or fiduciaries of Brookdale and because of their ability to control the business and corporate affairs of Brookdale, the Individual Defendants owed Brookdale and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Brookdale in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Brookdale and its shareholders so as to benefit all shareholders equally.

94.     Each director and officer of the Company owes to Brookdale and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

95.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Brookdale, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

- 32 -

96.    To discharge their duties, the officers and directors of Brookdale were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

97.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Brookdale, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Brookdale's Board at all relevant times.

98.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects.

99.    To discharge their duties, the officers and directors of Brookdale were required to exercise reasonable and prudent supervision over the management, policies, practices, and

- 33 -

internal controls of the Company. By virtue of such duties, the officers and directors of Brookdale were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, the United States, and pursuant to Brookdale's own internal guidelines, including its Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Brookdale conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Brookdale and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Brookdale's operations would comply with all laws and Brookdale's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

- 34 -

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

100.    Each of the Individual Defendants further owed to Brookdale and the shareholders the duty of loyalty requiring that each favor Brookdale's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

101.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Brookdale and were at all times acting within the course and scope of such agency.

102.    Because of their advisory, executive, managerial, and directorial positions with Brookdale, each of the Individual Defendants had access to adverse, non-public information about the Company.

103.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Brookdale.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

104.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

105.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement and abuse of control, and violations of Sections 14(a), of the Exchange Act; and (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls.

106.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Brookdale was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

- 36 -

107.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

108.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brookdale, and was at all times acting within the course and scope of such agency.

## BROOKDALE'S CODE OF CONDUCT

109.    Pursuant to the 2021 Proxy Statement, the Code of Conduct "applies to all employees, directors, and officers[.]"

110.    The Code of Conduct provides that its purpose is to "serve as a guide in doing [our] jobs the way they should be done - according to the highest ethical and professional standards and in accordance with applicable laws and regulations."

111.    The Code of Conduct provides, in the section titled "Associates, Conflicts of Interest, Corporate Opportunities and Gifts" that:

> Brookdale associates, officers and directors are expected to dedicate their best efforts to advancing Brookdale's interests and to make decisions that affect Brookdale based on the Company's best interests, independent of outside influences. Except as provided in Article Eight of the Company's Amended and Restated Certificate of Incorporation, every associate, officer and director must avoid any situation that conflicts or appears to conflict with the interests of Brookdale. A conflict of interest can arise when an associate or a related party can personally benefit or profit from a transaction involving Brookdale and the associate or related party, or where an associate's personal interests influence or

- 37 -

appear to influence his or her ability to make objective decisions in the course of performing his or her job duties.

* * *

Special rules apply to executive officers and directors who engage in conduct that creates an actual, apparent or potential conflict of interest. Before engaging in any such conduct, executive officers and directors must make full disclosure of all facts and circumstances to the General Counsel, who shall inform and seek the prior approval of the Audit Committee of the Board of Directors.

112.    The Code of Conduct provides, in the section titled "Health Care," in relevant part, that:

Brookdale intends to comply with state and federal laws relating to health care providers and to ensure that associates and agents of Brookdale comply with these laws. Brookdale endeavors to follow the highest standards of ethics, honesty and integrity in conducting transactions and relationships with physicians, insurers, clients, state and federal government agencies and any other health care related entities. Associates whose responsibilities include providing resident care should receive annual training regarding these health care standards.

113.    The Code of Conduct provides, in the section titled "Finance and Business Matters," in relevant part, that:

In compliance with the Sarbanes-Oxley Act of 2002 and related Securities and Exchange Commission ("SEC") regulations, the Company has established a written Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"). Amendments to or implicit or explicit waivers of the Code of Ethics will be disclosed as required by SEC rules. The Code of Ethics has been designed to deter wrongdoing and to promote honest and ethical conduct, including the ethical handling of any actual or apparent conflicts of interest; full, fair, accurate, timely and understandable disclosure in Brookdale's SEC filings and submissions, as well as other public communications by the Company; compliance with applicable laws, rules and regulations; and prompt reporting of any violations or suspected violations of the Code of Ethics or applicable law. To the extent of any inconsistency between the terms of this Code and the Code of Ethics, the requirements of the Sarbanes-Oxley Act shall control.

* * *

**Marketing and Advertising**

- 38 -

Advertising and marketing materials need to conform to state and federal laws and
regulations regarding these activities. Brookdale advertising should be truthful and not misleading. Specific claims about the quality of Brookdale's services should be supportable. Price advertising should accurately reflect the true charge for services provided to residents.

Brookdale will not use advertisements or marketing programs that might cause confusion between Brookdale's services and those of our competitors. Brookdale will not disparage the service or business of a competitor through the use of false or misleading representations.

* * *

**Fair Dealing**
Brookdale depends on its reputation for quality, service and integrity. The way we deal with our residents, competitors and suppliers molds our reputation, builds long-term trust and ultimately determines our success. Associates, officers and directors should endeavor to deal fairly with Brookdale's residents, competitors, suppliers and associates. We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

114. The Code of Conduct provides, in the section titled "Information, Records and Company Assets," in relevant part, that:

**Complaints and Concerns Regarding Accounting Matters**
Brookdale is committed to compliance with applicable securities and other laws, rules and regulations, accounting standards and internal accounting controls. It is the responsibility of every Brookdale associate to promptly report complaints or concerns regarding accounting, internal accounting controls and auditing matters. Associates may report suspected misconduct, including such concerns or complaints, on a confidential or anonymous basis by the calling the Brookdale Integrity Line. No one will be subject to retaliation because of a good faith report of suspected misconduct. Please see the Brookdale Integrity Line section of this Code for more details on reporting suspected misconduct.

* * *

**Integrity of Records, Statements and Reports, and Compliance with Accounting Procedures**
Each associate should do his or her part to ensure that Brookdale's books of account and financial records meet applicable standards of accuracy and

- 39 -

completeness. If an associate has reason to believe that any of Brookdale's books and records are not being maintained in an accurate or complete manner, the associate is expected to report this immediately to the head of Brookdale's Internal Audit Department.

\* \* \*

**Protection and Proper Use of Company Assets**
Associates, officers and directors have a duty to protect Brookdale's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on Brookdale's profitability. We should take measures to prevent damage to and theft or misuse of Brookdale property. When you leave the Company, all Brookdale property must be returned to the Company. Except as specifically authorized, all Brookdale assets, including Company time, funds, equipment, materials, resources and proprietary information, must be used for legitimate business purposes only.

## **Brookdale's Code of Ethics for Chief Executive and Senior Financial Officers**

115.    The Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"), which is referenced in the Code of Conduct, provides, that the Company is "committed to conducting [its] business in accordance with applicable laws, rules and regulations and the highest standards of business ethics, and to full and accurate financial disclosure in compliance with applicable law."

116.    The Code of Ethics states, in relevant part, the following:

As a Senior Officer, you must not only comply with applicable law. You also must engage in and promote honest and ethical conduct and abide by the Code of Business Conduct and Ethics and other Corporation policies and procedures that govern the conduct of our business. Your leadership responsibilities include creating a culture of high ethical standards and commitment to compliance, maintaining a work environment that encourages employees to raise concerns, and
promptly addressing employee compliance concerns.

117.    The Code of Ethics provides, in the section titled "Compliance With Laws, Rules And Regulations," in relevant part, that, "[y]ou are required to comply with the laws, rules and regulations that govern the conduct of our business[.]"

- 40 -

118.    The Code of Ethics provides, in the section titled "Conflicts of Interest," in relevant part, that:

> A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of the Corporation. Your obligation to conduct the Corporation's business in an honest and ethical manner includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

119.    The Code of Ethics provides, in the section titled "Disclosures," in relevant part, that:

> It is Corporation policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Corporation. As a Senior Officer, you are required to promote compliance with this policy by all employees and to abide by Corporation standards, policies and procedures designed to promote compliance with this policy.

120.    The Individual Defendants violated the Code of Conduct and Code of Ethics by engaging in or permitting the Misconduct and the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violation of Section 14(a) of the Exchange Act.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

121.    Based in Brentwood, Tennessee, Brookdale touts itself as the largest operator of senior living communities in the United States based on total capacity, with 679 communities in 41 states and the ability to serve over 60,000 residents as of December 31, 2021. As of February

- 41 -

1, 2020, the Company owned 356 communities, leased 307 communities, managed 77 communities on behalf of third parties, and managed three communities for which Brookdale has an equity interest. The Company operates and manages independent living, assisted living, memory care, and continuing care retirement communities while offering a range of home health, hospice, and outpatient therapy services to more than 20,000 patients, as of February 1, 2020. For fiscal year 2019, the Company reported nearly $4.06 billion in revenue.

122.    The Company incorporated in Delaware in June 2005 and was the result of a series of mergers to combine Brookdale Living Communities, Inc., which operated independently since 1986, and Alterra Healthcare Corporation, which operated independently since 1981. Shortly thereafter, on November 22, 2005, the Company went public and the following year, on July 25, 2006, Brookdale initiated a series of acquisitions that led to its rise as the nation's largest operator of senior living communities including its acquisition of American Retirement Corporation, Horizon Bay on September 1, 2011, and Emeritus Corporation on July 31, 2014, for $2.8 billion. Consequently, the Company bound itself to massive debt and lease obligations that financed Brookdale's steadfast growth strategy.

123.    However, as provided in the Company's annual reports filed with the SEC, to secure such considerable financing and lease agreements, the Company agreed to delineate profit and financial performance thresholds for Brookdale's facilities both separately and on a collective basis. Thus, pursuant to the Company's debt and lease obligations, the Company was required to, among other things, "maintain or satisfy specified financial ratios and coverage tests, including prescribed net worth levels" and "maintain lease coverage ratios on a lease portfolio basis" and "maintain stockholders' equity or tangible net worth amounts." Further, regarding

- 42 -

communities in which Brookdale manages, the Company could be terminated if it did "not satisfy certain designated performance thresholds." Moreover, the Company's mortgages and leases contained "cross-default and cross-collateralization" provisions, so that a default by Brookdale related to one community could affect a significant number of the Company's communities and their corresponding financing agreements and leases. Also, certain debt obligations were secured by both "a mortgage on a community" and a "guaranty by [Brookdale][.]"[2]

124. For that reason, to ensure that Brookdale would satisfy, among other things, the Company's financial performance thresholds and its other contractual obligations, and, in turn, to reduce the risk of defaulting on agreements concerning substantial segments of its community-portfolio, the Company closely supervised, carefully oversaw, diligently monitored, tightly controlled, and thoroughly scrutinized all facets of the Company's operations and management of its facilities and communities throughout the nation, including, and particularly, daily staffing—the Company's principal expenditure.

### The Individual Defendants Regulate Daily Staffing Needs

125. The Individual Defendants oversee, manage, analyze, and, ultimately, dictate the Company's day-to-day staffing needs at each one of Brookdale facilities around the country based upon the Service Alignment Software—a staffing algorithm produced by computer software that Brookdale designed, developed, and controls. In fact, only certain of the

---

[2] The Company's guarantees, which guaranteed the full and prompt performance of its contractual obligations including on-demand remuneration of fees, costs, and charges of enforcement of Brookdale's management agreements, were material and necessary inducements for the execution of credit agreements, lending agreements, and management agreements with many lessors.

Company's high-level officers had access to or were able to alter the Service Alignment Software or its data inputs, as described below.

126. The Company used the Service Alignment Software to regulate, ration, and dictate the total amount of time for the care its staff could provide to the residents of Brookdale's communities. The Service Alignment Software accounts for two core types of information: (1) the amount of time necessary to accomplish certain day-to-day services, which were supposedly informed by internal studies; and (2) systems and a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to determine the amount of staffing hours the Company needed on an everyday basis. Thus, through the Service Alignment Software, the Individual Defendants determined the amount of staffing hours Brookdale needed in each of its facilities by accounting for the total assessed care that needed to be provided by Brookdale staff to the Company's residents and the respective average time necessary for care to be provided, which the Company purportedly determined through time studies that it conducted.

127. The Individual Defendants kept the details of its method confidential and would not even provide its own facility level employees, including executive directors at each facility, with the information (as described below) used to determine staffing needs. To that end, facility level employees were unable to adjust the daily staffing need which were determined by corporate management without explicit and written consent from upper-level corporate management.

**The Individual Defendants Regulate Brookdale's Budget**

- 44 -

128.    The Individual Defendants oversee, manage, analyze, and, ultimately, dictate the Company's operating budgets at each one of Brookdale's facilities around the country, including expense limits dedicated to staffing.[3]

129.    Initially, the Company's financial planning and analysis team circulates a draft budget with approximate final estimates for each Brookdale facility in the nation. Then, certain facility-level employees at each facility, whom have "read access" to the document, have one week to review their draft budget and respond to the Company's Regional Vice President, Regional Director of Operations and the Company's financial planning and analysis team with comments and modification requests. Upon final approval of the annual budget, the Individual Defendants caused the Company to strictly enforce those budgets, including maximum daily staffing expenses, without alteration by way of emails, telephone calls, conference calls, and meetings. The Individual Defendants regularly directed that facility-level employees: (1) strictly adhere to staffing budgets; (2) reduce staffing to eliminate budget variances; (3) adhere to savings commitments related to staffing; (4) "do a better job managing [the Company's] labor, as [staffing] is by far [Brookdale's] largest expense;" (5) implement changes to cause staffing to remain under budget or were pressured to make cuts. Moreover, the Individual Defendants caused the Company to admonish facility-level employees by: (1) stating that everyone would be held accountable for labor control; (2) stating that the Company had a zero-tolerance policy

---

[3] According to the Company's annual report filed with the SEC on February 22, 2018, for the quarter and year ended December 31, 2017 on a Form 10-K "[w]e have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel to focus on resident care and family connections. Our operating procedures include … implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures." The Company's annual reports filed with the SEC for the quarter and year ended December 31, 2014, December 31, 2015, and December 31, 2016 contained substantively the same statements.

- 45 -

related to staffing expenses coming in over budget; (3) emphatically accentuating the significance of controlling labor and eliminating overtime; (4) stating that the Company had a zero-tolerance policy for "dropping the ball" on labor controls.[4]

130.    Moreover, the Individual Defendants caused the Company to create and implement lucrative bonus and incentive packages attached to achieving or surpassing certain financial performance targets to induce employees to keep staffing expenses low.

### The Individual Defendants Regulate Brookdale's Staffing Guidelines at All Facilities

131.    The Individual Defendants caused the Company to establish, employ, and impose far-reaching, "company-wide" and "standardized" policies and operations procedures related to, among other things, management, accounting, finance, marketing, risk management, employee training, marketing, hiring of personnel, compliance with laws, employee behavior, resident behavior, resident assessment and resident care at its facilities.[5] The Company's facility-level employees lack the authorization to amend the Company's comprehensive, company-wide policies.

132.    The Company's documents, forms, data, and software related to, among other things, staffing is virtually identical in all of Brookdale' facilities throughout the country.

### Brookdale Operates as a Centralized and Single Enterprise

133.    The Company's corporate officers based out of Brookdale's headquarters in Brentwood, Tennessee, direct, control, and coordinate the Company's services and overall business operations for its locations throughout the United States. Moreover, a majority of Brookdale's executive and administrative functions are in Tennessee, the CEO and Chief

---

[4] According to documents produced by the Company in other litigation.
[5] Discussed in the Company's annual and quarterly reports.

Operating Officer, the Company's Secretary maintain their principal offices in Tennessee, all of Brookdale's Executive Vice Presidents are also located in Tennessee, and final decisions regarding the company-wide issues relating to the operations of Brookdale facilities throughout the nation were made by corporate executives at the Company's headquarters in Tennessee.[6]

134. The Company's centralized operation as a single enterprise is further evidenced by Brookdale's annual and quarterly reports that the Individual Defendants caused the Company to file with the SEC, as referenced in detail below. For example, the Company's annual report for the periods ended December 31, 2014, December 31, 2015, December 31, 2016, December 31, 2017, and December 31, 2018 state that "we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing."

**The Misconduct**

135. During the Relevant Period, the Individual Defendants engaged in and/or permitted the Misconduct. The Individual Defendants allowed multiple violations of Brookdale's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in or allowing the Misconduct and engaging in or allowing widespread violations of the Company's Code of Conduct and, as a result, caused the Company to engage in the Misconduct by failing and allowing the Company to fail to take meaningful

---

[6] *See Edwards v. Emeritus Corp.*, Case No. 2:16-CV-08191-BRO-JPR (C.D. Cal. 2016); Notice of Removal of Action to Federal Court, ECF #1 ☐11; *Briones v. Brookdale Senior Living, Inc.*, Case No. 2:16-CV-08789-FMO-SK (C.D. Cal. 2016); Notice of Removal of Action to Federal Court, ECF #1 ☐21, Declaration of Liberty Stansbury, SVP Human Resources for Brookdale, ☐3-8; *Therrien v. Brookdale Senior Living, Inc.*, Case No. 2:13-CV-00933-GAF-DTB (C.D. Cal. 2013); Notice of Removal of Action to Federal Court, ECF #1 ☐14, and Declaration of Chad White ☐☐2-4*; Rejuso v. Brookdale Senior Living, Inc.*, Case No. 2:17-CV-04647-DSF-KS (C.D. Cal. 2017); ECF #1, Declaration of Liberty Stansbury ☐☐5-9; *Schrenk v. Brookdale Senior Living, Inc.*, Case No. 5:18-CV-01270-SVW-SP (C.D. Cal. 2018); ECF #1, Declaration of Liberty Stansbury ☐☐5-7; *See Llamas v. Brookdale Senior Living, Inc.*, Case No. 8:14-CV-00223-JLS-AN (C.D. Cal. 2014); ECF #1, Declaration of Jack Leebron ☐☐4-10.

action in response to complaints from Brookdale's residents, families of residents, and even Brookdale's own staff regarding the aforementioned violations and to take wrongful action in response. The Misconduct resulted in a decline in the value of the Company and subjected the Company to regulatory scrutiny.

### Brookdale's Standard Form Contracts Misrepresent the Services Provided

136.    The Company's standard and uniform form Residency Agreements advertise Brookdale's commitment to personalized care. To that end, Brookdale mandates that each of its facilities conduct what Brookdale refers to as a "Personal Service Assessment" (the "Personal Service Assessment") upon each resident, which assesses a resident's needs. Afterwards, according to the level of care required, residents are assigned to one of two "Care Groups": (1) Choice Personal Services—care includes services related to, among other things, medication, nutrition, dressing and grooming, showering, or bathing, bathroom assistance, escort and mobility and service coordination; or (2) Comprehensive Care Options—care includes services related to, among other things, chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand upright, bathroom assistance needs for residents who are catheterized, incontinent or cannot stand upright, two person or mechanical lifts, cognitive and psychological needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance, and pet care. In its form contract, Brookdale pledges to regularly re-assess residents' level of care needed to meet their needs.

137.    Each service need is broken down by particular and granular needs and ascribed a cost. The Company charges its residents a monthly "Personal Service Rate" in exchange for

- 48 -

meeting the evaluated level of care and specific needs documented in the Personal Service Plan, which includes the "Basic Service Rate" and together with the lesser of: (1) the total cost for meeting each assessed need with each category; or (2) a "Predictable Maximum Total" the Company assigns to each Care Group. Personal Service Rates are amended from time to time depending on re-evaluations of residents' needs and updates to their Personal Service Plans. According to the standardized letters the Company sends to Brookdale residents who are subject to rate increases, the Company attributes the increased rate, in large part, to the increased staffing costs to "take care of your senior living needs."

***Brookdale's Sales & Marketing Materials Misrepresent the Services Provided***

138.     In addition to the misrepresentations regarding the staffing and services provided to its residents that are contained in the Company's standard and uniform form Residency Agreements, Brookdale's sales and marketing materials, including the Company's website, brochures, and presentations, which induced residents to enter into those Residency Agreements emphasize those same or substantially similar misrepresentations. For instance, the Company's website[7] stated:

a.      [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, ***offering individually tailored personal care options to perfectly suit their needs.***

b.      Your health is our top priority, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A ***personalized service assessment and plan*** where we evaluate ***your individual needs and then create a custom care plan tailored to you.***

c.      Brookdale will ***assess your needs*** and help you chose the **services you need**.

---

[7] https://www.brookdale.com/en.html.

d. Our **trained caregivers provide attention and assistance** with medication support, bathing, dressing, cooking and other tasks **throughout the day**. Our staff will also coordinate services with outside healthcare providers and monitor residents to ensure they are healthy. **So your loved one gets the care they need** while enjoying the quality of life they've earned.

e. **Trained caregivers provide assisted living care by providing assistance** with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers.

f. At an assisted living community, ***caring staff members*** are available to help them **accomplish these tasks**, making life a lot easier than if they were living alone. This service provides ***peace of mind*** for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day***.

g. The Brookdale approach provides ***services that are tailored to each individual's unique needs***, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, by ***offering the desired service and care as their needs and preferences dictate***. By ***customizing personal care offerings for the individual***, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go.

h. At Brookdale, we are **committed to listening to your needs**, understanding the life you want for yourself or your loved one, and ***then partnering with you to customize a solution*** for all the places you still want your life to go.

i. The first step towards determining the right senior living option is ***to understand you and your family's needs***.

j. [W]e believe in delivering senior care that's ***tailored to you*** and your loved one ***based on those unique needs*** and desires. That's why we provide a variety of options. ***This personalized approach ensures that you*** and your family ***get exactly what you need....***

k. [We] cannot provide ***exceptional care and service*** until we find out exactly what it is that your ***loved one needs.***

l. ***We start with a detailed assessment,*** listing the specifics of your loved one's level of care.

(Emphasis added.)

139. Further, Brookdale's website advertised that the Company would "[r]ecognize and [i]ntegrate" the results of each resident's Personal Service Assessment by ensuring that Brookdale's "professional staff is trained to recognize the specific needs … of each individual" and that a "continuous assessment process" "ensures" the Company would be able to satisfy its residents' care needs.

140. Similarly, certain of the Company's marketing materials advertised that at Brookdale facilities:

> ***Carefully selected and trained associates do more than assist with activities of daily living*** such as dressing, bathing and dispensing of medications; ***they implement custom care plans designed to meet the individual needs of each resident*** … It all begins with a Personal Service Assessment. We take the time to listen to our residents so that ***we understand how to establish clinical, dining and program support that works for them in a meaningful way***. We recognize their individual needs and preferences and respond to them accordingly.

(Emphasis added.)

141. The Company's marketing materials also highlighted that Brookdale:

> Provide[s] customized care solutions to meet residents' unique needs and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, we strive to offer personalized care and exceptional service at competitive and affordable rates. ***Fees for care and services are based on each resident's needs*** and preferences, as determined by the Living Accommodation selected ***and their Personal Service Plan.***
>
> * * *
>
> This provides customer value because ***our residents only pay for what they need and want.***

(Emphasis added.)

- 51 -

142.    Likewise, certain of the Company's presentations available on Brookdale's social media platforms, such as a video presentation uploaded to YouTube on December 1, 2017, have emphasized the advantages Brookdale's staffing provided:

> We know it's hard to talk about the next chapter, so we make every effort to make it easy for you. We start by asking, what does compassion, excellence, respect and integrity mean to you? Well, it means everything to us here at Brookdale and we listen. Listening helps us answer any question or concerns you may have about senior living. Together, we team up and plan the best way for you to enjoy life. This trusted relationship is maintained in over 1000 communities nationwide so you can live just about anywhere you want and have **80,000 passionate associates ready to work for you**. They've made Brookdale the industry leader in dedicated senior care. Every day they'll connect with you in a personal way and make sure that you're engaged and included. I want you to know that Brookdale is more than a progressive community, we're a community with a vision. A vision that is continually improving senior care at all levels for you. I know that senior care decisions can be difficult which is why we're dedicated to making it easy for you....

***The Individual Defendants Systematically Failed to Adequately Staff Brookdale's Facilities and Failed to Disclose and Actively Concealed Same***

143.    Moreover, Brookdale falsely advertised its quality of care and provided data to the CMS inaccurate data, including related to staffing levels, in order to achieve higher star-ratings and attract more customers/patients and residents

144.    During the Relevant Period, the Individual Defendants caused the Company to systematically fail to provide adequate staffing for Brookdale's facilities. As a result, contrary to the representations described above, the Individual Defendants caused the Company to fail to meet the collective needs as determined by the Personal Service Assessment and violate the Company's obligations under the Residency Agreements and also state adult care home rules and regulations.

- 52 -

145.     Specifically, to avoid systemic defaults on the Company's massive debt and lease obligations, as detailed above, the Individual Defendants caused the Company to set staffing figures, including the amount of time estimated to fulfill certain tasks and levels of care, greatly beneath the actual required duration. As a result, the collective amount of labor time required to deliver the daily services for Brookdale's resident population exceeded the daily amount of staff time the Company allotted to its facilities. Moreover, to ensure staffing costs would not rise, the Individual Defendants caused the Company to assert tight-knit control over the facility staffing and adopt a policy that precluded local facility-level employees from adjusting staffing, or critical factors and data that was entered into the Company's Service Alignment Software (such as, task counts, task times, logic algorithms, and source code), based upon known staffing demands to meet the daily care needs of Brookdale's residents. Furthermore, the Company itself failed to appropriately adjust staffing despite the fact that the Individual Defendants knew Brookdale's staffing figures were inadequate to meet residents' assessed care needs, Brookdale's contractual obligations, and to comply with adult care home laws, rules, and regulations.

146.     The Misconduct resulted in extreme wait times for service care needs that were paid for and even subjected dependent, disabled, and/or vulnerable residents to the risk of actual service deprivations. As a result, the Misconduct violated state laws and regulations and exposed the Company to a substantially increased risk of litigation.

147.     Despite receiving a wave of complaints arising out of the Misconduct from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff, the Individual Defendants intentionally and knowingly refused to address the well-founded complaints, continued to engage in or permit the Misconduct, failed to disclose the Misconduct,

- 53 -

and actively concealed the Misconduct, so that it would not default on its massive debt and lease obligations. Moreover, numerous reports generated by the Company's own facilities, corporate audits of each facilities' performance, and internal emails and communications demonstrate the Individual Defendants engaged in or permitted the Misconduct.

148.    Throughout the Relevant Period, Brookdale did not maintain control over its financial statements and operational statements. This caused the Company's financial reports throughout the Relevant Period to be materially false and misleading.

**Instances of Widespread Understaffing at Brookdale Facilities Across the United States**

149.    Throughout the Relevant Period, the Individual Defendants failed to correct the ongoing Misconduct occurring in Brookdale facilities across the country and instead spread false and misleading statements about Brookdale's performance in caring for their residents. From early on, this subjected the Company to scrutiny from various organizations and regulatory agencies.

150.    On September 8, 2016, Brookdale's Geary Street facility in Oregon violated regulations after several residents seeking assistance waited for responses to their call lights for more than forty-five minutes. Additionally, Oregon's Department of Human Services issued an order barring Brookdale's Eagle Point facility from taking new residents. A licensing survey found "unpleasant odors, failure to properly monitor diabetic patients, and issues with staffing requirements and training."[8]

---

[8]    https://kobi5.com/news/assisted-living-facility-barred-from-accepting-new-residents-amid-dhs-concerns-47225/. (Last visited May 20, 2022.)

- 54 -

151.    Also in 2016, the California Department of Social Services' Community Care Licensing Division issued citations to Brookdale's Oceanside facility for lack of staff in the assisted living department of the facility.[9]

152.    On December 24, 2016, the Community Care Licensing Division issued a citation at Brookdale's Palm Springs facility because twenty residents of the facility did not receive their necessary medications due to the fact that not one staff member was on active duty.[10]

153.    On May 24, 2017, the Colorado Department of Public Health & Environment cited Brookdale's Boulder Creek facility, stating the facility failed "to employ sufficient staff to ensure the provision of service necessary to meet the needs of two sample residents."[11]

154.    Additionally, the Colorado Department of Public Health & Environment cited the Brookdale Boulder Creek facility for extensive and unlawful response times to residents' call lights.[12]

155.    In 2018, the Community Care Licensing Division issued a citation to Brookdale's Corona facility because of understaffing—only one staff member was on duty.[13]

156.    On August 5, 2019, the North Carolina Division of Health Service Regulation fined Brookdale's Country Day Road facility $2,000.00 for failing to "ensure aide hours met the minimum requirements on 14 sampled shifts."[14]

---

[9] https://www.ccld.dss.ca.gov/carefacilitysearch/FacDetail/374601952. (Last visited May 20, 2022.)
[10] https://www.ccld.dss.ca.gov/carefacilitysearch/FacDetail/336410691. (Last visited May 20, 2022.)
[11] https://www.boulderweekly.com/news/disgraceful-exit/; https://cdphe.colorado.gov/find-and-compare-facilities. (Last visited May 20, 2022.)
[12] https://cdphe.colorado.gov/find-and-compare-facilities. (Last visited May 20, 2022.)
[13] https://www.ccld.dss.ca.gov/carefacilitysearch/FacDetail/336426434. (Last visited May 20, 2022.)
[14] https://info.ncdhhs.gov/dhsr/acls/adultcarepenalties.asp. (Last visited May 20, 2022.)

- 55 -

157. On September 24, 2019, the North Carolina Division of Health Service Regulation fined Brookdale's Wilmington facility $4,000.00 for failing to supervise a resident who was previously known to be a high fall risk.[15]

158. On August 7, 2020, the North Carolina Division of Health Service Regulation fined Brookdale's Reidsville facility $7,000.00 for failing to "ensure medications were administered as ordered."[16]

159. The aforementioned instances of neglect and dangerous mismanagement were products of the strategic, chronic understaffing resulting from the Individual Defendants' Misconduct.

160. Furthermore, the Company and the Individual Defendants failed to adjust staffing levels in spite of sustained and frequent citations, violating contractual agreements with the Company's residents, families of residents, rules, regulations, as well as state and federal laws.

**Related Litigation**

***The Runton Action***

161. On April 4, 2017, Gloria Runton, by and through her guardian Adult Advocacy & Representations, initiated the Runton Action on behalf of a class of residents in the Company's communities located in Florida, against Brookdale for violating Florida's Deceptive and Unfair Trade Practices Act, Section 501.201 and for breach of contract. Runton sought declaratory and injunctive relief for Brookdale's allegedly engaging "in a scheme to defraud residents by making misrepresentations regarding the determination and sufficiency of the staffing" at Brookdale's facilities.

---

[15] *Id.*
[16] *Id.*

- 56 -

162. On March 11, 2020, the parties to the Runton Action reached a settlement wherein any resident of the Florida Brookdale facilities in question between the dates of April 4, 2013, and November 13, 2019 would be entitled to "reimbursement of 15 percent of the Community Fee Payment for each year of their Residency."

*Bright Action*

163. On May 3, 2019, Meghan Bright, as curator of the estate of Leonard Foote and Jean Howard, by and through her son Gary Weir, as power of attorney, initiated the Bright Action on behalf of a class of residents in the Company's communities located in Florida and a class of residents in the Company's communities located in North Carolina, against Brookdale seeking, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations. Bright Action, ECF No. 1, ☐☐ 11. On June 23, 2020, the court granted a joint motion to consolidate the Bright Action with the Gunza Action.

*Gunza Action*

164. On April 24, 2020, George Gunza, by and through his sister Peggy Fisher, as power of attorney, initiated the Gunza Action on behalf of a class of residents in the Company's communities located in North Carolina, against Brookdale, seeking substantially similar relief as sought in the Bright Action, including, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations. Gunza Action, ECF No. 1, ☐☐ 12. Specifically, Gunza brought claims under the North Carolina Uniform Declaratory Judgment Act, the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), and for breach of contract. As noted

- 57 -

above, on June 23, 2020, the court granted a joint motion to consolidate the Gunza Action with the Bright Action to form the Consumer Class Action.

165. On March 12, 2021, the court denied in large part Brookdale's motion to dismiss the Consumer Class Action in part, dismissing only Gunza's claims for injunctive and declaratory relief due to lack of standing for no longer being a Brookdale resident. However, Gunza's NCUDTPA claim survived because Brookdale's misleading statements amount to more than just "corporate optimism" or puffery and instead suggested Brookdale "engaged in a deliberate scheme to target elderly, disabled, and dependent individuals…based on the false promise of delivering services tailored to meet their care needs."[17]

166. Further, the court held that Gunza made a viable breach of contract claim, alleging that the Residency Agreement "obligated" Brookdale to furnish services for which Gunza contracted and paid for, "meet minimum staffing requirements set by North Carolina statutes, and use the Personal Assessment System to determine and provide staffing levels sufficient to deliver the level of care paid for."[18]

### The California Action

167. On March 15, 2021, the California Attorney General filed a complaint on behalf of Californians affected by Brookdale's misconduct, alleging that Brookdale "systematically" violated multiple California laws by: (1) suddenly discharging residents without the necessary notice required by California law, and (2) falsely advertising to potential residents a quality-of-care Brookdale was not providing.

---

[17] *Bright v. Brookdale Senior Living, Inc.*, No. 3:19-CV-00374, 2021 WL 6496799 (M.D. Tenn. Mar. 12, 2021).
[18] *See* Gunza Action complaint, ¶¶ 3, 4, 6, 8, 9).

- 58 -

168. The California Action alleged that Brookdale "transferred or discharged" residents without necessary notice so that Brookdale could replace lower profit-yielding residents with higher profit-yielding residents, such as discharging a Medi-Cal resident for a Medicare resident. The California Action alleged that Brookdale "has systematically disregarded" the law preventing this type of predatory profit-seeking behavior.

169. Additionally, the California Action alleged that Brookdale falsely advertised its quality of care by furnishing false information to CMS, which CMS uses to determine the "star" quality rating CMS disseminates to the public for evaluation of the country's nursing homes, presenting another instance of the Individual Defendants subjecting the Company to behavior in violation of Brookdale's Code of Conduct and its prohibition against unlawful marketing and making misrepresentations to the United States government.

170. On March 11, 2022, the California Attorney General announced a $3.25 million settlement with Brookdale.

171. Due to the Individual Defendants' failure to maintain adequate controls and employ/adhere to the Code of Conduct over the course of the Relevant Period, the Company has been subjected to unnecessary expenses in the form of punitive fines and extensive litigation fees stemming from a variety of litigation including the forementioned Runton Action settlement, Consumer Class Action and California Action.

**False and Misleading Proxy Statements**

*2018 Proxy Statement*

172. On August 21, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Parrell, Petty,

- 59 -

Seward, and Wielansky solicited the 2018 Proxy Statement which contained material misstatements and omissions relating to the Misconduct.

173. With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[t]he Board has also adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, including our principal."

174. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants' allowance of and/or engagement in the Misconduct and failures to report violations of the Code of Conduct.

175. The 2018 Proxy Statement also called for shareholder approval of, among other things: (1) the election of three directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to declassify the Board (the "First 2018 Proposal"); and (3) the approval of an amendment to the Company's Certificate of Incorporation to eliminate a supermajority voting for director removal (the "Second 2018 Proposal" and, together with the First 2018 Proposal, the "2018 Proposals").

176. The 2018 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, the: (1) Misconduct; (2) Brookdale's failure to maintain internal controls to ensure the Company's policies regarding advertising and marketing were followed and; (3) that the Company's internal controls were inadequate to protect current and prospective residents and stockholders from

- 60 -

Company misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

177. The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2018 Proposals who would not have approved the 2018 Proposals had they been informed about the Misconduct.

### *2019 Proxy Statement*

178. On September 18, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky solicited the 2019 Proxy Statement which contained material misstatements and omissions.

179. With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he Board also has adopted a Code of Business Conduct and Ethics that applies to all employees, directors and officers, as well as a Code of Ethics for Chief Executive and Senior Financial Officers, which applies to our President and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, Treasurer and Controller."

180. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and Code of Ethics was not followed, as evidenced by the Individual Defendants' allowance of and/or engagement in the Misconduct and failures to report violations of the Code of Conduct or Code of Ethics.

181. The 2019 Proxy Statement also called for shareholder approval of, among other things: (1) the election of two directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to facilitate implementation of a majority voting standard for

- 61 -

uncontested elections of directors (the "2019 First Amendment Proposal"); and (3) the approval of the Amended and Restated 2014 Omnibus Inventive Plan (the "Plan") which, among other things, would: (i) replenish the number of shares of common stock available to be granted under the plan by 5,400,000, or 2.9% of the Company's outstanding shares of Brookdale common stock as of September 9, 2019; (ii) amend the term of the existing plan from June 5, 2024 to the tenth anniversary of the Annual Meeting; (iii) increase the share limitation on awards granted during any fiscal year from 700,000 to 800,000 for restricted shares, restricted stock units, unrestricted shares, performance awards or other stock-based awards; (iv) subject dividends or dividend equivalents credited with respect to any award granted under the Plan to the same restrictions, conditions and risks of forfeiture as the underlying awards; and (v) subject all equity-based awards granted under the Plan, other than awards representing a maximum of 5% of the shares reserved for issuance under the plan, to a minimum vesting period of at least 12 months following the grant date (the "Incentive Proposal" and, together with the 2019 First Amendment Proposal, the "2019 Proposals" and, together with the 2018 Proposals, the "Proposals").

182. The 2019 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*: (1) the Misconduct; (2) Brookdale's failure to maintain internal controls to ensure the Company's policies regarding advertising and marketing were followed and; (3) that the Company's internal controls were inadequate to protect current and prospective residents and stockholders from

- 62 -

Company misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

183. The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2019 Proposals who would not have approved the 2019 Proposals had they been informed about the Misconduct.

*2020 Proxy Statement*

184. On May 18, 2020, the Company filed a Schedule 14A with the SEC (the "2020 Proxy Statement"). Defendants Baier, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky solicited the 2020 Proxy Statement which contained material misstatements and omissions.

185. With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, "[t]he Board also has adopted a Code of Business Conduct and Ethics that applies to all employees, directors, and officers, as well as a Code of Ethics for Chief Executive and Senior Financial Officers, which applies to Our President and Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and Treasurer."

186. The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and Code of Ethics was not followed, as evidenced by the Individual Defendants' allowance of and/or engagement in the Misconduct and failures to report violations of the Code of Conduct or Code of Ethics.

187. The 2020 Proxy Statement also called for shareholder approval of, among other things, (1) the election of three Class I directors and three Class II directors; (2) the Company's

- 63 -

executive officer compensation; and (3) the appointment of Ernst & Young LLP as the Company's 2020 independent registered accounting firm.

188.     The 2020 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, inter alia: (1) the Misconduct; (2) Brookdale's failure to maintain internal controls to ensure the Company's policies regarding advertising and marketing were followed and; (3) that the Company's internal controls were inadequate to protect current and prospective residents and stockholders from Company misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### Nationwide Public Disclosure of the Misconduct

189.     On April 30, 2020, *Nashville Business Journal* published the April 2020 Article titled "Lawsuit accuses Brentwood health care giant of deception, understaffing" which reported on the Consumer Class Action filed against the Company alleging that the Company had intentionally "chronically" understaffed its facilities in North Carolina "in an effort to meet financial benchmarks" and, as a result, misled residents in North Carolina and their families when Brookdale had "promised basic care and daily living services." Further, the April 2020 Article revealed that the lawsuit claimed that the Company's residents in North Carolina "have not received the care and services they paid for" and seeks, *inter alia*, to enjoin the Company from engaging in "unlawful and fraudulent practices." The April 2020 Article also shed light on allegations regarding the Company's use of "computer software to 'underestimate' staffing needs at each of its facilities." The April 2020 Article further revealed that the Company's officers

- 64 -

"routinely" scolded executive directors in emails related to staffing budgets. Finally, the April 2020 Article exposed that the Company had "created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale's financial performance targets" to entice employees to "stay at or below Brookdale's limits for staffing and expenses."

190. On March 11, 2022, the California Attorney General announced a $3.25 million settlement with the Company to end allegations that the Company's ten facilities in California "misrepresented its quality of care to the public by reporting false information." In particular, the Company overreported the amount of hours that registered nurses give care to residents to the CMS. In turn, this false information fraudulently inflated the Company's star rating that is "used by consumers as a means of selecting a nursing home." The Company's behavior violated both the Unfair Competition Law and the False Advertising Law.

## DAMAGES TO BROOKDALE

191. As a direct and proximate result of the Individual Defendants' conduct, Brookdale will lose and expend many millions of dollars.

192. Such expenditures include, but are not limited to, costs associated with the costs of legal fees associated with the Consumer Class Action filed against the Company and other lawsuits filed against the Company including but not limited to the California Action's $3.25 million settlement, the Runton Action's settlement, its CEO, former CEO, and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

193. Such expenditures include, but are not limited to, costs associated with the costs of defending investigations of the Misconduct and for fines paid in connection thereto.

194. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties

- 65 -

to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

195. As a direct and proximate result of the Individual Defendants' conduct, Brookdale has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

196. Plaintiffs bring this action derivatively and for the benefit of Brookdale to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Brookdale, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Exchange Act.

197. Brookdale is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

198. Plaintiffs are, and have been at all relevant times, Brookdale shareholders. Plaintiffs will adequately and fairly represent the interests of Brookdale in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

199. Plaintiffs incorporate by reference and re-alleges each and every allegation stated above as if fully set forth herein.

- 66 -

200. A pre-suit demand on the Board of Brookdale is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Baier, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky (the "Director-Defendants"); and non-parties Freed and Jordan R. Asher (the "Non-Parties" and, together the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors who were on the Board at the time this action was commenced.

201. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their failure to maintain internal controls and further, the Director-Defendants complete failure to report and remedy the Misconduct discussed herein. As directors of Brookdale's Board, each Director-Defendant engaged in an unlawful business strategy stemming from the very business structure of the company itself. The Company systematically understaffed its facilities across the country through its proprietary software to minimize staff and maximize profits in complete contravention of publicly marketed Company advertising. This fact renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves.

202. Demand is also excused as to all the Director-Defendants because the Misconduct was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

203. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was

- 67 -

intended to make the Company appear more stable, profitable, and reputable. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

204.    Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by causing the Company to pay Defendants Baier, Smith, and Swain their annual bonus and/or stock awards each year that they violated the Company's policies. Indeed, the Misconduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

205.    Moreover, Defendants Baier, Bromley, Bumstead, Johnson-Mills, Warren, and Wielansky caused the 2019 Proxy Statement to call for a shareholder vote to approve the Incentive Proposal, which provided for the grant of stock and cash-based performance awards for officers and directors, including Defendants Baier and Swain. The misrepresentations and omissions set forth herein were material to shareholders in voting on the Incentive Proposal who would not have approved the Incentive Proposal, had they been informed about the Misconduct. As a result of shareholder approval of the Incentive Proposal, Defendants Baier and Swain undeservedly received approximately $4,773,420 and $1,306,414, respectively, in performance-based stock awards during the fiscal year ended December 31, 2019; and Defendants Bromley, Bumstead, Sansone, Wielansky, Clegg, and Seward, and non-party Freed undeservedly received approximately $99,995 each in stock awards during the fiscal year ended December 31, 2019; and Defendants Johnson-Mills and Warren undeservedly received approximately $41,367 and $24,382, respectively in stock awards during the fiscal year ended December 31, 2019. For this

reason too, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

206. Demand is also excused as to the Director-Defendants because they were fully aware of the Misconduct during the Relevant Period, as evidenced by the fact that Brookdale's residents, families of residents, and even Brookdale's own staff inundated the Company with complaints of the chronic understaffing of Brookdale's facilities and, as a result of the Misconduct, the Company's failure to provide proper and promised care to the Company's residents. Among other Individual Defendants, Defendants Bromley, Bumstead, and Wielansky caused Defendant Baier to be promoted to CEO in February 2018. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

207. Additional reasons that demand on Defendant Baier is futile follow. Defendant Baier has served as the Company's President and CEO and as a Company director since February 2018. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Baier with her principal occupation, and she receives handsome compensation, including $6,350,901 during the fiscal year ended December 31, 2019, $4,674,255 during the fiscal year ended December 31, 2018, $2,407,188 during the fiscal year ended December 31, 2017, and $2,492,367 during the fiscal year ended December 31, 2016. As the Company provides Defendant Baier with her primary occupation and means of livelihood, it is unlikely she would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining her compensation and evaluating her continued employment with Brookdale. Defendant Baier was ultimately responsible for all of the false and misleading statements and omissions that were made. As the Company's highest officer and as a

- 69 -

trusted Company director, she conducted little, if any, oversight of the Misconduct (which Defendant Baier engaged in and permitted despite being aware of it), consciously disregarded her duties to monitor such controls, and consciously disregarded her duties to protect corporate assets. Defendant Baier breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208. Additional reasons that demand on Defendant Bromley is futile follow. Defendant Bromley has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. Defendant Bromley has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Bromley permitted despite being aware of it), consciously disregarded his duties to monitor such, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bromley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209. Additional reasons that demand on Defendant Bumstead is futile follow. Defendant Bumstead has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Bumstead has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Bumstead permitted despite being aware of it), particularly with respect to setting compensation packages that encourages the Misconduct, consciously disregarded his duties to monitor such controls, and consciously

- 70 -

disregarded his duties to protect corporate assets. For these reasons, Defendant Bumstead breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Johnson-Mills is futile follow. Defendant Johnson-Mills has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee. Defendant Johnson-Mills has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Misconduct (which Defendant Johnson-Mills permitted despite being aware of it), consciously disregarded her duties to monitor such controls, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Johnson-Mills breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Sansone is futile follow. Defendant Sansone has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. Defendant Sansone has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Sansone permitted despite being aware of it), consciously disregarded his duties to monitor such controls, and consciously disregarded his duties to protect corporate assets. For these reasons,   Defendant Sansone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

- 71 -

212.     Additional reasons that demand on Defendant Warren is futile follow. Defendant Warren has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Warren has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Misconduct (which Defendant Warren permitted despite being aware of it), particularly with respect to setting compensation packages that encourages the Misconduct, consciously disregarded her duties to monitor such controls, and consciously disregarded her duties to protect corporate assets. Defendant Warren breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

213.     Additional reasons that demand on Defendant Wielansky is futile follow. Defendant Wielansky has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. Defendant Wielansky has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Misconduct (which Defendant Wielansky permitted despite being aware of it), particularly with respect to setting compensation packages that encourages the Misconduct, consciously disregarded his duties to monitor such controls, and consciously disregarded his duties to protect corporate assets. Defendant Wielansky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

- 72 -

214.    Additional reasons that demand on non-party Freed is futile follow. Non-party Freed has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Freed has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Misconduct (which Freed permitted despite being aware of it), consciously disregarded her duties to monitor such controls, and consciously disregarded her duties to protect corporate assets. For these reasons,  non-party Freed breached her fiduciary duties, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.    Additional reasons that demand on the Board is futile follow.

216.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, six of the eight Director-Defendants have served on the Board for at least two years or more. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

217.    In violation of the Audit Committee Charter, Defendants Bromley, Warren, and Wielansky failed to ensure that Brookdale's public disclosures were full and accurate and that the Company complied with all relevant laws and regulations. Additionally, Defendants

- 73 -

Bromley, Warren, and Wielanksy failed to "manage the Corporation's exposure to risk," a mandate set forth in the Audit Committee's Charter. Thus, as members of the Audit Committee, they face a substantial likelihood of liability and demand is futile as to them.

218.    Brookdale has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Brookdale any part of the damages Brookdale suffered and will continue to suffer thereby. Thus, any demand on the Director-Defendants would be futile.

219.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

220.    The acts complained of herein constitute violations of fiduciary duties owed by Brookdale's officers and directors, and these acts are incapable of ratification.

221.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Brookdale. If there is a directors' and

officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Brookdale, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

222. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Brookdale to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

223. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

224. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

226.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

227.    Under the direction and watch of the Directors, the 2018 Proxy Statement, 2019 Proxy Statement, and 2020 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, the: (1) Misconduct; (2) Brookdale's failure to maintain internal controls to ensure the Company's policies regarding advertising and marketing were followed and; (3) that the Company's internal controls were inadequate to protect current and prospective residents and stockholders from Company misconduct.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

228.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ performance based compensation elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on the Misconduct and misrepresented as a

- 76 -

result of false and misleading statements, allowing the Individual Defendants to wrongfully benefit from the Misconduct alleged herein.

229.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or tolerance of the Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

230.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Misconduct.

231.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval the Proposals.

232.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2019 Proposals who would not have approved, among other things, Defendants Baier, Bromley, Bumstead, Clegg, Johnson-Mills, Leeds, Seward, Warren, and Wielansky incentive award plan, had they been informed about the Misconduct. As a result of shareholder approval of the Inventive Proposal, Defendants Baier and Swain undeservedly received approximately $4,773,420 and $1,306,414, respectively, in performance-based stock

- 77 -

awards during the fiscal year ended December 31, 2019; and Defendants Bromley, Bumstead, Sansone, Wielansky, Clegg, and Seward, and non-party Freed undeservedly received approximately $99,995 each in stock awards during the fiscal year ended December 31, 2019; and Defendants Johnson-Mills and Warren undeservedly received approximately $41,367 and $24,382, respectively in stock awards during the fiscal year ended December 31, 2019.

233.    The false and misleading elements of the 2018 Proxy Statement led to, among other things, the approval of the 2018 Proposals and the election or re-election of Defendants Bromley, Johnson-Mills, and Warren, which allowed them to breach or continue breaching their fiduciary duties to Brookdale.

234.    The false and misleading elements of the 2019 Proxy Statement led to, among other things, the approval of the 2019 Proposals and the election of Defendant Sansone and non-party Freed which allowed them to breach their fiduciary duties to Brookdale.

235.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

236.    Plaintiffs, on behalf of Brookdale, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

237.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

238.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Brookdale's business and affairs.

- 78 -

239.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

240.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Brookdale.

241.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

242.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Misconduct.

243.    Also in breach of their fiduciary duties owed to Brookdale, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to investors in the Proxy Statements that failed to disclose, *inter alia*, the: (1) Misconduct; (2) Brookdale's failure to maintain internal controls to ensure the Company's policies regarding advertising and marketing were followed and; (3) that the Company's internal controls were inadequate to protect current and prospective residents and stockholders from Company misconduct.

244.    The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay the Individual Defendants their annual bonuses and/or stock awards each year that they violated the Company's policies.

245.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of maintaining Brookdale's fraudulent staffing and advertising practices.

246. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of maintaining Brookdale's fraudulent staffing and advertising practices. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

247. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

248. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Brookdale has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

249. Plaintiffs on behalf of Brookdale have no adequate remedy at law.

**Against Individual Defendants for Unjust Enrichment**

250.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

251.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Brookdale.

252.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Brookdale that was tied to the performance of Brookdale, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

253.    Plaintiffs, as shareholders and representatives of Brookdale, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

254.    Plaintiffs on behalf of Brookdale have no adequate remedy at law.

**FOURTH CLAIM**

**Against Individual Defendants for Abuse of Control**

255.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

- 81 -

256. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Brookdale, for which they are legally responsible.

257. As a direct and proximate result of the Individual Defendants' abuse of control, Brookdale has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Brookdale has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

258. Plaintiffs on behalf of Brookdale have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

259. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

260. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Brookdale in a manner consistent with the operations of a publicly-held corporation.

261. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Brookdale has sustained and will continue to sustain significant damages.

262. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

263. Plaintiffs, on behalf of Brookdale, have no adequate remedy at law.

- 82 -

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

264.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

265.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Brookdale to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

266.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

267.    Plaintiffs, on behalf of Brookdale, have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Brookdale, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Brookdale;

(c)     Determining and awarding to Brookdale the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Brookdale and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

- 83 -

applicable laws and to protect Brookdale and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Brookdale to nominate at least five candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Brookdale restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 31, 2022                                    Respectfully submitted,

                                    **BRAMLETT LAW OFFICES**

- 84 -

s/*Paul Kent Bramlett*

Paul Kent Bramlett (TN #7387)
Robert Preston Bramlett (TN#25985)
P.O. Box 150734
Nashville, Tennessee 37215
Telephone: (615) 248-2828
E-mail: PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

*Liaison Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
E-mail: tbrown@thebrownlawfirm.net

*Lead Counsel for Plaintiffs*
**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**BRAGAR EAGEL & SQUIRE P.C.**
Lawrence P. Eagel
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5888
Facsimile: (212) 486-0462
Email: eagel@bespc.com

*Additional Counsel for Plaintiffs*

- 85 -