# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BRIAN DAVIS, BRIAN BICKETT, and )
ROBERT BAZINET, derivatively on behalf )
of BROOKDALE SENIOR LIVING INC., )
                                     )

Plaintiffs, )
                                     )

v. )                **Case No. 3:20-cv-0929**
                                     )                **Judge Aleta A. Trauger**

LUCINDA M. BAIER, T. ANDREW )
SMITH, STEVEN E. SWAIN, MARCUS )
E. BROMLEY, FRANK M. BUMSTEAD, )
JACKIE M. CLEGG, DANIEL A. )
DECKER, RITA JOHNSON-MILLS, )
JEFFREY R. LEEDS, MARK J. )
PARRELL, WILLIAM G. PETTY, JR., )
GUY P. SANSONE, JAMES R. SEWARD, )
DENISE W. WARREN, and LEE S. )
WIELANSKY, )
                                     )

Defendants, )
                                     )

and )
                                     )

BROOKDALE SENIOR LIVING INC., )
a Delaware corporation, )
                                     )

Nominal Defendant. )

## <u>MEMORANDUM</u>

The defendants have filed a Motion to Dismiss Plaintiffs' Verified Consolidated Amended Shareholder Derivative Complaint (Doc. No. 46), to which the plaintiffs have filed a Response (Doc. No. 48), and the defendants have filed a Reply (Doc. No. 49). For the reasons set out herein, the motion will be granted in part and denied in part.

**A. The Nature of the Case**

Brookdale Senior Living Inc. ("Brookdale") is "the largest operator of senior living communities in the United States based on total capacity, with 679 communities in 41 states and the ability to serve more than 60,000 residents as of December 31, 2021." (Doc. No. 42 ¶ 2.) The individual defendants are current and former Brookdale executives and members of its Board of Directors ("Board"). (*Id.* ¶¶ 30–89.) In recent years, Brookdale, which is incorporated in Delaware, has faced a number of allegations regarding (1) the quality of its services and (2) the honesty of its and its executives' representations to the public. Several lawsuits have been filed based on those allegations, including the consolidated cases at issue here. (*Id.* ¶¶ 11–17, 29.) These plaintiffs, like many of the others, take particular issue with (1) Brookdale's accumulation of liabilities as part of its corporate expansion, which allegedly resulted in excessive pressure to cut costs; (2) Brookdale's attempts to cut those costs through an internal software algorithm, the Service Alignment Software ("SAS"), that produced staffing-level recommendations that, according to the plaintiffs, were deficient; and (3) the defendants' various statements allegedly misrepresenting or concealing the reality of that situation.

These plaintiffs are, or at least were, owners of Brookdale stock, and these cases are shareholder derivative suits, meaning that they were brought by those shareholders—ostensibly on Brookdale's behalf, but without the consent of the Board. Specifically, these derivative plaintiffs seek to pursue six counts on Brookdale's behalf against the officer and director defendants. Count I, the only statutory claim, is for violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). (Doc. No. 42 ¶¶ 224–36.) Counts II through VI are

---

[1] These facts are taken primarily from the plaintiffs' Verified Consolidated Amended Shareholder Derivative Complaint (Doc. No. 42) and are accepted as true for the purpose of the Motion to Dismiss.

common law claims for, respectively, breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. (Id. ¶¶ 237–67.)

Claims such as the plaintiffs' depart from the ordinary structure of litigation in that they permit one party to pursue claims on behalf of another. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) ("The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'") (quoting *Ross v. Bernhard*, 396 U.S. 531, 534, (1970)). In order for a stockholder to bring a claim on behalf of the corporation in which he owns only a partial, non-controlling share, however, certain threshold requirements must be met. *See id.* at 97.

Delaware law provides that "[t]he business and affairs of every corporation organized [under the laws of the state] shall be managed by or under the direction of a board of directors, except as may be otherwise provided in [the Delaware Code] or in its certificate of incorporation." Del. Code Ann. tit. 8, § 141(a). Pursuant to that rule, "[w]hether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 (1984) (quoting *United Copper Secs. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263 (1917)). The law theoretically *could* treat that right of control by directors, in the absence of a shareholder vote, to be inviolable, allowing directors to manage or mismanage a corporation however they wish, until they are constrained by the entity's owners acting collectively. That, though, is not the status quo that Delaware has chosen to adopt with regard to the initiation of litigation.

3

Rather, Delaware law recognizes that a shareholder may bring suit on a corporation's behalf if he can establish "either that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or, if no demand was made, that such a demand would [have been] a futile gesture and is therefore excused." *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (citations omitted). That rule—typically referred to as the "demand requirement"— "exists to preserve the primacy of board decisionmaking," *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 808 (Del. Ch. 2009) (citation omitted), while leaving open two narrow paths through which a shareholder of a corporation may seize that responsibility from the directors by "articulat[ing] a reasonable basis" for that shareholder "to be entrusted with a claim that," by right, "belongs to the corporation." *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

One of those narrow paths—establishing that the corporation's Board of Directors wrongly refused a litigation demand—is at issue in a separate set of consolidated cases currently pending in this court. *See Anders v. Baier*, No. 3:21-CV-0373, 2022 WL 4097332, at *11 (M.D. Tenn. Sept. 7, 2022). The court held in that case that, although the Board claimed merely to be indefinitely forestalling consideration of those plaintiffs' litigation demand, the Board's unjustifiable delays eventually reached the stage at which the demand had been constructively refused, giving rise to a right to sue derivatively. *Id.* at *13. This case involves the other option for overcoming the demand requirement—establishing that such a demand would have been futile in the first place. *See id.* (discussing relationship between the two suits). (Doc. No. 42 ¶¶ 200–01.) The defendants now seek dismissal of the plaintiffs' claims on the ground that the plaintiffs have failed to plead facts sufficient to support that theory. (Doc. No. 46.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must, generally speaking, "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court's evaluation of the sufficiency of those facts, however, depends on the applicable pleading standard. Most ordinary civil claims are governed by the relatively forgiving requirements of Rule 8. Shareholder derivative actions, however, are subject to the more demanding pleading standard of Rule 23.1(b), which requires that the complaint:

    (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

    (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

    (3) state with particularity:

        (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

        (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1; *see McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001).

"[A]lthough Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, it does not *create* a demand requirement of any particular dimension." *Kamen,* 500 U.S. at 96. The Supreme Court has held that, faced with this "gap in the federal securities laws," a federal court should apply the "scope of the demand

5

requirement" that exists "under state law." *Id.* at 108. The parties agree that the relevant state, in this instance, is Delaware.

## III. ANALYSIS

### A. Principles of Demand Futility Under Delaware Law

"The purpose of the demand-futility analysis is to assess whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). Delaware's demand futility rule should not be misconstrued as a barrier intended to insulate all but the most egregious misbehavior by directors from liability. To the contrary, "[t]he demand requirement does not exist for the benefit of defendants in derivative suits" at all, but rather "for the benefit of the corporation itself." *In re Am. Int'l Grp., Inc.*, 965 A.2d at 808 & n.160 (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)). The court's inquiry therefore is not focused on judging the individual directors' behavior, in and of itself, but on whether the pleaded facts raise sufficient doubt about those directors' capacity to disinterestedly direct the affairs of the corporation as they relate to the proposed litigation at issue. "'Directoral interest . . . exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation or stockholders.' Generally, the interest at issue must be material to the director, and materiality is assessed based upon the individual director's economic circumstances." *Freedman v. Adams*, No. CIV.A. 4199-VCN, 2012 WL 1345638, at *6 (Del. Ch. Mar. 30, 2012) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

6

"Independence is a fact-specific determination made in the context of a particular case." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004). The Delaware Supreme Court has recently refined its demand futility caselaw to adopt a "three-part . . . universal test," applicable to all cases in which the issue of demand futility arises. *United Food*, 262 A.3d at at 1050. That test requires the court to consider the following factors on a "director-by-director basis":

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at 1058 (citation omitted). The court will find that a demand was excused "[i]f the answer to any of the questions is 'yes' for at least half of" the members of the board." *Id.* Because that test considers the board's ability to consider a litigation demand—not the legality of the underlying allegations—the test must be applied "based on the board's composition at the time the plaintiff brought the complaint, not when the alleged wrong occurred." *Freedman*, 2012 WL 1345638, at *6 (citation omitted).

## B. The Contested Directors

At the time that this action was filed, the Board had nine members:

1. Lucinda M. Baier
2. Marcus E. Bromley
3. Frank M. Bumstead
4. Rita Johnson-Mills
5. Guy P. Sansone

7

6.  Denise W. Warren

7.  Lee S. Wielansky

8.  Victoria Freed

9.  Jordan Asher

(Doc. No. 42 ¶ 200.) There are two directors about whom the parties agree. Asher has never been named as a defendant in these cases, and the Verified Consolidated Amended Shareholder Derivative Complaint makes no argument that Asher would have been unable to consider a litigation demand based on the relevant allegations. Asher is therefore firmly in the "disinterested" column. On the other side of the ledger, the defendants have conceded, for the purposes of this motion, that "Baier, the Company's President and CEO, was not independent." (Doc. No. 47 at 8 n.9.) The derivative plaintiffs' argument that a request would have been futile therefore hinges on the remaining seven board members whose independence remains contested: defendants Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky, as well as non-party Freed. If four or more of those seven directors lacked independence, then a demand would have been futile and these claims can proceed.

## C. Potential for Director Liability

The court will first consider the question of director liability, because it is the issue that has received the most attention from the parties and that would, for reasons that the court will later discuss, permit the broadest scope of demand futility. At first glance, the potential for a conflict of interest here is apparent—after all, several of the directors are named defendants in this case. Delaware law is clear, however, that "[d]emand is not excused solely because the directors would be deciding to sue themselves." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (citing *Jacobs v. Yang*, C.A. No. 206–N, 2004 WL 1728521, at *6 n. 31 (Del.Ch. Aug. 2, 2004)). Otherwise, any aspiring derivative plaintiff could establish

demand futility simply by naming more than half of the board's members as defendants, regardless of their actual connection to the underlying allegations. The fact that many of the relevant directors are named defendants in this suit is therefore not sufficient, in and of itself, to establish that a litigation demand would have been futile.

There is, moreover, another hurdle applicable to these plaintiffs, based on the details of Brookdale's incorporation. The defendants point out that Brookdale's certificate of incorporation includes an "exculpatory provision" for directors, as contemplated by Del. Code Ann. tit. 8, § 102(b)(7), which defines such a provision as follows:

> A provision eliminating or limiting the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer, provided that such provision shall not eliminate or limit the liability of:
>
> (i)     A director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders;
>
> (ii)    A director or officer for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;
>
> (iii)   A director under § 174 of this title [regarding unlawful dividends and stock purchases];
>
> (iv)   A director or officer for any transaction from which the director or officer derived an improper personal benefit; or
>
> (v)    An officer in any action by or in the right of the corporation.

Del. Code Ann. tit. 8, § 102(b)(7); *see In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1181 (Del. 2015). According to Brookdale, its certificate of incorporation contains such a term, stating:

> No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174

9

of the Delaware Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.

(Doc. No. 47 at 11 n.11 (quoting Amended and Restated Certificate of Incorporation, Art. 8 (Sept. 30, 2005)).) Although the text of that exculpatory clause does not appear in the Verified Consolidated Amended Shareholder Derivative Complaint, that pleading does cite Brookdale's incorporating documents, including by citing the exculpatory clause "to the extent such a provision exists." (Doc. No. 42 ¶ 219.) The court accordingly will consider the clause pursuant to the rule that, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Comm'l Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007) (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999)).

The Delaware Supreme Court has held that "plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the suit." *In re Cornerstone Therapeutics*, 115 A.3d at 1179; *see also Owens ex rel. Esperion Therapeutics, Inc. v. Mayleben*, No. CV 12985-VCS, 2020 WL 748023, at *7 (Del. Ch. Feb. 13, 2020) (*citing Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62 (Del. Ch. 2015)). A "serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (quoting *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)). For a claim to fall outside of Brookdale's exculpatory clause, it must be "(i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the

10

Delaware Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit." (Doc. No. 47 at 11 n.1.)

The plaintiffs argue that each of the contested directors in this case "faced a substantial likelihood of liability" arising out of their "breaching their non-exculpable duties of loyalty, candor, reasonabl[e] inquiry, oversight, supervision and good faith." (Doc. No. 48 at 11.) Those breaches, the plaintiffs argue, support a substantial risk of non-exculpable liability under (1) the Exchange Act and (2) various largely overlapping causes of action. The court will examine the plaintiffs' general argument first, and then turn to the specific causes of action.

### 1. Bad Faith/Duty of Loyalty

The issues of bad faith and violation of the duty of loyalty are not necessarily identical, but they are related enough that the court will consider them together. "The Delaware Supreme Court has stated that bad faith conduct may be found where a director 'intentionally acts with a purpose other than that of advancing the best interests of the corporation, acts with the intent to violate applicable positive law, or intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Citigroup*, 964 A.2d at 125 (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)) (ellipses omitted). The question of the duty of loyalty considers whether "the directors made the underlying decision under the influence of self-interest, or dependent on a third party, they have breached a duty of loyalty, and are liable for loss caused thereby." *Ryan v. Armstrong*, No. CV 12717-VCG, 2017 WL 2062902, at *14 (Del. Ch. May 15, 2017), *aff'd*, 176 A.3d 1274 (Del. 2017). Each inquiry, in other words, considers whether there are facts suggesting that a director departed from his basic obligation to act in the interest of the corporation according to his own business judgment.

11

In order to argue that five or more directors did so depart, the plaintiffs rely heavily on *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 960 (Del. Ch. 1996), and the subsequent cases construing that case's precedent. *Caremark* involved a shareholder derivative suit filed in the wake of a substantial criminal investigation of Caremark, a pharmacy company that was indicted for committing multiple felonies and ultimately entered a guilty plea to one of the charged counts. *Id.* at 960. Unlike in this case, the question of demand futility came before the court not in connection with a motion to dismiss, but in the context of a motion to approve a settlement of the shareholder derivative action. That motion "require[d] the court to assess the strengths and weaknesses of the claims asserted in light of the discovery record." *Id.* at 961. "The proposed settlement provide[d] very modest benefits," meaning that, in order for it to be approved, that approval would have to rest, at least in part, on "the weakness of the plaintiffs' claims." *Id.* at 972. The court considered a number of substantive issues, concluding, "in light of the discovery record, that there [was] a very low probability that it would be determined that the directors of Caremark breached any duty to appropriately monitor and supervise the enterprise." *Id.* at 961. That assessment—that the plaintiffs had a low, but not nonexistent, chance of success—was consistent with the parties' modest agreement. The court therefore approved the settlement. *Id.* at 972.

The *Caremark* plaintiffs had alleged that "the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Id.* at 967. The court described that theory of individual liability as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," particularly in light of the "good policy reasons why it is so difficult to charge directors with responsibility for corporate losses for an alleged

12

breach of care, where there is no conflict of interest or no facts suggesting suspect motivation involved." *Id.* (citation omitted). The court explained:

> What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact[] believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests. To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests.

*Id.* (footnote omitted).

All of the aforementioned language is, if anything, relatively hostile to the plaintiffs' arguments in this case. Nevertheless, the court's approval of the settlement in *Caremark* reflected an acknowledgement that *some* argument akin to the plaintiffs' was capable of succeeding under some facts. In particular, the court held that, "[i]n order to show that the Caremark directors breached their duty of care by failing adequately to control Caremark's employees, plaintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of . . . ." *Id.* at 971. The court further explained that a "lack of good faith" could be "evidenced by sustained or systematic failure of a director to exercise reasonable oversight." *Id.* at 971.

The court stressed that that test is "demanding" and that the standard for a plaintiff's passing it is "quite high." *Id.* Nevertheless, because *Caremark* acknowledged that such liability

could exist in rare cases, and because courts have continued to cite *Caremark* as accurately stating Delaware law in that regard, the plaintiffs argue that they can establish a substantial risk of director liability "[u]nder *Caremark*." (Doc. No. 48 at 13.) That approach, whether or not it is ultimately successful in this case, is consistent with Delaware law. Indeed, even the Delaware Supreme Court has come to recognize that a "*Caremark* claim" presents a potentially viable route for establishing liability, even if it is one that is "difficult to plead and ultimately to prove out." *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019).

Ultimately, though, the plaintiffs' allegations in this case look much more like the type of accusations that *Caremark* expressly rejected than those that it suggested could succeed. The plaintiffs argue, in essence, that Brookdale's decisions were simply so indefensible, so central to the company's functioning, so readily observable, and so poorly addressed that the directors must have been acting in bad faith and in contravention of their duty of loyalty. That, though, is the kind of reasoning backwards from the substance of the challenged action that *Caremark* expressly warned against.[2] *See id.*; *see also Horman v. Abney*, No. CV 12290-VCS, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and

---

[2] The plaintiffs repeatedly suggest that *Caremark* favors their position in light of the "corporate trauma" that Brookdale has endured. (*See* Doc. No. 48 at 13–14.) That phrase does not appear in *Caremark* itself, but is used in some other cases applying it. *See, e.g., City of Detroit Police & Fire Ret. Sys. on Behalf of NiSource, Inc. v. Hamrock*, No. CV 2021-0370-KSJM, 2022 WL 2387653, at *11 (Del. Ch. June 30, 2022). The court does not find the concept of "corporate trauma" to be particularly illuminating or helpful. After all, *every* shareholder derivative action seeks to obtain redress for some alleged harm to the corporation, and it is not clear to the court when such damages would rise to the level of "trauma" or why that distinction would be significant. What *is* clear, though, is that such ostensible trauma does not negate the high standard set forth in *Caremark*. Indeed, the Caremark corporation, unlike Brookdale, actually pleaded guilty to a felony—which would seem to be traumatic, insofar as an abstract business entity can experience trauma—and the court still found a low likelihood of success and set forth the demanding principles that this court has cited.

14

the board must have known so.") (quoting *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007)).

Moreover, when the Delaware Supreme Court recently refined the demand futility test in into its current form, it emphasized that one of the core purposes of doing so was to "refocus[] the inquiry on the decision regarding the litigation demand, rather than the decision being challenged." *United Food*, 262 A.3d at 1058–59 (citation omitted). It may still be the case that, in select situations, a director's approval of a corporate action that is "inexplicable other than [through] bad faith is sufficiently likely to imply liability that demand on directors taking such action is futile." *Ryan*, 2017 WL 2062902, at *18. That, though, is a high bar—and one that these allegations do not meet. While the plaintiffs have advanced a theory of the case through which these directors' decisions might have been driven by improper considerations, there is at least one other quite plausible alternative explanation: that Brookdale and its directors were earnestly trying to cut costs in the interests of the corporation and its shareholders but pushed that process foolishly, dangerously far. That might be a very good reason to hold Brookdale liable to the people whom it has allegedly hurt. It is not, however, a basis for concluding that individual directors should be liable *to Brookdale*. Delaware law could not be clearer on this point: when corporate directors, acting within their business judgment and in the pursuit of legitimate business objectives, cause a corporation to commit bad acts, it constitutes wrongdoing *of* the corporation, not wrongdoing *to* the corporation. It is the people hurt, not the company that hurt them, who get to cry foul.

The caselaw applying *Caremark* confirms that the plaintiffs' allegations fall short of its demanding requirements. "Bad faith is established, under *Caremark*, when 'the directors completely fail to implement any reporting or information system or controls, or[,] having

implemented such a system or controls, consciously fail to monitor or oversee its operations[,] thus disabling themselves from being informed of risks or problems requiring their attention." *Marchand*, 212 A.3d at 821 (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)) (formatting of original alterations omitted). In other words, it is not sufficient simply to point out that the board's oversight fell short, even disastrously so. Rather, the plaintiff must peer into the actual functioning of the board and identify either (1) a total failure to implement structures of relevant oversight or (2) a conscious decision not to rely on the structures that did exist by at least half of the directors.

If this standard seems like it is asking a plaintiff to know an unusual amount about a company's internal operations before bringing suit, that is because it does. In fact, the Delaware Supreme Court has characterized its *Caremark* caselaw as including, among other things, an "admonishment to seek out relevant books and records and then use[] those books and records to plead facts supporting a fair inference that no reasonable compliance system and protocols were established," rather than simply assuming that that was the case. *Id.* at 824 (citing *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016)). While requiring that degree of internal knowledge of a corporation may pose a considerable obstacle, that challenge reflects the anomalous nature of demand-futile shareholder derivative litigation and the narrow, if necessary, role that such litigation plays in the broader system of corporate regulation and oversight. After all, if a shareholder pursuing derivative litigation does not know enough about the inner workings of a corporation's board to establish that a litigation demand would actually be futile, all he has to do is send a litigation demand and then, if necessary, bring his suit when that demand is actually or constructively denied—as, indeed, some plaintiffs have done with regard to Brookdale.

Particularly problematic for the plaintiffs in this case is their near-total lack of individualized allegations regarding the decisionmaking processes and actions of each director. Delaware law does not permit a plaintiff to "rely on the 'group' accusation mode of pleading demand futility," *In re Citigroup*, 964 A.2d at 121 n.36, and the plaintiffs have identified no reason to think that that principle should have any less force simply because Delaware law is being applied through Federal Rule 23.1. To the contrary, the premise that particularized pleading, as that concept is understood in the Federal Rules, generally requires defendant-specific allegations is well-established. *See, e.g., D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003) (acknowledging the impermissibility of group pleading under the particularity requirement of Rule 9(b)).

As this court has noted before, it is possible to take that principle too far. *See Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 679 (M.D. Tenn. 2022) (Trauger, J.). A particularized pleading requirement is not a requirement that each defendant be subject to a wholly distinct theory of liability or an exclusive set of factual allegations that does not overlap at all with that of the other defendants. Nor is it a prohibition on ever discussing defendants collectively. Nevertheless, a plaintiff must at least plead *something* sufficient to implicate each individual defendant, not simply "the defendants" as an undifferentiated clump. That is particularly clear in a case, such as this one, that requires the court to apply a test that explicitly hinges on tallying up of defendants one by one. The court must be given enough detail to sort the independent directors from the conflicted ones.

Admittedly, the plaintiffs appear to have realized their obligation to engage in individualized pleading and, in an attempt to comply with that obligation, supplemented their general allegations with a number of paragraphs focused on "[a]dditional reasons" why certain

17

individual defendants face a substantial risk of individual liability. (Doc. No. 42 ¶¶ 207–14.) Aside from the paragraph involving Baier, however, these passages consist overwhelmingly of near-boilerplate recitations of unremarkable facts associated with board membership, such as defendants' dates of service and the fact that they were compensated for their work, followed by conclusory assertions of a lack of oversight. If anything, the ostensibly individualized paragraphs highlight the degree to which the plaintiffs do not, for the most part, have director-specific arguments for liability at their disposal. Rather, their arguments largely rise or fall on the degree to which a substantial risk of liability can simply be inferred from Brookdale's overall situation.

One aspect of the supplemental allegations, however, does warrant addressing, even if it is not ultimately sufficient to negate the flaws in the plaintiffs' case. The plaintiffs argue that, even if they have not sufficiently pleaded liability on behalf of each director defendant, they have done so on behalf of the three defendants who were part of Brookdale's Audit Committee: Bromley, Warren, and Wielansky. These arguments at least come closer to the mark. However, merely placing a person on a key committee, without more, is not an individualized allegation of actual liability. "Just as in a general failure of oversight claim," plaintiffs seeking to establish demand futility based on membership on an audit committee "must provide particularized allegations." *In re Coca-Cola Enterprises, Inc. Derivative Litig.*, 478 F. Supp. 2d 1369, 1378 (N.D. Ga. 2007) (citation omitted), *aff'd sub nom. Staehr v. Alm*, 269 F. App'x 888 (11th Cir. 2008). Here, however, the plaintiffs' Audit Committee argument is simply a slightly more targeted version of their argument that culpability can be inferred from the extent, severity, and discoverability of the underlying wrongdoing. As this court has already explained, the courts of Delaware have gone to great lengths to caution that such arguments are not sufficient to establish

18

individual liability on behalf of an exculpated director in all but the most clear-cut cases, which this case is not.

The court therefore holds that the plaintiffs have not sufficiently pleaded that a litigation demand would have been futile based on the defendants' risk of potential liability. The plaintiffs have alleged facts suggesting that Brookdale, which was entrusted with the lives and well-being of a vast population of highly vulnerable people, adopted profit-driven strategies that exposed its residents to unacceptable danger and neglect. The plaintiffs, though, are not suing on behalf of those vulnerable residents. They are investors, seeking to sue on behalf of Brookdale itself, on the premise that Brookdale is in fact among the *victims* of those events. And if they had pleaded facts actually suggesting that the directors departed from the broad discretion afforded to their business judgment by Delaware law or otherwise acted in bad faith, then the plaintiffs might be able to make such a case. Without at least some focus on Brookdale's internal decisionmaking process and the specific actions, interests, and decisions of individual directors, however, they can make no such showing. Accordingly, unless there is some narrower, claim-specific basis for finding a substantial risk of liability, the plaintiffs have failed to make their required showing.

### 2. Section 14(a) of the Exchange Act

"Section 14(a) of the Exchange Act provides [that] '[i]t shall be unlawful for any person . . . in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security.*" Kugelman v. PVF Cap. Corp.*, 972 F. Supp. 2d 993, 997 (N.D. Ohio 2013) (quoting 15 U.S.C. § 78n(a)(1)). That prohibition typically goes hand-in-hand with the implementing regulation regarding false or misleading statements found in 17 C.F.R. § 240.14a-9, which dictates:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a). The plaintiffs assert that at least five of the directors face a substantial risk of personal liability under that rule due to their roles in the preparation of Brookdale proxy statements that included misleading statements or omissions concealing Brookdale's potential liabilities related to its poor staffing and reliance on SAS.

Citation to the Exchange Act, however, does not permit a plaintiff to bypass the Rule 23.1 pleading obligations that are fatal to the plaintiffs' more general arguments. An allegation of individual liability under the Exchange Act requires individualized pleading just as surely as any other derivative claim. *See NiSource*, 2021 WL 877720, at *5. The plaintiffs' group pleading and inferences of director culpability from the general presence of wrongdoing are therefore fatal to establishing demand futility with regard to the Exchange Act.

Once again, the court emphasizes that the issue is not whether Brookdale's actions were acceptable or even lawful. There are numerous bodies of law regulating standards of care, healthcare fraud, consumer protection, and facility licensing that bear directly on the first-order bad acts of which Brookdale has, by now, been so frequently and troublingly accused. The determinative issues in this case, however, involve the internal relationships between Brookdale and its officers and directors. Without facts regarding those relationships that are sufficient to permit the plaintiffs' derivative claims to go forward, even the most serious underlying allegations regarding Brookdale itself are beside the point. The presence of Exchange Act claims does not change that conclusion.

### 3. Common Law Claims

The same general reasoning that the court has already discussed applies with equal force to the plaintiffs' proposed common law causes of action, none of which excuses a lack of more particularized pleading. For example, a plaintiff alleging unjust enrichment by multiple defendants must "allege facts demonstrating that each [d]efendant was enriched, that [the plaintiff] was impoverished, that a relationship existed between those facts, that justification was absent, and that no remedy at law existed." *Taylor v. Kissner*, 893 F. Supp. 2d 659, 674 (D. Del. 2012) (*citing Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)). Similarly, a claim of corporate waste would require pleading of facts sufficient to demonstrate divided loyalties or a total lack of legitimate corporate purpose, and the court has already held that such facts have not been adequately pleaded on an individual basis. *See In re Tivity Health, Inc.*, 414 F. Supp. 3d 1095, 1109 (M.D. Tenn. 2019) (Crenshaw, C.J.) ("[U]nder well-settled Delaware law, directors are only liable for waste when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.") (quoting *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993)). The plaintiffs have not identified any caselaw that would mandate a different result with regard to abuse of control or gross mismanagement, or waste of assets. To the contrary, those seem to be precisely the sort of claims intended to be constrained by the exculpatory clause that, the court has held, the plaintiffs' allegations are insufficient to bypass. *See Respler on Behalf of Magnum Hunter Res. Corp. v. Evans*, 17 F. Supp. 3d 418, 421 (D. Del. 2014) (discussing overlap between breach of fiduciary duty, gross mismanagement, and abuse of control).

21

## D. Material Personal Benefit

The court therefore turns to the question of material benefit from the challenged actions. "Generally, the fact that directors receive customary compensation for their service on the Board does not lead to an inference of a material conflict." *Freedman*, 2012 WL 1345638, at *6 (citing Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 9.02[b][3], at 9–75 n.327 (2011)). A plaintiff can overcome that principle, however, by pleading "particularized facts from which [the court] could infer that [the director's] compensation materially exceeded what is commonly understood and accepted to be a usual and customary director's fee." Id. at *7. The plaintiffs have not pleaded any facts suggesting that the directors' base fees were beyond the realm of usual and customary rates. The issue of material benefit therefore cannot establish demand futility, as a general matter, with regard to each and every decision approved by those directors.

The plaintiffs, however, have also pleaded a narrower, but more persuasive, argument. Specifically, they argue that at least five directors—namely, Baier,[3] Bromley, Bumstead, Freed, Sansone, Johnson-Mills, Warren, and Wielansky—received material personal benefits in connection with the issuance of a September 18, 2019 Schedule 14A Proxy Statement ("2019 Proxy Statement") that forms the basis of some of the plaintiffs' claims.[4] The 2019 Proxy Statement

> called for shareholder approval of, among other things: (1) the election of two directors; (2) the approval of an amendment to the Company's Certificate of Incorporation to facilitate implementation of a majority voting standard for

[3] Baier's lack of independence, as the court has already noted, is uncontested. This argument is therefore superfluous with regard to her.

[4] The plaintiffs also allege a direct material benefit to some directors—specifically, those directors' re-election—in connection with a 2018 Proxy Statement. This argument, though, does not reach enough members of the board, as the benefit at issue is attributed only to Bromley, Johnson-Mills, and Warren—one shy of the four directors needed in addition to Baier. (See Doc. No. 42 ¶ 233.)

22

uncontested elections of directors (the "2019 First Amendment Proposal"); and (3) the approval of the Amended and Restated 2014 Omnibus [Incentive] Plan (the "Plan") which, among other things, would: (i) replenish the number of shares of common stock available to be granted under the plan by 5,400,000, or 2.9% of the Company's outstanding shares of Brookdale common stock as of September 9, 2019; (ii) amend the term of the existing plan from June 5, 2024 to the tenth anniversary of the Annual Meeting; (iii) increase the share limitation on awards granted during any fiscal year from 700,000 to 800,000 for restricted shares, restricted stock units, unrestricted shares, performance awards or other stock-based awards; (iv) subject dividends or dividend equivalents credited with respect to any award granted under the Plan to the same restrictions, conditions and risks of forfeiture as the underlying awards; and (v) subject all equity-based awards granted under the Plan, other than awards representing a maximum of 5% of the shares reserved for issuance under the plan, to a minimum vesting period of at least 12 months following the grant date . . . .

(Doc. No. 42 ¶ 181.)

The plaintiffs argue that the 2019 Proxy Statement was false and/or misleading in three ways: (1) it failed to disclose Brookdale's misconduct; (2) it failed to disclose that Brookdale had not maintained adequate internal controls surrounding the company's advertising and marketing; and (3) it failed to disclose that Brookdale's internal controls for protecting residents and shareholders from misconduct were inadequate. (*Id.* ¶ 182.) For the reasons that the court has already discussed, the plaintiffs have failed to plead a substantial risk of five or more directors' individual liability under that theory with sufficient particularity to support demand futility. The Delaware Supreme Court has been clear, however, that a plaintiff can sufficiently plead demand futility by setting forth individualized facts demonstrating that "the answer to *any of* the" three questions set forth in the three-pronged test "is 'yes'." *United Food*, 262 A.3d at 1059. The first of those questions—before the topic of individual liability is even broached—is "whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand." *Id.* That aspect of the test acknowledges that conflicts of interest can arise

even in the absence of demonstrated individual liability, simply through the economic stake that individuals might have had in the relevant decision.

This argument relies, in particular, on the role of the 2019 Proxy Statement in securing approval of the proposed Omnibus Incentive Plan. The plaintiffs allege that,

> [a]s a result of shareholder approval of the Incentive Proposal, Defendant[] Baier . . . undeservedly received approximately $4,773,420 . . . in performance-based stock awards during the fiscal year ended December 31, 2019; and Defendants Bromley, Bumstead, Sansone, [and] Wielansky, and non-party Freed undeservedly received approximately $99,995 each in stock awards during the fiscal year ended December 31, 2019; and Defendants Johnson-Mills and Warren undeservedly received approximately $41,367 and $24,382, respectively in stock awards during the fiscal year ended December 31, 2019.

(Doc. No. 42 ¶ 205.) In other words, the plaintiffs have pleaded, on an individualized basis and down to the dollar, that eight of the nine directors who considered the litigation demand received direct material benefits in excess of their preexisting fees from the approval of the proposals addressed by the 2019 Proxy Statement.

The defendants nevertheless argue that those payments are not material, because the plaintiffs have failed to "identify any reason why, in the particular circumstances of this case, the [c]ourt should conclude that the compensation package unduly influenced one or more of the directors' decisionmaking." (Doc. No. 47 at 10 (quoting *Ryan*, 2015 WL 1915911, at *8).) The material connection between the complained-of falsehood and the individual monetary windfalls of the defendants is, however, straightforward, at least as long as one keeps one's focus narrowly trained on the 2019 proposals. The payments being approved were, after all, incentives and rewards; the sustainability and wisdom of the company's business model and trajectory were therefore highly relevant. An argument that the 2019 Proxy Statement was false or misleading is therefore unavoidably an argument that the request through which substantial sums of money

were transferred to the director defendants was tainted by impropriety—regardless of whether any particular number of individual directors were specifically acting in bad faith.

Under Delaware law, the plaintiff shareholders were permitted to assume that it would have been futile to ask the Board of Directors to consider litigation that would directly challenge the process by which at least half of those directors received material payments in excess of their ordinary director compensation. That does not mean that a Brookdale shareholder had the right to go directly to court on the company's behalf regarding the full range of actions described in the Verified First Amended Complaint. It does, however, excuse any such demand specifically related to the 2019 Proxy Statement and associated proposals. The court accordingly will not dismiss the plaintiffs' claims in full, and will permit any claims based on that document to go forward.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss Plaintiffs' Verified Consolidated Amended Shareholder Derivative Complaint (Doc. No. 46) will be granted in part and denied in part. The court will dismiss all claims except those based on the 2019 Proxy Statement.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge