| | |
|---|---|
| **BRIAN DAVIS, BRIAN BICKETT, and ROBERT BAZINET,** derivatively on behalf of **BROOKDALE SENIOR LIVING INC.,** <br><br>Plaintiffs, <br><br>v. <br><br>**LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, and LEE S. WIELANSKY,** <br><br>Defendants, <br><br>and <br><br>**BROOKDALE SENIOR LIVING INC.,** a Delaware corporation, <br><br>Nominal Defendant. | Case No. 3:20-cv-0929 <br>Judge Aleta A. Trauger |

## MEMORANDUM

The defendants have filed a Motion for Judgment on the Pleadings (Doc. No. 59), to which the derivative plaintiffs have filed a Response (Doc. No. 70), and the defendants have filed a Reply (Doc. No. 72). The derivative plaintiffs have filed a Motion for Leave to Amend the Consolidated Amended Shareholder Derivative Complaint (Doc. No. 76), to which the defendants and the nominal defendant have filed Responses (Doc. No. 83; Doc. No. 84), and the derivative plaintiffs have filed a Reply (Doc. No. 85). For the reasons set out herein, the Motion

for Judgment on the Pleadings will be granted, and the Motion for Leave to Amend will be denied.

## I. BACKGROUND[1]

Delaware law provides that "[t]he business and affairs of every corporation organized [under the laws of the state] shall be managed by or under the direction of a board of directors . . . ." Del. Code Ann. tit. 8, § 141(a). Pursuant to that rule, "[w]hether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 (1984) (quoting *United Copper Secs. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263 (1917)). Directors, however, do not merely have powers; they also have duties, and sometimes a corporation may have reason to consider suing one or more directors for violating those duties. There are, however, obvious issues with the possibility of a potential defendant's voting on whether or not he himself should be sued.

One mechanism for addressing this problem is to permit what are known as "stockholder (or 'shareholder') derivative actions." Delaware, like other states, recognizes an exception to the usual rule that a corporation's directors control its power to sue. An independent stockholder may bring suit in the name of the corporation in which he owns a stake, if he can establish "either that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or, if no demand was made, that such a demand would [have been] a futile gesture and is therefore excused." *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (citations omitted). The rule that permits stockholder derivative suits only if a litigation demand either was wrongly rejected or

---

[1] Except where otherwise indicated, these facts are taken primarily from the plaintiffs' Verified Consolidated Amended Shareholder Derivative Complaint (Doc. No. 42) and are accepted as true for purposes of the pending motions.

would have been futile—typically referred to as the "demand requirement"— "exists to preserve the primacy of board decisionmaking," *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 808 (Del. Ch. 2009) (citation omitted), while leaving open two narrow paths through which a shareholder of a corporation may seize that responsibility from the directors by "articulat[ing] a reasonable basis" for that shareholder "to be entrusted with a claim that," by right, "belongs to the corporation." *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000). If an investor meets the necessary requirements for one of those two paths, he can rely on the shareholder derivative form to induce the company to sue its own directors—even if the directors have objected or would object.

This case is a stockholder derivative action involving Brookdale Senior Living Inc. ("Brookdale"), a Delaware corporation that is "the largest operator of senior living communities in the United States based on total capacity, with 679 communities in 41 states and the ability to serve more than 60,000 residents as of December 31, 2021." (Doc. No. 42 ¶ 2.) The individual defendants are current and former Brookdale executives and members of its Board of Directors ("Board"). (*Id.* ¶¶ 30–89.) In recent years, Brookdale has faced a number of allegations regarding (1) the quality of its services and (2) the honesty of its and its executives' representations to the public. Several lawsuits have been filed based on those allegations, including the consolidated cases at issue here. (*Id.* ¶¶ 4–19.)

These derivative plaintiffs did not make a litigation demand to the Board. Some other aspiring derivative plaintiffs did, however, and their claims are the subject of another case in this court, *Templin v. Baier*. *See Anders v. Baier*, No. 3:21-CV-0373, 2022 WL 4097332, at *11 (M.D. Tenn. Sept. 7, 2022).[2] In *Templin*, the court held that, although the Board claimed merely to be indefinitely forestalling consideration of those plaintiffs' litigation demands, the Board's

---

[2] "*Anders*" refers to a plaintiff who is no longer part of that case.

3

unjustifiable delays eventually reached a point at which the demand had been constructively refused—and wrongly so, giving rise to a right to sue derivatively. *Id.* at *13.

The plaintiffs in this case wish to rely on the other option for overcoming the demand requirement—establishing that such a demand would have been futile in the first place. (Doc. No. 42 ¶¶ 200–01.) On July 22, 2022, the defendants filed a Motion to Dismiss, in which they argued that the plaintiffs had failed to plead facts sufficient to support demand futility. (Doc. No. 46.) On January 27, 2023, the court granted that motion with regard to the significant majority of the derivative plaintiffs' allegations. (Doc. No. 51.) The court noted that, under Delaware law, the plaintiffs could not establish demand futility based simply on the fact that board members would be deciding whether or not to sue themselves. Rather, the defendants would need to establish that at least five of the nine Directors who had served on the Board during the relevant time period "lacked independence" for the purposes of the litigation, as that concept was understood under Delaware law. (Doc. No. 50 at 8.) The court noted that the bar for such a showing under Delaware law is high, particularly when the relevant corporate charter contains a so-called "exculpatory clause" protecting directors from most liability, as Brookdale's did. (*Id.* at 9–11.) The court examined the pleaded facts and concluded that the derivative plaintiffs had, for the most part, failed to meet Delaware's high standard for demonstrating demand futility. (*Id.* at 11–23.)

The court noted, however, that there was one aspect of the plaintiffs' allegations that, although it had received only limited attention in either the Verified Consolidated Amended Shareholder Derivative Complaint or the parties' briefing, called for a different analysis. The court noted that, in addition to the derivative plaintiffs' more general allegations of a lack of independence, they had also alleged that a majority of the Directors had "received material

4

personal benefits in connection with the issuance of a September 18, 2019 Schedule 14A Proxy Statement ('2019 Proxy Statement') that forms the basis of some of the plaintiffs' claims." (*Id.* at 22.) Delaware law recognizes that a derivative plaintiff can establish a director's lack of independence in connection with a certain decision based on that director's "material personal benefit" from the decision itself, even if the director is protected from liability by an exculpatory clause. *See United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021). Accordingly, the court held that the plaintiffs had sufficiently pleaded demand futility with regard to claims based on the 2019 Proxy Statement, but the court dismissed all other claims on the ground that the plaintiffs should have made a litigation demand, as the plaintiffs in the Templin matter did. (Doc. No. 50 at 25.)

At the time that the court made its ruling, it was relying on the plaintiffs' characterization of the 2019 Proxy Statement in their Verified Consolidated Amended Shareholder Derivative Complaint. After the court issued its opinion, however, the defendants filed their Answer, to which they appended the 2019 Proxy Statement itself. (Doc. No. 57; Doc. No. 57-1.) The defendants maintain that that attachment, not the plaintiffs' description, should guide the court's understanding of the 2019 Proxy Statement's substance and import, on the ground that it is "well settled that a written instrument controls over conflicting allegations in a complaint." (Doc. No. 60 at 1.) The derivative plaintiffs do not dispute the accuracy of the appended 2019 Proxy Statement or the general rule that an actual appended document controls over a party's pleaded description of it. *See Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (collecting cases).

On March 8, 2023, the defendants filed a Motion for Judgment on the Pleadings directed at the only claims still pending: those based on the 2019 Proxy Statement. (Doc. No. 59.) The

5

defendants argue that "the plain terms of the 2019 Proxy [Statement] unequivocally show that the supposed material personal benefits [that the derivative plaintiffs] rely on . . . did not result (and could not have resulted) from the issuance of the 2019 Proxy." (Doc. No. 60 at 1.) In the alternative, they argue that, even if the 2019 Proxy Statement provides a basis for filing stockholder derivative claims, the derivative plaintiffs have failed to state any actual claim based on that statement. (*Id.*)

On August 4, 2023, the derivative plaintiffs filed a Motion for Leave to Amend the Consolidated Amended Shareholder Derivative Complaint. (Doc. No. 76.) They seek to make two sets of amendments, the first of which would "provide updated and corrected compensation information related to Plaintiffs' damages arising from their proxy claim pursuant to Section 14(a) of the Securities and Exchange Act of 1934." (*Id*. at 2.) The second request for leave to amend, however, is far more akin to a motion to reconsider. Specifically, the plaintiffs state that they wish to "reassert previously dismissed claims and allege that demand was futile based on this Court's ruling in" *Templin*. (*Id*. at 2.)

## II. LEGAL STANDARD

### A. Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that, if a party can no longer amend its pleading as a matter of course (under Rule 15(a)(1)), it "may amend its pleading only with the opposing party's written consent or the court's leave." Rule 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires." The Sixth Circuit interprets this rule as embodying a "liberal amendment policy." *Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) (quoting Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002)). Denial may nonetheless be appropriate when there is "undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## B. Motion for Judgment on the Pleadings

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). A motion under Rule 12(c) differs from a motion to dismiss, however, in that a Rule 12(b)(6) motion is focused entirely on the complaint, whereas a Rule 12(c) motion can only be filed "[a]fter the pleadings are closed," Fed. R. 12(c), which permits the court to look to allegations, admissions, or other materials in the answer, as necessary.

In deciding a motion to dismiss or motion for judgment on the pleadings, the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court's evaluation of the sufficiency of those facts depends on the applicable pleading standard. Most ordinary civil claims are governed by the relatively forgiving requirements of Rule 8. Shareholder derivative actions, however, are subject to the more demanding pleading standard of Rule 23.1(b), which requires that the complaint:

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

7

> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>
> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1; *see McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001).

### III. ANALYSIS

#### A. Attempt to Revive Dismissed Claims

A derivative plaintiff's compliance with the demand requirement is based on the facts "at the time the plaintiff brought the complaint." *Freedman v. Adams*, No. CIV.A. 4199-VCN, 2012 WL 1345638, at *6 (Del. Ch. Mar. 30, 2012) (citing *In re Tyson Foods, Inc.*, 919 A.2d 563, 582 (Del. Ch. 2007)). Because the court had not issued its opinion regarding the demand requirement in *Templin* when these plaintiffs initiated their case, that ruling is irrelevant to the demand futility analysis. This is not a situation in which a later-arising case signaled a change in the law favoring a party that had previously lost a motion on the same issue. *Templin* was non-precedential and, in any event, did not involve the same legal question at issue here. The plaintiffs wish to rely on the *Templin* opinion, not as a precedent, but as a fact supporting demand futility. The court's ruling in *Templin*, however, had not occurred at the time that these plaintiffs asserted their supposed right to bypass the demand requirement. The court could deny the request for leave to revive the derivative plaintiffs' dismissed claims on that basis alone.

The court could also deny this request based solely on the plaintiffs' unreasonable delays. The court issued its opinion in *Templin* before it dismissed these plaintiffs' claims. If the plaintiffs believed that *Templin* changed the calculus with regard to these claims, they could have raised the argument in their Response, which had not yet been filed when *Templin* was issued. The plaintiffs, however, mentioned *Templin* only briefly, without any discussion of the court's

8

ruling therein. Then, when the court dismissed most of these plaintiffs' claims, the plaintiffs could have sought reconsideration or amendment based on *Templin* immediately. Instead, they waited for several months and for the defendants to file and brief a Motion for Judgment on the Pleadings.

Even aside from those issues, though, the plaintiffs' reading of *Templin* and its bearing on the question of demand futility is unconvincing. The court held, in *Templin*, that the Board wrongly constructively denied those derivative plaintiffs' litigation demands. The court did not, however, hold that such a demand would have been futile as a matter of law. At most, *Templin* might be evidence of potential futility, if it had pre-dated these plaintiffs' filing, which it did not. Even then, though, the court would need to consider the specific facts of the situation as a whole; the court could not simply assume that one holding mandated the other.

In any event, *Templin* did not precede these consolidated plaintiffs' filing of their initial complaints—in large part because the plaintiffs in *Templin* were busy trying to satisfy the requirement that these plaintiffs skipped. The court's rationale for dismissing most of the claims in this case, based on the plaintiffs' failure to perform a procedurally mandatory step prior to filing, is unaffected by the court's decision not to dismiss the claims of other derivative plaintiffs who did perform that mandatory step. This aspect of the plaintiffs' request will be denied.

### B. 2019 Proxy Statement

The derivative plaintiffs' other proposed amendments and the defendants' Motion to Dismiss focus on the same basic issue: whether the derivative plaintiffs have stated, or can state, actionable claims arising out of the only basis for recovery that remains before the court—the 2019 Proxy Statement. The court, therefore, will consider those requests together.

9

Under Delaware law, "[e]ach stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing . . . may authorize another person or persons to act for such stockholder by proxy . . . ." Del. Code Ann. tit. 8, § 212(b). Proxy authority is often affirmatively solicited by a company's management in connection with efforts to obtain the approval or rejection of specific corporate proposals, *see J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S. Ct. 1555, 12 L.Ed.2d 423 (1964), although other people and groups can use the proxy solicitations as well, *see* 17 C.F.R. § 240.14a-101. Proxy solicitations must be truthful and non-misleading; otherwise, they risk running afoul of Section 14(a) of the Exchange Act, which Congress enacted to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Borak*, 377 U.S. at 431.

The 2019 Proxy Statement began with an introductory letter to stockholders by defendant Lee Wielansky in his capacity as Chair of the Board. (Doc. No. 57-1 at 4.) The solicitation covered seven topics slated to be at issue in the next stockholder meeting, at least two of which involved issues of compensation. (*Id.* at 5.) Item 3 called on shareholders to "approve, on an advisory basis, the Company's named executive officer compensation," and Item 7 called on them to "approve the Amended and Restated Brookdale Senior Living Inc. 2014 Omnibus Incentive Plan." (*Id.*) The parties appear to agree that only the second of those two topics, the Incentive Plan, affected a high enough number of directors to potentially support demand futility.

As the court has already noted, demand is excused, under Delaware law, if a majority of directors received a "material personal benefit" from the action that would be the subject of proposed litigation. Not all director compensation, however, is a "material personal benefit" for these purposes. Delaware courts, rather, typically require that the director compensation at issue

10

"materially exceed[] what is commonly understood and accepted to be a usual and customary director's fee" in order to justify demand futility. *Freedman v. Adams*, No. CIV.A. 4199-VCN, 2012 WL 1345638, at *7 (Del. Ch. Mar. 30, 2012).

The derivative plaintiffs do not dispute that general rule, but they argue that the incentive payments made possible by the 2019 Proxy Statement should be considered differently "because all amounts could be received as stock options." (Doc. No. 70 at 7.) The plaintiffs point out that the Delaware Court of Chancery has suggested that, if a derivative plaintiff "alleg[es] that each of the members of the . . . board has a financial interest in [a] challenged option plan," then that allegation will generally be sufficient to "create a reasonable [doubt] as to whether the . . . board is independent and disinterested" with regard to that plan. *London v. Tyrrell*, No. CIV.A. 3321-CC, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008) (quoting *Byrne v. Lord*, No. CIV.A. 14040, 1995 WL 684868, at *4 (Del. Ch. Nov. 9, 1995)). The court explained that, "[a]lthough the general rule holds that 'demand is not excused simply because directors receive compensation from the company or an executive of the company,' the receipt of stock options is different," due to the "'strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue [the directors'] current holdings or cause them to disgorge improperly obtained profits.'" *Id.* at *5 (quoting *Weiss v. Swanson*, 948 A.2d 433, 448 (Del. Ch. 2008); *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007)).

Before the court can consider this issue on the merits, it must first address the procedural posture through which the derivative plaintiffs' arguments in favor of demand futility have arisen. In the plaintiffs' briefing for the two pending motions, they have provided a detailed, in-depth discussion of why, in their view, the director defendants cannot be treated as disinterested in connection with the 2019 Proxy Statement. The actual discussion of the 2019 Proxy Statement

11

in the currently operative Verified Consolidated Amended Shareholder Derivative Complaint, however, is both decidedly more cursory and, the derivative plaintiffs now admit, factually incorrect. The plaintiffs explain that they originally "mistakenly allege[d] that payments made in 2019 to many directors w[ere] pursuant to the" incentive plan approved through the 2019 Proxy Statement, which, they now concede, was not the case. (Doc. No. 70 at 15.) They argue, however, that they should now be permitted to amend their allegations to reflect the truth—that a majority of the directors did benefit from the 2019 approval, but did so only through later payments starting in 2020. (*Id.*)

It is not uncommon for a plaintiff to need to correct a technical detail like this one after realizing that a financial or corporate matter was more complex than he originally imagined. The plaintiffs' initial failure to allege these facts correctly, however, highlights the reality that this case, as originally filed, was about something far different from a narrow set of claims associated with one proxy solicitation. It is only now, after the plaintiffs have seen most of their claims dismissed, that they are refashioning the 2019 proxy-related allegations, which originally took up only a few paragraphs of the Complaint, to play a much more prominent role. Changing the focus of the case so drastically, years after it was filed, would undoubtedly prejudice the defendants. Moreover, the plaintiffs' delay in seeking leave to amend, while less striking with regard to this set of issues than with regard to their attempt to revive their claims in full, was still unjustified. The equities, therefore, weigh more strongly against amendment in this instance than they would in a case in which plaintiffs merely sought to make technical corrections to their description of a financial transaction.

Nevertheless, the court will consider the viability of the proposed amendment on the merits. The defendants argue that, while the plaintiffs are correct to admit the error in their initial

allegations, they are merely seeking to replace one mischaracterization with another, because the "plain text of the 2019 Proxy shows that the Proxy did not solicit shareholder votes to authorize or approve any awards of stock to anyone." (Doc. No. 83 at 7.) Rather, they explain, the statement "simply solicited votes to amend the 2014 Omnibus Incentive Plan . . . to add to the pool of shares available under the Plan for possible future awards to any of Brookdale's employees, directors or consultants." (*Id.* at 17.)

> As the 2019 Proxy Statement explained:
>
> The Existing 2014 Plan reserved for issuance a number of shares of our common stock . . . . As of September 9, 2019 (the record date of the Annual Meeting), 5,357,369 shares of . . . common stock remained available for issuance with respect to future awards under the Existing 2014 Plan. It is unlikely that such number of shares will be sufficient to complete our full annual equity compensation award cycle beyond 2020 in accordance with our current equity compensation practices. We therefore are requesting that our stockholders vote to approve the Amended and Restated 2014 Plan, which will reserve for issuance an additional 5,400,000 shares of our common stock. If stockholders approve the Amended and Restated 2014 Plan, approximately 10,757,369 shares of our common stock will be available for awards, plus any additional shares that become available for reuse under the terms of the Amended and Restated 2014 Plan due to forfeitures, surrenders or cancellations of any of the 7,553,376 restricted stock and RSU awards outstanding thereunder as of September 9, 2019. The proposed 5,400,000 additional shares, which represent 2.9% of the outstanding shares of our common stock (excluding outstanding unvested restricted shares) as of September 9, 2019, are expected to allow us to make our full annual equity compensation awards under the Amended and Restated 2014 Plan for approximately three years under our current equity compensation practices.

(Doc. No. 57-1 at 79.) In other words, the proposed amendment would make the future issuance of stock options possible beyond the point at which the existing pool of shares would have run dry, but it did not entitle anyone to any particular award. Rather, the company would merely replenish the shares available. The actual granting of stock options would be performed

13

separately by the Board's Compensation Committee as part of its administration of the incentive plan.³ (*See* Doc. No. 57-1 at 80–81.)

The plaintiffs respond that the addition of shares to the incentive plan's pool had the actual effect of permitting the director defendants to receive greater stock options in 2020 and beyond. At this stage in the proceedings, the court must treat that allegation as true. The plaintiffs' allegations, however, do nothing to change the fact that awarding stock options and increasing the amount of stock options potentially available in the future are two qualitatively different things. The rule recognized by Delaware Court of Chancery provides that the particular balance of incentives associated with *actually awarding* stock options may permit a court to depart from the usual rule that director compensation will only support demand futility if it is in excess of ordinary practice. *See Ausikaitis ex rel. Masimo Corp. v. Kiani*, 962 F. Supp. 2d 661, 676 (D. Del. 2013) (stating that the rule applies "[w]hen a director receives challenged stock options"). A decision that merely makes the award of future stock options under a preexisting plan more likely or potentially more generous, however, is distinct from the approval of an option plan itself. The plaintiffs have identified no authority suggesting that an exception to the ordinary approach for determining demand futility would apply to that situation. Any exception, insofar as there is one, is directed at actual "stock option grants." *Warhanek v. Bidzos*, No. CV 12-263-RGA-SRF, 2013 WL 5273112, at *7 (D. Del. Sept. 18, 2013).

Decisions applying Delaware's rule largely confirm that it is not a blanket exception from the usual "material personal benefit" standard, available any time stock options are implicated by a decision. Rather, Delaware courts have continued to look closely at the specific actions at issue to determine whether the award was potentially problematic because, for example, the "directors

---

³ As the plaintiffs point out, the proposed amendments did make some other changes, as well. (Doc. No. 70 at 3–4.) None of those other changes, however, represented an actual award of stock options.

granted options that violated an express restriction in a stockholder-approved plan" and/or the directors "manipulated the fair market valuation underlying the option awards and used an exercise price that was lower than the minimum requirement of fair market value." *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 332 (Del. Ch. 2022); *In re Ebix, Inc. Stockholder Litig.*, No. CIV.A. 8526-VCN, 2014 WL 3696655, at *21 (Del. Ch. July 24, 2014); *see also Quadrant Structured Prod. Co., Ltd. v. Vertin*, No. CIV.A. 6990-VCL, 2014 WL 5465535, at *3 n.4 (Del. Ch. Oct. 28, 2014). These cases suggest that it was not the intention of the Delaware Court of Chancery to set one rule for stockholder derivative actions unrelated to stock options and an entirely different, much less demanding rule for actions in which such options are implicated. Rather, the details and context of a decision related to stock options are part of "the circumstances surrounding the disputed award" that may bear on the court's consideration. *In re Ebix, Inc.Stockholder Litig.*, 2014 WL 3696655, at *21. Sometimes, particularly with regard to lawsuits directed at the actual awarding of stock options, the details and context of the decision will be enough to establish demand futility, in and of themselves. It does not, however, appear that that will necessarily always be the case with every stock option-related decision or lawsuit.

That does not mean that a decision to increase the pool of available shares for future stock option grants is incapable of supporting a finding of material personal benefit for demand futility purposes. Rather, such a decision is simply subject to the same test that every other decision regarding policies related to director compensation is: if it materially departs from ordinary, customary practice in the director's favor, then that departure may demonstrate a lack of disinterestedness. The plaintiffs, however, have not provided any evidence sufficient to conclude that merely replenishing the pool, in and of itself, involved any departure from usual and customary practice.

15

In response to the defendants' arguments, the plaintiffs try to establish a material personal benefit by pointing to the amounts of the directors' incentive payments in 2020, 2021, 2022, and 2023. At most, though, those amounts would support an exception to the demand requirement for a lawsuit challenging those actual awards—not a lawsuit about allegedly false or misleading statements in a proxy solicitation that sought approval for replenishing the stock pool from which those later awards were ultimately made. Moreover, there is little evidence that those amounts departed significantly from ordinary corporate practice.

The likely futility of the proposed amendment, combined with the plaintiffs' considerable delays, their initial failure to get these facts straight in the first place, and the potential prejudice to the defendants all support denial of leave to amend. This case was initiated over three years ago and was broadly focused on a wide array of alleged wrongdoing at Brookdale, of which the 2019 Proxy Statement was but one small part—a part so seemingly inconsequential that the plaintiffs failed to even really understand it until every other aspect of their case had failed. The defendants have now expended considerable resources on this case and will have to expend more in connection with the claims filed by stockholders who, unlike these, did take efforts to comply with the demand requirement. The interests of justice would not be served by permitting the plaintiffs to resurrect this matter as an almost entirely different case—focused on a single document—than the case they actually brought and which the defendants have been litigating for years. The court, accordingly, will not permit an amendment.

What is left, then, are claims in the Verified Consolidated Amended Shareholder Derivative Complaint based on allegations that the plaintiffs now admit are false. The plaintiffs argue that the court should nevertheless let those claims proceed under the law-of-the-case

doctrine, given that the court declined to dismiss them once.[4] The question under consideration, however, is similar but not the same. The court's earlier decision involved a Rule 12(b)(6) motion and, therefore, was based solely on the Complaint. The defendants have now filed a motion pursuant to Rule 12(c), which permits the court to consider not only the complaint but also the answers. In most cases, that would not make much difference, because the party opposing a Rule 12(c) motion is entitled to have the allegations of his pleading treated as true, even if they conflict with another pleading or pleadings. In this instance, however, the defendants' Answer did not merely contradict the Complaint; it added undisputed substance and context to the Complaint by providing the court with the 2019 Proxy Statement itself, which the court can take judicial notice of because of its having been mentioned by the plaintiffs in their own pleadings. There is nothing inconsistent about concluding that the plaintiffs' claims were viable based on their paraphrasing of the 2019 Proxy Statement, but then concluding otherwise once the statement itself became available and the plaintiffs conceded that their characterization was incorrect.

In any event, even if the law of the case doctrine did potentially reach this situation, it would be within the court's discretion whether to apply it, and the court would not. *See In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case.") (citing *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004); *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)). The amendment that the plaintiffs seek

---

[4] "The law-of-the-case doctrine precludes reconsideration of a previously-decided issue at a subsequent stage in the litigation 'unless one of three exceptional circumstances exists: [1] the evidence in a subsequent trial was substantially different; [2] controlling authority has since made a contrary decision of law applicable to such issues; or [3] the decision was clearly erroneous, and would work a substantial injustice.'" *J.L. Spoons, Inc. v. Ohio Dep't of Pub. Safety*, 509 F. App'x 464, 469 (6th Cir. 2012) (quoting Poundstone v. Patriot Coal Co., 485 F.3d 891, 895 (6th Cir. 2007)).

is untimely, prejudicial, and likely futile, and, without that amendment, any claim they have stated in connection with the 2019 Proxy Statement is not plausible, because the pleaded allegations contradict the document on which they are premised. The defendants, therefore, are entitled to judgment on the pleadings with regard to the remaining claims.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Judgment on the Pleadings (Doc. No. 59) will be granted, and the derivative plaintiffs' Motion for Leave to Amend the Consolidated Amended Shareholder Derivative Complaint (Doc. No. 76) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge